## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **WOOD DEVELOPMENT, LLP,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO. 04-12590DPW** |
| **V.** | ) | |
| | ) | |
| **PHILADELPHIA INDEMNITY** | ) | |
| **INSURANCE CO.,** | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Now comes the Defendant Philadelphia Indemnity Insurance Company and moves this Honorable Court for Summary Judgment against Plaintiff Wood Development, LLP pursuant to Rule 56(a) of the Federal Rules of Civil Procedure. As grounds for this Motion, the Defendant states that there are no genuine issues as to any material facts and that the Defendant is entitled to judgment as a matter of law.

In further support, the Plaintiffs respectfully refer this Honorable Court to the concurrently filed *Memorandum of Law in Support of Defendant's Motion for Summary Judgment; Defendant's Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment pursuant to Rule 56.1; and Exhibits attached thereto.*

## RULE 7.1 CERTIFICATION

Pursuant to Local Rule 7.1, counsel for the Defendant conferred in good faith with counsel for Plaintiff before filing this Motion. The parties were unable to resolve or narrow the issues presented by this Motion.

## REQUEST FOR ORAL ARGUMENT

The Defendant hereby requests oral argument, as the Defendant believes that oral arguments would assist and be beneficial to the Court.

WHEREFORE, the Defendant respectfully requests that this Honorable Court

**ALLOW** this Motion for Summary Judgment in favor of the Defendant.

**CERTIFICATE OF SERVICE**
I hereby certify that this document(s) filed
through the ECF system will be sent
electronically to the registered participants as
identified on the Notice of Electronic filing
(NEF) and paper copies will be sent to those
indicated as non-registered participants on
January 31, 2006.

**DATED:  January 31, 2006**

**DEFENDANT PHILADELPHIA
INSURANCE COMPANY**
**By its Attorneys,**

Robert J. Murphy BBO# 363760
Joel D. Hillygus BBO# 657119
**MURPHY & RILEY, P.C.**
**141 Tremont Street**
**Boston, MA  02111**
**(617) 423-3700**

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **WOOD DEVELOPMENT, LLP,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO. 04-12590DPW** |
| **V.** | ) | |
| | ) | |
| **PHILADELPHIA INDEMNITY** | ) | |
| **INSURANCE CO.,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The Plaintiff, Wood Development, LLP ("Wood"), has brought this first-party insurance coverage action to determine its rights under a policy of insurance issued to it by Defendant, Philadelphia Indemnity Insurance Company ("PIIC"). Wood alleges that PIIC has a contractual obligation under the policy to pay for a first-party loss sustained by Wood on or about January 9, 2004 (Count I-Contract). PIIC denies such an obligation and seeks Summary Judgment on Wood's Complaint. PIIC seeks Summary Judgment on Count II of the Complaint (M.G.L. c. 93A) to the extent that a finding for PIIC on Count I would necessitate a judgment for PIIC on Count II.[1]

### FACTS

On or about June 1, 2003, Wood purchased a commercial development at 45 North Main Street in Fall River, Massachusetts (the "Property"). (*Exhibit A – Deposition of Martin Wood, p. 49, lines 20-21*). It also acquired the rights to the commercial lease for a portion of the Property entered into between Forty Five North Main LLC and Wilson Credit Services, LLC ("Wilson

---

[1] The parties have agreed to stay substantive discovery on Count II pending resolution of Count I.

1

Credit").[2] *(Exhibit A – Deposition of Martin Wood, p. 43, lines 11-15).* (the "Lease" is attached as *Exhibit B*). Following acquisition of the Lease by Wood, Wilson Credit remained a tenant at the Property pursuant to the terms of the Lease.

## A.    The Lease

The Lease commenced on June 1, 2002. *(Exhibit B - Lease).* As inducement to the original landlord to enter into the Lease with Wilson Credit, Consolidation USA, Inc. and Consolidation USA II, Inc. agreed to a guaranty of the Lease for the initial year. *(Exhibit B - Lease).* It is a generally accepted practice in the commercial real estate field to require a guarantor where the tenant is not financially stable and none of the other tenants at the Property required a guarantor. *(Exhibit A – Deposition of Martin Wood, p. 45, lines 19-21 and p. 46, lines 3-6).* Wood performed a due diligence and reviewed the Lease prior to obtaining the Property. *(Exhibit A – Deposition of Martin Wood, p. 35, lines 2-6).*

Section 8.3.1 of the Lease sets forth the respective obligations of the parties with regard to heat for the Property:

> 8.3.1.  Landlord, at its expense, shall:  (i) furnish heat to the premises, the cost of such heat to be paid for by the Tenant; and (ii) cause the common areas of the Building to be cleaned on business days (except on Saturdays).

Section 17.2 of the Lease sets forth the landlord's ability to access the Property:

> Tenant shall: . . . (ii) upon reasonable advance notice permit Landlord and any mortgagee of the Building or the Building and land or of the interest of the Landlord therein, and their representatives, to have reasonable access to and to enter upon the premises at all reasonable hours for the purposes of inspection or of making repairs, or of complying with all laws, orders and requirements of governmental or other authorities, or of exercising any right reserved to Landlord by this Lease . . . . If Tenant shall not be personally present to open and permit entry into the premises at any time permissible, Landlord or Landlord's agents

---

[2] The lease was for a portion of the commercial property with an address of 25 North Main Street in Fall River, Massachusetts.

may enter the same by a master key, or may forcibly enter the same, without rendering Landlord or such agents liable therefore (if during such entry Landlord or Landlord's agents shall accord reasonable care to Tenant's property) and without in any manner affecting the obligations and covenants of this Lease.

**B.    The PIIC Policy**

Subsequent to the acquisition of the Property, PIIC issued Policy No. PHI-PHPK052406 to Martin Wood as the general partner of Wood Development, LLP (the "Policy"). *(Exhibit C – PIIC Policy).* The Policy was effective June 10, 2003 to June 10, 2004 and provided first-party coverage for the Property. The Policy contains the following exclusion:

> 2.    We will not pay for "loss" caused by or resulting from any of the following:
>
>> f.    Water, other liquids, powder, or molten material that leaks or flows from plumbing, heating, air-conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:
>>
>>> (1)    You do your best to maintain heat in the "buildings"; or
>>> (2)    You drain the equipment and shut off the supply if the heat is not maintained.

**C.    The Loss**

By letter dated May 7, 2003, Consolidation USA, Inc. and Consolidation USA II, Inc., the guarantors of the Lease, retained Debt Management, Inc. to "establish Wilson Credit Services, LLC as a financially viable collection agency." *(Exhibit D – May 7, 2003 Letter).* The letter noted that Wilson Credit was "unable to pay its bills as they become due" and was "presently insolvent." Wood reviewed this letter as part of its due diligence before purchasing the Property. *(Exhibit A – Deposition of Martin Wood, p. 203, line 20 to p. 204, line 5).*

At the time that Wood acquired the Property in June 2003, it was concerned about the financial stability of Wilson Credit based on the expiration of the guaranty of the Lease and it

3

sought to extend the guaranty. (*Exhibit A – Deposition of Martin Wood, p. 51, lines 11-19*). The failure of the guarantors to extend the guaranty despite extensive phone inquiries and failed promises to do so caused further concerns regarding the creditworthiness of Wilson Credit. (*Exhibit A – Deposition of Martin Wood, p. 58, lines 7-13*). Beginning in July 2003, the monthly rent due from Wilson Credit was paid on an increasingly late basis. (*Exhibit A – Deposition of Martin Wood, p. 80, line 18 to p. 82, line 6*). The November 2003 rent was not paid until the middle of December and the December 2003 rent was never paid despite being due on December 1, 2003. (*Exhibit A – Deposition of Martin Wood, p. 97, line 3 to p. 98, line 9*). Moreover, the rent was paid by entities other than Wilson Credit that had no obligation to make such payments.[3] (*Exhibit A – Deposition of Martin Wood, p. 85, lines 2-4*).

Beginning in September 2003, Wood made numerous requests to obtain a key to the premises occupied by Wilson Credit. (*Exhibit A – Deposition of Martin Wood, p. 105, line 17 to p. 106, line2*). As the outside temperatures decreased, Wood's requests for a key increased. (*Exhibit A – Deposition of Martin Wood, p. 107, lines 15-19*). Wood was concerned as to whether heat was being maintained to the premises and wanted to independently verify that fact. (*Exhibit A – Deposition of Martin Wood, p. 101, lines 2-4*).

In November 2003, Wood consulted an attorney regarding the removal of Wilson Credit from the premises. (*Exhibit A – Deposition of Martin Wood, p. 90, lines 3-11*). In December 2003, there were no lights on at the premises occupied by Wilson Credit and its parking spaces were not being utilized. (*Exhibit A – Deposition of Martin Wood, p. 103, line 1 to p. 104, line 5*). Wood concluded around Christmas 2003 that Wilson Credit was not working in the space. (*Exhibit A – Deposition of Martin Wood, p. 124, lines 5-17*).

---

[3] Although the Lease was assigned from Wilson Credit to Consolidation USA based on a failure to pay a promissory note, Consolidation USA had no obligation to make the lease payments. *(Exhibit F – Lease Assignment)*.

4

On January 9, 2004, Wood obtained a key for the Wilson Credit offices by mail and entered the premises. (*Exhibit A – Deposition of Martin Wood, p. 184, line 13*). Upon entering the vacated premises, it was discovered that plumbing had frozen and burst, resulting in extensive water damage to the Property. Wood subsequently learned that heat had been shut off to the premises on December 31, 2003 for nonpayment of the gas bill. (*Exhibit A – Deposition of Martin Wood, p. 151, lines 5-23*). Prior to the discovery of the loss, Wood had been advised by its property manager that, due to concerns about freezing and other maintenance issues, access should be gained by force if the key was not obtained in short order. *(Exhibit E – Deposition of James Karam, p. 26, line 13 to p. 27, line 3).*

Wood has agreed that it had the ability to put the gas utility in its name and that this action would have ensured that heat was supplied to the premises. (*Exhibit A – Deposition of Martin Wood, p. 119, line 24 to p. 120, line 11*). In fact, Wood had no difficulty in switching the gas to its name following the loss. (*Exhibit A – Deposition of Martin Wood, p. 134, line 1 to p. 135, line 1*). The utility also put a notation on the account following the loss to notify the owner, Wood, prior to disconnecting the utilities. (*Exhibit A – Deposition of Martin Wood, p. 151, line 23 to p. 153, line 21*). Wood has also agreed that a locksmith could have been utilized to gain access to the Property. (*Exhibit A – Deposition of Martin Wood, p. 191, lines 2-5*).

PIIC received notice of the loss on January 21, 2004 and, following an investigation of the circumstances surrounding the loss and the extent of damages, denied coverage for the loss by letter dated April 30, 2004. *(Exhibit G – Denial of Coverage Letter).* The denial was based on Wood's failure to maintain heat to the premises despite an express contractual obligation to do so.

## ARGUMENT

## I.  SUMMARY JUDGMENT STANDARD.

Summary Judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); Mass. Mut. Life Ins. Co. v. Fraidowitz, 360 F. Supp. 2d 243, 246 (D. Mass. 2005).[4]

## II.  PLAINTIFF REQUIRED TO USE REASONABLE EFFORTS TO MAINTAIN HEAT AT PROPERTY

Defendant is not aware of any Massachusetts case law interpreting the freezing exclusion at issue here as to the requirement that the insured utilize its "best" efforts to maintain heat. However, other jurisdictions have concluded that the phrase "do your best" in a policy is unambiguous and has a clear and unmistakable meaning. See Goldman & Sons v. Hanover Ins. Co., 607 N.E.2d 792 (N.Y. 1992). Other Courts have held that the insured must use "diligent efforts" or "reasonable efforts" under the circumstances. Kahler, Inc. v. Weiss, 539 N.W.2d 86, 91 (SD 1995); Auto-Owners Ins. Co. v. Hansen Housing, Inc., 604 N.W.2d 504, 512 (SD 2000); Coady Corp. v. Toyota Motor Distributors, Inc., 361 F.3d 50, 59 (1st Cir.2004)(finding that "best efforts" is implicitly qualified by a reasonableness test). Even under the lower threshold, Wood did not do its best under the circumstances to maintain heat at the Property.

In a strikingly similar fact pattern, the Court in McCartney v. Pawtucket Mut. Ins. Co., 1994 Conn. Super. LEXIS 3293, held that a homeowner did not even exercise reasonable efforts

---

[4] Massachusetts law governs this dispute because the forum's choice of law rules govern Federal courts sitting in diversity, and Massachusetts courts take a flexible interest approach to conflict of laws. See Millipore Corp. v. The Travelers Indemnity. Co., 115 F.3d 21, 29-30 (1st Cir. 1997). As the Insureds' risk was located in Massachusetts, Massachusetts substantive law should apply. Id. at 30-31.

in preventing damage from frozen water pipes. In <u>McCartney</u>, the homeowner became concerned in December 1991 about the supply of heating oil in her vacant house. In an attempt to have the supply checked, she telephoned a real estate agent and a heating oil company to no avail as the tanks were inside the locked house. In January 1992, the fuel supply was exhausted. On January 23, 1992, a neighbor entered the home after the homeowner had mailed the keys to him. He discovered that water had frozen in the pipes, causing them to rupture and resulting in extensive water damage.

The <u>McCartney</u> Court interpreted an exclusion that required the insured to use reasonable care to maintain heat in the building. The Court found that the cold temperatures during the months of December and January required the homeowner to maintain oil in the tanks in order to facilitate heat to the house. Accordingly, the Court upheld the exclusion as the insured did not use reasonable care in maintaining heat. See also <u>Evangilista v. Hingham Mut. Fire Ins. Co.</u>, 19 Mass. L. Rep. 105 (2005)(Frigid temperatures would have alerted a reasonable person to check a vacant home for heat).

Based on a similar fact pattern, Wood did not even use reasonable care in maintaining heat to the premises. Wood certainly did not use its best efforts to do so.

## III.    THE PLAINTIFF FAILED TO DO ITS BEST UNDER THE CIRCUMSTANCES TO MAINTAIN HEAT

The cause of the loss to the Property is undisputed as is the conclusion that the loss is the type of direct physical loss covered under the Policy absent the application of a policy exclusion contained in the "Ultimate Cover Program, Causes of Loss Form."[5] The exclusion at issue in that form reads as follows:

---

[5] PI-ULT-008-11-98.

2. *We will not pay for "loss" caused by or resulting from any of the following:*

    *f.*     *Water, other liquids, powder, or molten material that leaks or flows from plumbing, heating, air-conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:*

        *(1)*     *You do your best to maintain heat in the "buildings"; or*
        *(2)*     *You drain the equipment and shut off the supply if the heat is not maintained.*

The question presented by this action is whether Wood did its best under the circumstances to maintain heat at the Property. Defendant asserts that Wood did not do its best under the circumstances to maintain heat based on the following: 1) Wood had an obligation to maintain heat; 2) Wood was on notice that temperatures were low and its tenant was unable to meet its bills; 3) Wood had the ability and opportunity to take reasonable steps to ensure that heat was maintained, but failed to do so; and 4) the standard of care in the commercial real estate field was to gain access to the premises by any means given the circumstances at the time.

**A.    Wood had an obligation to maintain heat to the Property.**

As evidenced by Section 8.3.1 of the Lease, Wood had an express contractual obligation to supply heat to the premises occupied by Wilson Credit. That provision of the Lease states:

    8.3.1   Landlord, at its expense, shall: (i) furnish heat to the premises, the cost of such heat to be paid for by the Tenant; and (ii) cause the common areas of the Building to be cleaned on business days (except on Saturdays).

The plain terms of the Lease provision state that Wood "shall furnish heat to the premises." There was never on oral or written modification of this provision of the Lease. Wood reviewed the Lease prior to obtaining the Property and, as evidenced by its post-loss actions in putting the gas services in its name, was aware of the Lease provision.

Likewise, the PIIC Policy required that Wood do its best to maintain heat to the premises. Even absent such an express provision, Wood had an implied obligation based on the facts as it knew them to be to take reasonable steps to maintain heat to the premises.

**B.    Wood was on notice of the potential for frozen pipes.**

From the onset of its involvement with Wilson Credit, Wood was on notice that Wilson Credit was a financially unstable or insolvent entity that was not paying its bills on time and was relying on third-parties for the late payment of bills. During due diligence prior to the purchase of the Property, Wood was aware that a guaranty was required in order for the original landlord to enter into the Lease with Wilson Credit and that the guaranty was due to expire on June 1, 2003. Martin Wood testified that it is a generally accepted practice in the commercial real estate field to require a guarantor where the tenant is not financially stable. Further, Wood was aware that none of the other tenants at the Property required a guarantor.

As part of its due diligence, Wood also reviewed a letter dated May 7, 2003, which evidenced that Consolidation USA, Inc. and Consolidation USA II, Inc., the guarantors of the Lease, had retained Debt Management, Inc. to "establish Wilson Credit Services, LLC as a financially viable collection agency." The letter noted that Wilson Credit was "unable to pay its bills as they become due" and was "presently insolvent."

Based on this knowledge, Wood immediately sought to extend the guaranty and claims to have obtained verbal assurances from the guarantors that it would be extended. After numerous phone calls to a number of different representatives of the guarantors and the failure to receive an extension of the guaranty, Wood became increasingly concerned about the financial stability of Wilson Credit. In addition, rent was not timely paid beginning in July 2003 and, over the next three months, was paid increasingly late. By October 2003, rent was received more than three

weeks late. The rent for November 2003 was not paid until the middle of December 2003 and the rent for December 2003 was never paid. When rent was received, it was paid by third-parties who had no obligation for payment.

Beginning in September 2003, Wood made numerous requests to obtain a key to the premises occupied by Wilson Credit. As the outside temperatures decreased, Wood's requests for a key increased. Wood was concerned as to whether heat was being maintained to the premises and wanted to independently verify that fact.

Obviously due to his concerns about the financial viability of Wilson Credit and its ability to pays its bills, Wood consulted an attorney in November 2003 regarding the removal of Wilson Credit from the premises. In December 2003, Wood was aware that there were no lights on at the premises occupied by Wilson Credit and that its parking spaces were not being utilized. Wood concluded around Christmas 2003 that Wilson Credit was not working in the space.

Prior to the discovery of the loss, Wood had been advised by its property manager that, due to concerns about freezing and other maintenance issues, access should be gained by force if the key to the Wilson Credit offices was not obtained in short order. Wood was admittedly concerned about the dropping temperatures and the potential for a freeze-up.

**C.    Wood failed to take reasonable steps to maintain heat.**

Wood had an obligation to maintain heat to the Property and was on notice of the potential for frozen pipes given the dropping temperatures, the inability of Wilson Credit to pay its bills, and Wilson Credit's virtual abandonment of the premises. However, Wood failed to take even reasonable steps to maintain heat to the Property despite the opportunity and ability to do so. It certainly did not utilize its best efforts.

Wood has agreed that it had the ability to put the gas utility in its name and that this simple action would have ensured that heat was supplied to the premises. In fact, Wood had no difficulty in switching the gas to its name following the loss or in having the utility put a notation on the account that Wood should be contacted prior to the disconnection of the utilities.

As an alternative to this simple action, Wood had the express contractual right to enter the premises occupied by Wilson Credit by key or by force for inspection. As to the right of access, Section 17.02 of the Lease states in relevant part as follows:

> Tenant shall: . . . (ii) upon reasonable advance notice permit Landlord and any mortgagee of the Building or the Building and land or of the interest of the Landlord therein, and their representatives, to have reasonable access to and to enter upon the premises at all reasonable hours for the <u>purposes of inspection</u> or of making repairs, or of complying with all laws, orders and requirements of governmental or other authorities, or of exercising any right reserved to Landlord by this Lease . . . . <u>If Tenant shall not be personally present to open and permit entry into the premises at any time permissible, Landlord or Landlord's agents may enter the same by a master key, or may forcibly enter the same,</u> without rendering Landlord or such agents liable therefore (if during such entry Landlord or Landlord's agents shall accord reasonable care to Tenant's property) and without in any manner affecting the obligations and covenants of this Lease. (emphasis added)

As noted above, Wood began repeated requests to obtain a key to the offices of Wilson Credit in September 2003, but did not obtain one until January 9, 2004. This was an unreasonable wait given the substantial concerns about finances discussed above and the extreme temperatures experienced during the winter of 2003-2004.[6] Moreover, Wood was aware in December 2003 that there were no lights on at the premises occupied by Wilson Credit and that its parking spaces were not being utilized. Wood concluded around Christmas 2003 that Wilson Credit was not working in the space yet did not enter the premises to confirm the presence of heat despite the express contractual ability to do so and admitted concerns about whether heat

---

[6] The Court may take judicial notice of facts of general knowledge relating to the climate of a state. 31A C.J.S., Evidence, § 73, p. 63.

was present at the premises. Wood further ignored the advice of its own property manager to gain access by force if necessary and has admitted that the cost of a locksmith would have allowed access.[7]

In summary, Wood failed to take the following reasonable steps to fulfill its obligation to maintain heat at the Property despite notice that a potential for frozen plumbing existed: 1) failed to make a telephone call to the utilities to confirm that gas was supplied to the Property and that it was not shut off absent notice or to put the gas in its own name; 2) failed to insist upon a key to the property to enforce its right of inspection; and 3) failed to gain access by force or through the use of a locksmith despite the contractual ability to do so after circumstances dictated the need to enter the Property.

## IV.   SUMMARY

Wood did not do its best to maintain heat under the circumstances based on the following: 1) Wood had an obligation to maintain heat; 2) Wood was on notice that temperatures were freezing, its tenant was unable to meet its bills, and its tenant had virtually abandoned the premises; 3) Wood had the ability and opportunity to take reasonable steps to ensure that heat was maintained, but failed to do so; and 4) the standard of care in the commercial real estate field was to gain access to the premises by any means given the circumstances at the time.

. Although the determination of whether Wood did its best to maintain heat is fact intensive, summary judgment is appropriate here where plaintiff has not established a genuine issue of material fact as to whether such efforts were utilized. See Phillips v. Pioneer State Mut. Ins. Co., 1999 Mich. App. LEXIS 1318 (Mich. Ct. App. 1999).

---

[7] Wood relied on the advice of Karam for the management of the Property. *(Exhibit A – Deposition of Martin Wood, p. 28, line 11 to p. 30, line 10.)*

## CONCLUSION

Based on the reasons and authorities stated above, this Court should **ALLOW** the Defendant's Motion for Summary Judgment.

**CERTIFICATE OF SERVICE**
I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 31, 2006.

**DATED:  January 31, 2006**

**DEFENDANT PHILADELPHIA INSURANCE COMPANY**
By its Attorneys,

Robert J. Murphy BBO# 363760
Joel D. Hillygus BBO# 657119
MURPHY & RILEY, P.C.
**141 Tremont Street**
**Boston, MA  02111**
**(617) 423-3700**

13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WOOD DEVELOPMENT, LLP,  )
      Plaintiff,          )
                       )     CIVIL ACTION NO. 04-12590DPW
V.                   )
                       )
PHILADELPHIA INDEMNITY  )
INSURANCE CO.,          )
      Defendant.         )

## DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO LOCAL RULE 56.1

In support of its Motion for Summary Judgment, the Defendant in the above captioned action submits this statement of facts as to which there is no genuine issue to be tried, pursuant to Local Rule 56.1:

1.     On or about June 1, 2003, Wood Development, LLP ("Wood") purchased a commercial development at 45 North Main Street in Fall River, Massachusetts (the "Property"). (*Exhibit A – Deposition of Martin Wood, p. 49, lines 20-21*).

2.     On or about June 1, 2003, Wood also acquired the rights to the commercial lease for a portion of the Property entered into between Forty Five North Main LLC and Wilson Credit Services, LLC ("Wilson Credit").[1] (*Exhibit A – Deposition of Martin Wood, p. 43, lines 11-15*).

3.     Following acquisition of the Lease by Wood, Wilson Credit remained a tenant at the Property pursuant to the terms of the Lease.

4.     The Lease commenced on June 1, 2002. (*Exhibit B - Lease*).

---

[1] The lease was for a portion of the commercial property with an address of 25 North Main Street in Fall River, Massachusetts.

5.    As inducement to the original landlord to enter into the Lease with Wilson Credit, Consolidation USA, Inc. and Consolidation USA II, Inc. agreed to a guaranty of the Lease for the initial year. *(Exhibit B - Lease)*.

6.    It is a generally accepted practice in the commercial real estate field to require a guarantor where the tenant is not financially stable and none of the other tenants at the Property required a guarantor. *(Exhibit A – Deposition of Martin Wood, p. 45, lines 19-21 and p. 46, lines 3-6)*.

7.    Wood performed a due diligence and reviewed the Lease prior to obtaining the Property. *(Exhibit A – Deposition of Martin Wood, p. 35, lines 2-6)*.

8.    Subsequent to the acquisition of the Property, PIIC issued Policy No. PHI-PHPK052406 to Martin Wood as the general partner of Wood Development, LLP (the "Policy"). *(Exhibit C – PIIC Policy)*.

9.    The Policy was effective June 10, 2003 to June 10, 2004 and provided first-party coverage for the Property. *(Exhibit C – PIIC Policy)*.

10.    By letter dated May 7, 2003, Consolidation USA, Inc. and Consolidation USA II, Inc., the guarantors of the Lease, retained Debt Management, Inc. to "establish Wilson Credit Services, LLC as a financially viable collection agency." *(Exhibit D – May 7, 2003 Letter)*.

11.    The letter noted that Wilson Credit was "unable to pay its bills as they become due" and was "presently insolvent." *(Exhibit D – May 7, 2003 Letter)*.

12.    Wood reviewed this letter as part of its due diligence before purchasing the Property. *(Exhibit A – Deposition of Martin Wood, p. 203, line 20 to p. 204, line 5)*.

13.    At the time that Wood acquired the Property in June 2003, it was concerned about the financial stability of Wilson Credit based on the expiration of the guaranty of the Lease and it sought to extend the guaranty. (*Exhibit A – Deposition of Martin Wood, p. 51, lines 11-19*).

14.    The failure of the guarantors to extend the guaranty despite extensive phone inquiries and failed promises to do so caused further concerns regarding the creditworthiness of Wilson Credit. (*Exhibit A – Deposition of Martin Wood, p. 58, lines 7-13*).

15.    Beginning in July 2003, the monthly rent due from Wilson Credit was paid on an increasingly late basis. (*Exhibit A – Deposition of Martin Wood, p. 80, line 18 to p. 82, line 6*).

16.    The November 2003 rent was not paid until the middle of December and the December 2003 rent was never paid despite being due on December 1, 2003. (*Exhibit A – Deposition of Martin Wood, p. 97, line 3 to p. 98, line 9*).

17.    The rent was paid by entities other than Wilson Credit that had no obligation to make such payments.[2] (*Exhibit A – Deposition of Martin Wood, p. 85, lines 2-4*).

18.    Beginning in September 2003, Wood made numerous requests to obtain a key to the premises occupied by Wilson Credit. (*Exhibit A – Deposition of Martin Wood, p. 105, line 17 to p. 106, line2*).

19.    As the outside temperatures decreased, Wood's requests for a key increased. (*Exhibit A – Deposition of Martin Wood, p. 107, lines 15-19*).

---

[2] Although the Lease was assigned from Wilson Credit to Consolidation USA based on a failure to pay a promissory note, Consolidation USA had no obligation to make the lease payments. (*Exhibit F – Lease Assignment*).

20.    Wood was concerned as to whether heat was being maintained to the premises and wanted to independently verify that fact. (*Exhibit A – Deposition of Martin Wood, p. 101, lines 2-4*).

21.    In November 2003, Wood consulted an attorney regarding the removal of Wilson Credit from the premises. (*Exhibit A – Deposition of Martin Wood, p. 90, lines 3-11*).

22.    In December 2003, there were no lights on at the premises occupied by Wilson Credit and its parking spaces were not being utilized. (*Exhibit A – Deposition of Martin Wood, p. 103, line 1 to p. 104, line 5*).

23.    Wood concluded around Christmas 2003 that Wilson Credit was not working in the space. (*Exhibit A – Deposition of Martin Wood, p. 124, lines 5-17*).

24.    On January 9, 2004, Wood obtained a key for the Wilson Credit offices by mail and entered the premises. (*Exhibit A – Deposition of Martin Wood, p. 184, line 13*).

25.    Subsequent to January 9, 2004, Wood learned that heat had been shut off to the premises on December 31, 2003 for nonpayment of the gas bill. (*Exhibit A – Deposition of Martin Wood, p. 151, lines 5-23*).

26.    Prior to the discovery of the loss, Wood had been advised by its property manager that, due to concerns about freezing and other maintenance issues, access should be gained by force if the key was not obtained in short order. (*Exhibit E – Deposition of James Karam, p. 26, line 13 to p. 27, line 3*).

27.    Wood has agreed that it had the ability to put the gas utility in its name and that this action would have ensured that heat was supplied to the premises. (*Exhibit A – Deposition of Martin Wood, p. 119, line 24 to p. 120, line 11*).

4

28.    Wood had no difficulty in switching the gas to its name following the loss. (*Exhibit A – Deposition of Martin Wood, p. 134, line 1 to p. 135, line 1*).

29.    The utility put a notation on the account following the loss to notify the owner, Wood, prior to disconnecting the utilities.  (*Exhibit A – Deposition of Martin Wood, p. 151, line 23 to p. 153, line 21*).

30.    Wood has agreed that a locksmith could have been utilized to gain access to the Property. (*Exhibit A – Deposition of Martin Wood, p. 191, lines 2-5*).

31.    PIIC received notice of the loss on January 21, 2004 and, following an investigation of the circumstances surrounding the loss and the extent of damages, denied coverage for the loss by letter dated April 30, 2004.  (*Exhibit G – Denial of Coverage Letter*).

**CERTIFICATE OF SERVICE**
I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 31, 2006.

**DATED:  January 31, 2006**

**DEFENDANT PHILADELPHIA INSURANCE COMPANY**
**By its Attorneys,**

Robert J. Murphy BBO# 363760
Joel D. Hillygus BBO# 657119
MURPHY & RILEY, P.C.
141 Tremont Street
Boston, MA  02111
(617) 423-3700

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WOOD DEVELOPMENT, LLP,  )
      Plaintiff,  )
                         )  **CIVIL ACTION NO. 04-12590DPW**
V.  )
                         )
PHILADELPHIA INDEMNITY  )
INSURANCE CO.,  )
      Defendant.  )

## DECLARATION OF JOEL D. HILLYGUS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Joel D. Hillygus deposes and says:

1.    I am an attorney for Philadelphia Indemnity Insurance Company ("Defendant"), the defendant in this matter. I make this affidavit based upon personal knowledge. I am over 18 and am competent to testify to the statements herein.

2.    Attached are exhibits submitted in support of Defendant's Motion for Summary Judgment.

3.    Attached as Exhibit A is a true copy of Deposition Transcript of Martin Wood conducted on October 24, 2005 in this matter.

4.    Attached as Exhibit B is a true copy of an Indenture of Lease between Forty Five North Main LLC and Wilson Credit Services, LLC which was produced by the Plaintiff to the Defendant during the course of discovery in this matter.

5.    Attached as Exhibit C is a true copy of a Philadelphia Indemnity Insurance Company Policy No. PHPK052406 ("PIIC Policy") issued by Defendant to Martin Wood.

6.    Attached as Exhibit D is a true copy of a Letter from Jeffrey A. Schreiber to Mark Arnold dated May 7, 2003 which was produced by the Plaintiff to the Defendant during the course of discovery in this matter.

7.    Attached as Exhibit E is a true copy of Deposition Transcript of James Karam conducted on November 29, 2005 in this matter.

8.    Attached as Exhibit F is a true copy of Collateral Assignment of Lease between Wilson Credit Services, LLC and Consolidation USA, Inc. which was produced by the Plaintiff to the Defendant during the course of discovery in this matter.

9.    Attached as Exhibit G is a true copy of a Letter from Defendant to Martin Wood dated April 30, 2004 which was produced by the Defendant to the Plaintiff during the course of discovery in this matter.

I declare under the penalties of perjury that the foregoing statements are true and correct this 31st day of January, 2006.

Joel D. Hillygus

Dated: January 31, 2006