UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| WOOD DEVELOPMENT, LLP, | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. 04-12590DPW |
| V. | ) | |
| | ) | |
| PHILADELPHIA INDEMNITY | ) | |
| INSURANCE CO., | ) | |
| Defendant. | ) | |

DECLARATION OF JOEL D. HILLYGUS IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

Joel D. Hillygus deposes and says:

1.    I am an attorney for Philadelphia Indemnity Insurance Company ("Defendant"), the defendant in this matter. I make this affidavit based upon personal knowledge. I am over 18 and am competent to testify to the statements herein.

2.    Attached are exhibits submitted in support of Defendant's Motion for Summary Judgment.

3.    Attached as Exhibit A is a true copy of Deposition Transcript of Martin Wood conducted on October 24, 2005 in this matter.

4.    Attached as Exhibit B is a true copy of an Indenture of Lease between Forty Five North Main LLC and Wilson Credit Services, LLC which was produced by the Plaintiff to the Defendant during the course of discovery in this matter.

5.    Attached as Exhibit C is a true copy of a Philadelphia Indemnity Insurance Company Policy No. PHPK052406 ("PIIC Policy") issued by Defendant to Martin Wood.

6.    Attached as Exhibit D is a true copy of a Letter from Jeffrey A. Schreiber to Mark Arnold dated May 7, 2003 which was produced by the Plaintiff to the Defendant during the course of discovery in this matter.

7.    Attached as Exhibit E is a true copy of Deposition Transcript of James Karam conducted on November 29, 2005 in this matter.

8.    Attached as Exhibit F is a true copy of Collateral Assignment of Lease between Wilson Credit Services, LLC and Consolidation USA, Inc. which was produced by the Plaintiff to the Defendant during the course of discovery in this matter.

9.    Attached as Exhibit G is a true copy of a Letter from Defendant to Martin Wood dated April 30, 2004 which was produced by the Defendant to the Plaintiff during the course of discovery in this matter.

I declare under the penalties of perjury that the foregoing statements are true and correct this 31st day of January, 2006.

_____
Joél D. Hillygus

Dated: January 31, 2006

1

UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

C.A. No. 04-12590DPW

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

WOOD DEVELOPMENT, LLP,
        Plaintiff

vs.

PHILADELPHIA INDEMNITY
INSURANCE CO.,
        Defendant

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

        DEPOSITION OF MARTIN WOOD, a witness

called by counsel for the Defendant, taken

pursuant to the applicable provisions of the

Federal Rules of Civil Procedure, before Joann

Denning, a Shorthand Reporter and Notary Public

in and for the Commonwealth of Massachusetts,

at the offices of Murphy & Riley, P.C., 141

Tremont Street, Boston, Massachusetts, on

Monday, October 24, 2005, commencing

at 10:34 a.m.



EXHIBIT
A

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**34**

1 A. Because these were older buildings and the
2 floor space had been broken up in some
3 instances where a number of tenants would share
4 one particular floor. When the buildings were
5 built, the metering for those floors -- for
6 example, the heat, the gas, the electricity was
7 metered per floor.
8 So what happened was that there was a
9 hybrid lease that basically went into effect
10 that if a tenant occupied approximately, let's
11 say, one-half of a 2500 square foot floor the
12 landlord would pay the electric bills, the gas
13 bills, the heating bills, and apportion the
14 expenses to the tenants.
15 Q. That apportionment would be set forth in the
16 terms of the lease with those tenants?
17 A. I believe so, yes.
18 Q. Any other material changes in the leases that
19 you were aware of that Mr. Karam was using?
20 A. Where the gas bills and electric bills were
21 separately metered I believe that it was the
22 tenant's responsibility. For example, if they
23 had a whole floor and the meters could be
24 identified, then the tenant -- that became the

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**35**

1 tenant's responsibility.
2 Q. As far as your due diligence when you purchased
3 these properties from Mr. Karam or his company,
4 did you review the leases to determine their
5 terms and conditions before you purchased it?
6 A. Yes.
7 Q. Did you have an attorney review those leases on
8 your behalf?
9 A. No.
10 Q. Specifically did you review the lease for
11 Wilson Credit prior to purchasing 45 Main
12 Street?
13 A. Correct.
14 Q. As a result of your review of that lease, you
15 were aware that the landlord was responsible
16 for the payment of the heating bills?
17 A. Well, I saw that in the lease, and that became
18 a question to Mr. Karam.
19 Q. We'll get back into that. I just want to
20 finish up with Mr. Karam. I have pulled off
21 some documents from the Secretary of State's
22 office, and there was an entity apparently
23 known as 45 North Main Street, LLC, that
24 changed its name to Service Ave. Realty, LLC.

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**36**

1 Are you aware of that?
2 A. No.
3 Q. The entity that you believe you purchased the
4 property from was 45 North Main Street, LLC?
5 A. Correct.
6 MR. MURPHY: For the record we'll mark
7 this as Exhibit 3, Secretary of State printout.
8 (Exhibit No. 3, Secretary of State
9 Printout, marked for Identification.)
10 Q. You can see the name was changed from 45 North
11 Main Street, LLC, on September 23rd, '03, and
12 it was changed to Service Ave. Realty, LLC.
13 Have you ever had any dealings or contracts or
14 business with Service Ave. Realty, LLC, to your
15 knowledge?
16 A. No, not that I know of.
17 Q. Down at the bottom it says the name and address
18 of the resident agent is James Karam at
19 10 North Main Street. That's the property that
20 you purchased from him?
21 A. No.
22 Q. I'm sorry. It's 10 Purchase Street?
23 A. Right.
24 Q. It also says care of First Bristol Court?

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**37**

1 A. Correct.
2 Q. Are you familiar with an entity known as First
3 Bristol Court?
4 A. Yes.
5 Q. What is that entity, sir?
6 A. I believe it's an entity that's owned by the
7 Karams.
8 Q. Do you know what the business of First Bristol
9 Court is?
10 A. Real estate ownership.
11 Q. I don't want to guess or speculate. Have
12 you had any dealings with it?
13 A. When I would call over there, they answer the
14 phone First Bristol.
15 Q. Other than that are you aware of the business
16 or have you had a contractual or business
17 relationship with a company called First
18 Bristol Court to your knowledge?
19 A. No.
20 Q. On these management contracts that you told me
21 about, that was not a contract with First
22 Bristol Court?
23 A. That's right, it was not.
24 Q. The next document I have, sir, again from the

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**38**

1 Secretary of State is for a company called
2 J. Karam Management, Inc. I'll show you the
3 Secretary of State documents on that. Have you
4 ever had any dealings with J. Karam Management
5 Corp. or J. Karam Management, Inc.?
6 A. Yes.
7 Q. What dealings have you had with them?
8 A. I believe that was the management company
9 controlled by Jim Karam that assisted in the
10 management of the property for me.
11 Q. I actually showed you an annual report. I'm
12 going to show you the main printout from the
13 Secretary of State's office. It indicates that
14 there was a name change on August 28, '84, from
15 J. Karam Management Corp., which I may have
16 been using and I apologize, to J. Karam
17 Management, Inc. Is that the entity that you
18 dealt with?
19 A. I believe so.
20 Q. Is that the entity which you indicated you
21 signed with the assist to manage property
22 agreement?
23 A. I believe so.
24 Q. They're alleged to have a principle place of

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**39**

1 business at 222 North Place, Fall River?
2 A. They did. They've moved to 10 North Main
3 Street.
4 Q. 10 North Main Street is where you would deal
5 with them?
6 A. No. Actually I was dealing with them when they
7 were at 224 Milliken Place.
8 Q. When you had dealings under your contract with
9 J. Karam Management, Inc., with whom would you
10 deal?
11 A. Primarily with the son, Jaimie, but I also
12 dealt with other people in the office there,
13 the bookkeeper -- her name was Sue Coriaty --
14 and their accounts payable people as well as
15 their accounts receivable people.
16 Q. Could you spell Coriaty for me?
17 A. C-O-R-I-T -- something like that.
18 Q. If you don't know, that's fine.
19 A. I don't know.
20 Q. Fair enough. Is Jaimie also a James?
21 A. I believe so.
22 Q. This first document, listed as secretary is
23 Suzanne E. Coriaty?
24 A. Correct.

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**40**

1  Q.  One is identified as a James J. Karam, and one
2  is a Janice B. Karam. Do you know who Janice
3  B. Karam is?
4  A.  I believe she's the wife of Jim Karam.
5  Q.  The father?
6  A.  Yeah, the father.
7  Q.  Other than the J. Karam Management, Inc., did
8  you have any other assistance of any form or
9  description in the management of the property
10  known and numbered as 45 North Main Street?
11  A.  No.
12  Q.  Did anyone else from Wood Development General
13  Partners, LLP, have any involvement in the
14  management of that property -- strike that --
15  Wood Development Limited Partnership?
16  A.  No.
17  Q.  The named plaintiff in this case is Wood
18  Development, LLP. Is there also an entity
19  known as Wood Development, LLP?
20  A.  I don't think so.
21  Q.  You have told me the names of all Wood related
22  entities so far today?
23  A.  Correct.
24  Q.  I'd like to direct your attention then to the

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**41**

1  property at 45 North Main Street. Before
2  acquiring the property, did you have any
3  dealings with Wilson Credit?
4  A.  No.
5  Q.  Did you do any sort of background check into
6  the tenants at 45 North Main Street to
7  determine their creditworthiness?
8  A.  Yes.
9  Q.  What did you do?
10  A.  I asked around. I asked some questions. I
11  don't remember who I asked, but I do remember
12  what I was told, and that -- I believe it was
13  by the Karams, that the Wilson Credit agent or
14  collection agency was controlled by Jeffery
15  Schreiber, an attorney in Danvers, and that his
16  wife, Suzanne Schreiber, controlled several
17  other collection entities known as Consolidated
18  -- I don't know whether it's Consolidated I or
19  Consolidated II.
20  It may have been Consolidated I and
21  Consolidated II which were also collection
22  agencies which had guaranteed the lease for
23  Wilson Credit.
24  Q.  Were you aware generally that Wilson Credit was

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**42**

1  a new establishment?
2  A.  Yes.
3  Q.  Did you conduct any sort of background check or
4  get any documentation regarding their credit
5  rating or creditworthiness?
6  A.  No.
7  Q.  Is that something you normally did with regard
8  to tenants?
9  A.  Yes and no.
10  Q.  Do you have access to a database, for instance,
11  that you can call up on the computer and get
12  background information regarding tenants?
13  A.  Yes.
14  Q.  What service did you subscribe to in 2002?
15  A.  In 2002 we subscribed to a service called
16  Info Systems, Inc.
17  Q.  Is that the same business you use today?
18  A.  Yes.
19  Q.  On that system you could enter information
20  regarding a tenant or potential tenant and get
21  a background check regarding the
22  creditworthiness?
23  A.  Correct.
24  Q.  Did you do that for the tenant at 45 North Main

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**43**

1  Street when you purchased that building?
2  A.  No.
3  Q.  Why not?
4  A.  One of the rules or procedures with regards to
5  using this -- strike that -- with regards to
6  using this reporting or credit service was that
7  you had to have a signed credit application or
8  a lease application and have the names,
9  individual's date of birth as well as Social
10  Security number.
11  Q.  So is it your testimony that as a result of
12  taking over these leases you could not conduct
13  such an investigation under the terms of your
14  agreement with Info Systems, Inc.?
15  A.  I did not try.
16  The creditworthiness of the tenant would be an
17  extremely important piece of information to
18  have before taking over the building?
19  A.  Correct.
20  Q.  Other than your discussions with the Karams, is
21  there anything else that you did to satisfy
22  yourself of the creditworthiness of the tenant
23  at 45 North Main Street?
24  A.  Yes.

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**44**

1  Q.  What else did you do, sir?
2  A.  I took a look at their rent roll sheets to
3  determine how punctual the rent was paid.
4  Q.  Anything else?
5  A.  No. That was it.
6  Q.  Did you know Mr. Schreiber personally or by
7  reputation?
8  A.  I know by reputation.
9  Q.  What was your knowledge about his reputation in
10  2002?
11  A.  I know that he was an attorney.
12  Q.  Anything else about his reputation that you
13  knew at that time?
14  A.  No.
15  Q.  How about his wife Suzanne, did you have any
16  information about her?
17  A.  No.
18  Q.  Did you have any information about Wilson
19  Credit that you have not told me about today?
20  A.  No.
21  Q.  What was the significance of the fact that they
22  had a guarantor for the lease?
23  A.  Made me feel more comfortable.
24  Q.  Was a guarantor something that Mr. Karam had

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**45**

1  required of all his tenancies?
2  A.  No.
3  Q.  Did Mr. Karam tell you why he had a guarantor
4  for Wilson Credit?
5  A.  I believe we discussed it, but he said he was
6  comfortable with the fact that there was a
7  guarantee, and he provided me with copies of
8  tax returns.
9  Q.  For the guarantor?
10  A.  For the guarantor.
11  Q.  Did Mr. Karam ever tell you what conditions
12  that he had before he would require a guaranty
13  for a tenancy?
14  A.  No.
15  Q.  Generally you're aware that a guarantor was
16  only done in instances where the named tenant
17  was not financially stable?
18  A.  Yes.
19  Q.  That's a generally accepted practice in the
20  field?
21  A.  Yes.
22  Q.  Did you have any specific discussions with
23  Mr. Karam as to why he felt Wilson Credit was
24  not financially stable at the time of the

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

### 46

```
1        tenancy?
2  A.    No.
3  Q.    Were there any other tenants at 45 North Main
4        Street that had required a guarantor as a
5        contingent of a lease contract?
6  A.    No.
7  Q.    So this was a tenant then that required
8        specific due diligence to determine their
9        continued creditworthiness in light of their
10       initial lack of creditworthiness?
11 A.    I don't know.  I could speculate, but you don't
12       want me to do that.
13 Q.    I don't want you to speculate, sir, but you
14       were the person who was doing the due diligence
15       on this commercial building, and I'm trying to
16       determine what, in fact, you did do when you
17       purchased it.
18 A.    Well, I believe that one of my conversations
19       with the Karams were why the rent for this
20       particular space was as low as it was to Wilson
21       Credit.  They had a provision in the lease that
22       basically allowed me to increase the rent for a
23       bump up in real estate taxes, a bump up in
24       operating expenses and general maintenance of
         (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

### 47

```
1        the property.
2  Q.    Didn't all your leases have that?
3  A.    No.  Actually a couple of the leases were gross
4        leases, gross rent lease situations.
5  Q.    I'm sorry for interrupting you, sir.
6  A.    And that I believe that one of the other
7        reasons that he asked for a guaranty on that
8        particular tenant was that he did renovate that
9        space for them at a cost of close to $200,000.
10 Q.    Have you now told me all conversations you had
11       with Mr. Karam regarding the manner -- strike
12       that -- the reasons why he had a guaranty from
13       Consolidated USA for the Wilson Credit lease?
14 A.    I believe so.
15 Q.    Produced as part of your response to our
16       request for production of documents was a fair
17       number of documents, one of which is the
18       indenture of lease between 45 North Main
19       Street, LLC, and Wilson Credit Services, LLC.
20             I'm giving it to you in the manner in
21       which I received it which also includes what
22       appear to be a number of damages documents in
23       this case.  I'm just directing your attention
24       to the lease itself.
         (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

### 48

```
1              At Page 42 of that lease, Exhibit 4, is
2        the landlord's work which indicates the work
3        that was to be performed by the landlord prior
4        to the lease being signed?
5  A.    Correct.
6  Q.    To your knowledge is that a full and complete
7        listing of the work that was done by the
8        landlord that you indicated cost $200,000?
9  A.    I am not sure.
10 Q.    You're not aware of anything that was done
11       beyond that?
12 A.    I believe that we had a conversation after the
13       fact, after the water damage, as to what was
14       done.  I believe that the Karams provided me
15       with some information.
16 Q.    Did they provide you with documents?
17 A.    I believe so.
18 Q.    Can you identify those documents in sufficient
19       detail for me to send a request out to your
20       attorney for them?
21 A.    I think I can.  I think I have them.
22 Q.    How would you describe them or characterize
23       them?
24 A.    A package of documents that basically pertain
         (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

### 49

```
1        to the renovation of the space.
2  Q.    Also contained in that lease document, sir, at
3        Page 34, I'd like to show you that document and
4        ask you if you can identify that.  It actually
5        starts at Page 33 with the word "guaranty" and
6        goes over to Page 34.
7  A.    This is the guaranty by Susan Schreiber, the
8        president of Consolidated USA II, for the
9        lease.
10 Q.    You were aware that was a guaranty actually by
11       consolidation USA, Inc., and Consolidation USA
12       II, Inc., two corporations?
13 A.    Correct.
14 Q.    Were you aware that that guaranty was only for
15       a period of one year?
16 A.    Correct.
17 Q.    If it began in June 2002, then it expired in
18       June 2003?
19 A.    Correct.
20 Q.    You purchased this property in June 2003?
21 A.    Correct.
22 Q.    So at the time that you purchased the property,
23       the guaranty was or was about to be expired?
24 A.    Correct.
         (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

### 50

```
1  Q.    Did you have any conversations with anyone
2        regarding the financial stability of Wilson
3        Credit, LLC, based on the fact that the
4        guaranty was now terminating?
5  A.    I spoke to Suzanne Schreiber and on several
6        occasions as well to Keith Newell who was the
7        chief financial officer of Schreiber &
8        Associates.
9  Q.    What was the substance of those conversations,
10       sir?
11 A.    That they would honor the terms of the lease.
12       They felt that the location was vital to their
13       collection activities in the region.
14 Q.    Did you ever reduce that to writing?
15 A.    No, but I asked.
16 Q.    You asked what?
17 A.    I asked for it to be reduced to writing.  I
18       said, Send me a letter.
19 Q.    Did they send you a letter?
20 A.    No.
21 Q.    Did the fact that they failed to send you a
22       letter raise your concerns regarding the
23       creditworthiness of Wilson, LLC?
24 A.    Yes.
         (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

### 51

```
1  Q.    When did you have these conversations with
2        Ms. Schreiber and Mr. Newell?
3  A.    I believe it was in June.
4  Q.    That would be June 2002?
5  A.    Correct.  I believe it was just prior to my
6        buying the property.
7  Q.    Do you have any notes that would reflect the
8        substance of your conversation with these two
9        individuals?
10 A.    No.
11 Q.    In any event, it would be fair to say that
12       before you bought the property you had reviewed
13       the lease and the guaranty, you knew the
14       guaranty was running out, and you were
15       concerned about the financial stability of
16       Wilson Credit?
17 A.    Hm-hm.
18 Q.    I'm sorry, sir.  You have to answer --
19 A.    Yes.
20 Q.    As a result of that concern, you had
21       independent conversations with both
22       Ms. Schreiber who you understood to be the
23       principal for the two guarantors, Consolidation
24       USA I and II, I'll call them, and also with
         (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**58**

1 A. Yes.
2 Q. When did you get concerned about that?
3 A. Extremely concerned in the middle of January of
4    2004.
5 Q. That's after this loss had taken place?
6 A. Correct.
7 Q. Between the period of June '03 when you
8    acquired the property until the end of the
9    year, during that six months with your repeated
10   phone calls and no response, did your concern
11   level get elevated during that period of time?
12 A. From time to time, yes, but the rent kept on
13   coming.
14 Q. Have you now told me all the conversations you
15   had with Ms. Schreiber on the issue of the
16   guaranty?
17 A. No. There were more.
18 Q. What further conversations did you have with
19   her?
20 A. I had a conversation with her, I believe, in
21   January of 2004.
22 Q. Pre- or post-loss?
23 A. Post-loss.
24 Q. How did that conversation arise?

**59**

1 A. I called her. I left a message. I believe she
2    called me back.
3 Q. What was the substance of the conversation?
4 A. That they were going to continue to pay the
5    rent, they were reorganizing Wilson Credit, and
6    they would be getting in touch with me to enter
7    into a new agreement.
8 Q. When you say "new agreement," are you talking
9    about a new lease or a new guaranty?
10 A. A new lease.
11 Q. Did she tell you at that point in time that
12   Wilson Credit was financially insolvent and
13   going out of business?
14 A. She told me they were having problems and that
15   they were, in fact, the owners of all the
16   assets located at Wilson Credit's rental space.
17 Q. Were you aware that Wilson had assigned the
18   lease to Consolidation USA?
19 A. Yes.
20 Q. Did you agree with that consolidation?
21 A. No.
22 Q. How were you informed of that assignment?
23 A. I'm not sure.
24 Q. I'll just go back and finish up your

**60**

1    conversation with Ms. Schreiber.
2 A. I felt -- okay. Go ahead. Ask away.
3 Q. You may answer.
4 A. I felt comfortable with the fact that I spoke
5    to her, and she was very charming and put me at
6    ease and said, Don't worry about it.
7    Everything is going to be fine. The rent there
8    is a dream. It's not that much money, and we
9    would like to stay on.
10 Q. Did she give you any indication as to why
11   Wilson Credit failed and why some reconstituted
12   organization would be successful?
13 A. No.
14 Q. Was she at all critical at all in your
15   conversations with her regarding the management
16   ability of the Wilsons?
17 A. I think she made some disparaging remarks.
18 Q. When first did she make disparaging remarks
19   about the Wilsons?
20 A. I can't remember.
21 Q. Was it prior to this January conversation?
22 A. It may have been.
23 Q. Do you recall the nature of the disparaging
24   remarks?

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**61**

1 A. No, not specifically.
2 Q. So you were aware before the loss that she was
3    critical at least of the management skills of
4    the Wilsons?
5 A. Yes. I didn't keep notes at that point in time
6    because I didn't realize before this loss the
7    extent of what was about to happen.
8 Q. Do you now have notes regarding your subsequent
9    conversations?
10 A. Yes.
11 Q. How would you characterize those notes?
12 A. They're in writing, footnotes on a memo pad.
13 Q. What are they notes of?
14 A. Approximately the time and the place that the
15   conversations took place.
16 Q. If I understand correctly, at some point did
17   you attempt on a given date to go back in time
18   and reconstitute all of the conversations that
19   you had with folks?
20 A. We tried, but we were not very successful at
21   it.
22 Q. But you did the best you could?
23 A. We did.
24 Q. When you say "we," who are you referencing?

**62**

1 A. People in the office.
2 Q. That would be people at Wood Development?
3 A. At Wood Development.
4 Q. Who other than yourself was involved in
5    reconstituting those notes?
6 A. It would have been my secretary.
7 Q. Who's that?
8 A. Her name is Juanita Roy, and one of my
9    maintenance men whose name is Gary Freitas.
10 Q. Help me.
11 A. F-R-E-I-T-A-S.
12 Q. What's the first name?
13 A. Gary, G-A-R-Y.
14 Q. Okay. I actually had the Freitas. When you
15   said Gary, I heard some other name I had never
16   recognized.
17 A. We had another employee who was the parking lot
18   attendant at 45 North Main Street. His name
19   was Teddy DeCosta, who is deceased now.
20 Q. When did you attempt to reconstitute these
21   notes?
22 A. I believe it was at a request by Barry
23   Braunstein, the attorney at Riemer & Braunstein
24   when we started litigation for recovery of the

**63**

1    premises.
2 Q. Do you recall approximately when that took
3    place, sir?
4 A. No, but he said --
5    MR. REILLY: Objection. I'm going to
6    instruct you not to testify as to your
7    conversations with your attorney.
8 Q. I thought we brought that up when we were
9    talking about Attorney Frank. There is a
10   privilege between any communications between
11   yourself and any attorney, and unless you waive
12   that privilege you should not communicate with
13   me any conversation that you had with an
14   attorney when nobody else was present.
15      So unless I specifically ask you for a
16   conversation with an attorney, please don't by
17   mistake let it slip out. I'm just looking for
18   the approximate time when you prepared these
19   notes that we've just been discussing.
20 A. I think it was the end of February or beginning
21   of March 2004.
22 Q. Do you still have a copy of those notes in your
23   possession?
24 A. I'm not sure.

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**76**

1  A.  Not to me.
2  Q.  A number of dealings with Mr. Jeffery
3  Schreiber.  Other than the fact he's the spouse
4  of Suzanne Schreiber, was there any
5  relationship or guaranty on behalf of Schreiber
6  or Schreiber & Associates that you're aware of?
7  A.  No.
8  Q.  So in dealing with him you just dealt with him
9  as attorney for Consolidation?
10 A.  Yeah, but I assumed that he and Consolidation
11 were one in the same because all of my phone
12 calls were to his office and from there I would
13 get transferred over to either his wife or to
14 the financial people that were in his office
15 that I had to deal with.
16 Q.  You indicated that you dealt with a Keith
17 Newell?
18 A.  Correct.
19 Q.  You understood him to be the chief financial
20 officer of Schreiber & Associates?
21 A.  Correct.
22 Q.  Did he have any dealings to your knowledge with
23 or on behalf of Consolidation I and II?
24 A.  Did he have any?  Did he have any dealings?  I
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**77**

1  believe, yeah, he worked for all of them.
2  Q.  So as far as you knew, he was CFO for the
3  umbrella group of companies?
4  A.  Yeah, Schreiber & Associates.
5  Q.  And Consolidation I and II?
6  A.  And Consolidation I and II.  I believe there
7  are more companies there as well.
8  Q.  Can you identify any of them?
9  A.  No.
10 Q.  What was the substance of conversations that
11 you had with Mr. Newell?
12 A.  Pre-loss, the rent, the condition of the
13 premises, the electricity being on, heat being
14 on, what temperature the heats were set at, and
15 is it possible for me to get a key to the
16 premises.
17 Q.  When did you first have conversation with
18 Mr. Newell?
19 A.  As far as speaking to him, in October.
20 Q.  Why did you have a conversation with him
21 regarding rent in October?
22 A.  Because the rent was late.  He said the rent is
23 going to be paid by another entity for the time
24 being, which it was.
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**78**

1  Q.  What was the other entity?
2  A.  I believe it was Consolidated USA I and II.
3  Q.  Did you find that it was late in October and
4  the fact that another entity had to pay for it
5  trigger any alarm bells in your mind?
6  A.  We had a conversation about it, and I talked to
7  him about the guaranty as well, sending the
8  guaranty, as well as getting a key to the
9  premises.  And he said that they were going to
10 work on it.  They were going through some
11 consolidation pains and would be getting back
12 to me shortly.
13     I then spoke to him or called him a couple
14 weeks after that and said, I'm going to need a
15 key, and he said that that would be difficult
16 because of the financial information and the
17 security, secure nature of the documentation
18 that was in the premises.
19 Q.  We'll get to that in a second.  Do you recall
20 when in October this conversation took place
21 with Mr. Newell?
22 A.  Several times.
23 Q.  During those conversations, it started off
24 because the rent was late?
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**79**

1  A.  Correct.
2  Q.  When is the rent due?
3  A.  Usually on the 1st.
4  Q.  That was true for Wilson?
5  A.  Correct.
6  Q.  So it's not usually.  Always for Wilson it's
7  due by the 1st of the month?
8  A.  Correct.
9  Q.  Am I correct when it's due on the 1st of the
10 month, that's for the next month?
11 A.  Correct.  It's in advance.
12 Q.  On October 1st for the month of October and so
13 on?
14 A.  Hm-hm.
15 Q.  Is that a yes?
16 A.  Yes.
17 Q.  I know you meant yes, but we have to have it on
18 the record, sir.
19     As a result of the rent being late, you
20 were concerned and started making phone calls?
21 A.  Correct.
22 Q.  Is it fair to say that as a result of your
23 conversations with Mr. Newell in October you
24 became more concerned about the financial
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**80**

1  solvency of Wilson Credit?
2  A.  No.
3  Q.  He had just told you that they wouldn't be
4  paying their rent, that somebody else had to
5  pay it and that they were having difficulty
6  with that corporation making ends meet?
7  A.  I believe the rent periodically came from a
8  different entity anyway.
9  Q.  But those are all red lights indicating to you
10 that there are financial problems here?
11 A.  Not necessarily.  The rent was coming on a
12 regular basis, and up until that point it was
13 late and then I made a phone call and continued
14 to get it on a regular basis.
15 Q.  Through the summer all of the rent payments
16 were late?
17 A.  No, I don't think so.
18 Q.  As part of Exhibit No. 17 in the documents that
19 were produced to us, the July rent wasn't
20 written until July 10th.  Presumably it was
21 received sometime after that, is that correct?
22 A.  I believe so.
23 Q.  That would be considered late?
24 A.  I believe the lease allows for a 10-day grace
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**81**

1  period, but I would assume so.  The lease does
2  allow for a 10-day grace period.
3  Q.  The lease says that the rent is due on the 1st
4  of the month, is that correct?
5  A.  I believe so.
6  Q.  There is a second clause which says, Unless
7  otherwise specified in the lease there's a
8  10-day grace period?
9  A.  I believe so.
10 Q.  The lease payment was otherwise specified?
11 A.  I believe so.
12 Q.  So it was due on the 1st of the month?
13 A.  Correct.
14 Q.  In fact, if anybody was not paying by the 1st
15 of the month you would follow up to see why it
16 wasn't paid?
17 A.  Correct.
18 Q.  So when they wrote a check on the 8th -- strike
19 that -- the 10th, that was a late payment?
20 A.  I believe so.
21 Q.  I'm sorry?
22 A.  I believe so, yeah.
23 Q.  Again, in August they wrote a check on August
24 8th, and, again, that would be a late payment,
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**82**

1     is that correct?
2 A.   I believe so.
3 Q.   By September they weren't writing that one
4     until September 22nd. That would be seriously
5     late, wouldn't it?
6 A.   Correct.
7 Q.   Is that why you started calling Mr. Newell
8     directly, is you didn't receive a check until
9     after the 22nd?
10 A.   I believe so.
11 Q.   In fact, when you indicated October earlier it
12     was really as early as September that you were
13     concerned about the increasingly late payments
14     of these checks?
15 A.   Yes.
16 Q.   Receiving money from your tenants in a timely
17     fashion is important to make ends meet with
18     mortgage and things of that nature?
19 A.   Yes.
20 Q.   Therefore, it's important for you to know that
21     you've got a financially stable tenant and able
22     to make payments on an ongoing basis?
23 A.   Yes.
24 Q.   That's why you called Mr. Newell, because you
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**83**

1     were concerned Wilson Credit was not such a
2     client or a tenant?
3 A.   I just wanted to maintain the tenancy and make
4     sure the rent came on a regular basis.
5 Q.   We can't be dancing around this issue, sir.
6     But as a reasonably prudent businessman you
7     knew from the beginning when you came in in
8     June that this was a highlighted tenant because
9     it was the only one with a guaranty, is that
10     correct?
11 A.   Yes.
12 Q.   You were concerned about the financial
13     condition and made inquiry about it; you spoke
14     with Mr. Karam; you spoke with the Schreibers?
15 A.   Yes.
16 Q.   Over the course of your dealings through the
17     first months that you were doing it, every
18     single month these payments were becoming later
19     and later?
20      MR. REILLY: Objection.
21 Q.   Is that correct?
22 A.   I don't know whether they were --
23 Q.   We just went through the dates.
24 A.   They were late.
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**84**

1 Q.   The fact that they were getting later and later
2     based on your experience in the field was a
3     sign of the financial inability to pay of the
4     tenant?
5 A.   I was just concerned that the rent was going to
6     be forthcoming.
7 Q.   I understand that, sir. But part of your job
8     as manager based on many years of experience in
9     the field, you knew that the classical pattern
10     of a tenant having an inability to pay was the
11     tenant being late and having increasingly late
12     rent payments?
13 A.   Yeah, that's a pattern.
14 Q.   In fact, you had called and confirmed that not
15     only was that a pattern but this corporation no
16     longer had an ability to make its rent
17     payments?
18 A.   I did not know that, whether they had an
19     ability or not had an ability.
20 Q.   In October -- it's not clear to me whether it's
21     September of October that you spoke with
22     Mr. Newell. He told you that Wilson could not
23     make the rent payments and that another entity
24     would be paying it?
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**85**

1 A.   Right, that's correct.
2 Q.   And, in fact, another entity started making
3     those payments on behalf of Wilson Credit?
4 A.   Correct.
5 Q.   So you knew that Wilson Credit was financially
6     unable to make ends meet?
7 A.   Whether I knew it or not --
8 Q.   Mr. Newell told you?
9 A.   Okay, that's what he said. He told me --
10 Q.   We can agree that you don't know personally
11     what their financial --
12 A.   I don't know personally what their financial
13     situation was.
14 Q.   But the best information you had is what
15     Mr. Newell told you?
16 A.   Correct.
17 Q.   And he told you they were unable to make ends
18     meet by September or October of 2003?
19 A.   He said they were going through a
20     reorganization and somebody else was going to
21     be paying the rent in the interim.
22 Q.   But that Wilson Credit was unable to make those
23     payments at that time?
24 A.   I don't think he put it specifically in those
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**86**

1     terms.
2 Q.   Do you know one way or another what he said
3     with regard to Wilson's ability to pay at that
4     time?
5 A.   He didn't say anything with regards to Wilson's
6     ability to pay. He said they were going to go
7     through a reorganization or a restructure of
8     their entity and someone else was going to come
9     in and manage the company, and in the interim
10     someone else would be paying the rent.
11 Q.   As a reasonably prudent real estate management
12     person, that required on your behalf action to
13     make sure that the new person coming in to run
14     this business was independently financially
15     able to make ends meet?
16 A.   Yeah, but I didn't know who that person was.
17 Q.   That's one of the reasons why you have a
18     non-assignment of lease without the permission
19     of the landlord in your lease?
20 A.   Right.
21 Q.   Because you wanted to be sure that whoever came
22     in and became responsible for running this
23     business could make ends meet?
24 A.   Right.
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**87**

1 Q.   You didn't want to be stuck with a non-paying
2     tenant?
3 A.   Right.
4 Q.   Now, at this point I would guess that it became
5     significantly more important for you to get the
6     guaranty from Consolidation I or II?
7 A.   Yes. It prompted me to be in contact with them
8     on a more regular basis than I had been in the
9     past.
10 Q.   Are those communications reflected in the notes
11     that we talked about earlier?
12 A.   I believe so. Either they're reflected in the
13     notes or in the telephone logs.
14 Q.   So at this point you found yourself between
15     sort of a rock and a hard place with no
16     guaranty, Wilson not being able to make ends
17     meet, and you needing the rent to make the
18     payments on the building?
19 A.   Yeah.
20      MR. REILLY: Objection.
21 Q.   What did you do to protect your interest at
22     this point in October, September?
23 A.   Well, I think I was pretty happy when the rent
24     came. I felt comfortable.
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

---

**88**

1 Q. Is there anything else that you did to protect
2    your interest to make sure you weren't going to
3    get stuck with these bills with winter coming
4    on?
5 A. Well, the only -- the only thing that I stood
6    to lose was the rent, and the rent was coming
7    in. To the best of my knowledge, the utility
8    bills were in the names of -- was in the name
9    of the tenant.
10 Q. We'll get into utilities in a second. I'm just
11    dealing with strictly from this point with
12    regard to the rent and what you did under all
13    of these circumstances to ensure that your
14    investment here was protected.
15 A. I called the tenant.
16 Q. Anything else that you haven't told us about
17    today?
18 A. No.
19 Q. Did you ever take any courses or have any
20    training, education, and experience in
21    collection practices or how to deal with
22    insolvent or nearly insolvent tenants?
23 A. No. On the residential end of it we use 14-day
24    notice and then we just follow through with the
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

---

**89**

1    eviction.
2 Q. Had you ever had an eviction of a tenant who
3    was unable to make ends meet in a commercial
4    setting prior to Wilson Credit?
5 A. No.
6 Q. Did you consult with an attorney regarding what
7    steps you could take to protect your interest
8    in this regard?
9 A. Yes.
10 Q. When first did you consult with an attorney?
11 A. I'm not really sure what the time frame was,
12    but I believe it was November.
13 Q. Was that Attorney Frank?
14 A. I believe so.
15 Q. As a result of your conversations with Attorney
16    Frank, did he do anything on your behalf?
17 A. I'm really not sure. I think he may have sent
18    them a notice to quit.
19 Q. Do you have a copy of that letter?
20 A. If it was not produced previously --
21 A. It was not.
22 A. Then I'll see if I can get one.
23 Q. I think the only letter that I have is a letter
24    Attorney Frank sent on January 28, '04,
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

---

**90**

1    regarding the damage to the property.
2 A. I think that may be it.
3 Q. That's just putting them on notice of the loss
4    and to notify their insurance company. It's
5    not a notice to quit. Is your memory that at
6    some point Attorney Frank sent a notice to quit
7    to Wilson Credit in November of '03?
8 A. I don't know.
9 Q. You just testified that he did.
10 A. I talked to him about it. I don't know whether
11    he had sent it.
12 Q. Was anything else done on your behalf before
13    January 9th, 2004, regarding Wilson Credit and
14    their ability to pay?
15 A. I believe I had some conversations with the
16    Karams with regards to that.
17 Q. What was the substance of your conversation
18    with the Karams?
19 A. That they were behind in the rent and they were
20    -- we had some concerns.
21 Q. You voiced your concerns to -- was it Jaimie or
22    James Karam?
23 A. I believe Jaimie.
24 Q. What did Jaimie tell you when you voiced your
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

---

**91**

1    concerns about Wilson's solvency?
2 A. He said to me, Are they paying the rent? I
3    said, Yes, they're behind a little bit. He
4    said, Well, as long as the rent is forthcoming,
5    even if it's late. He said, At this point in
6    time you may find it difficult in the
7    wintertime to switch over and get a new tenant.
8    He said to try to work with them.
9 Q. When you had conversations regarding the
10    ability of Wilson to pay, did you ever have any
11    conversations with anybody at Wilson?
12 A. I believe I did. I think it was Brandon
13    Wilson, and I believe it was in November of
14    2003, and he told me at that point in time that
15    all the check writing was going to be done out
16    of the Danvers office, out of Schreiber &
17    Associates.
18 Q. Did he say why?
19 A. No.
20 Q. Did you understand at that point that there was
21    an inability of Wilson to pay the bills
22    themselves as they became due?
23 A. No.
24 Q. Did that seem unusual to you, that a law firm
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

---

**92**

1    would be paying money for the benefit of a
2    non-related corporation?
3 A. Well, some of my other tenants, other
4    commercial tenants, are subsidiaries of larger
5    corporations, and the rent would be paid out of
6    Michigan for a tenancy that was here.
7    Sometimes on our residential end of it we would
8    have financial institutions pay the rent for
9    tenants from California, out of California, out
10    of New York City, out of Florida.
11 Q. I understand how that happens, but based on
12    numerous conversations you knew that Schreiber
13    & Associates was a law firm?
14 A. Yes.
15 Q. You knew that there was an indirect
16    relationship with Jeffery and Suzanne Schreiber
17    and the Consolidation entities?
18 A. I believe so, but I had seen the tax returns
19    for Consolidated, and they looked pretty
20    healthy, so I figured --
21 Q. But they had no obligation to make any payments
22    at this point in time?
23 A. They were making payments. They had no
24    obligation to, but they were.
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

---

**93**

1 Q. Had you ever seen the financial statements for
2    Wilson Credit?
3 A. No.
4 Q. Unlike your other tenants, this was a midstream
5    change in who the payor was?
6 A. Correct.
7 Q. That is generally based on your training,
8    education, and experience in the field of real
9    estate management a reflection of the financial
10    instability of the primary payor?
11 A. Yeah.
12 Q. We have referred to a number of these
13    spreadsheets which are beginning with 45 North
14    Main Street, Eagle rent rolls. What is that?
15    I'm just going to give you as an example the
16    November '03 one.
17 A. Eagle Restaurant?
18 Q. At the top it says --
19 A. I'm sorry, this building is known as the Eagle
20    building.
21 Q. All right, hence the Eagle Restaurant. Is this
22    a computer printout based on that of the entire
23    building or is this just an individual, like,
24    Excel spreadsheet that you fill out on an
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**94**

1      ongoing basis?
2  A.  It's a computer printout. It is not -- it's an
3      Excel spreadsheet.
4  Q.  In addition to giving the address and identity
5      of the tenant, we have across the top the
6      month. So this would be for November of '03,
7      is that correct?
8  A.  Yes.
9  A.  Then it has a column listed --
10  A.  Monthly rental.
11  A.  -- MO rent?
12      Yeah. That means monthly rental.
13  Q.  That's how much the rent is for that particular
14      month?
15  A.  Right.
16  Q.  Then there's a second column called balance.
17      What does that mean?
18  A.  That's the balance that is owing going into
19      that month.
20  Q.  So those numbers should be the same unless
21      there's a prior failure to pay?
22  A.  Correct.
23  Q.  What are the Columns 1, 2, 3, 4, and 5
24      attempting to reflect?

**95**

1  A.  Just basically when the rent payments are
2      later, when they -- in other words, if they
3      don't make a payment the first week of the
4      month, it usually gets posted the first week.
5      This information is lifted from individual
6      ledger sheets for each tenant. There's a
7      ledger sheet for each one of these tenants.
8  Q.  Is each one of these sheets prepared at the end
9      of the month?
10  A.  They're kept periodically during the month.
11  Q.  For instance, we seem to have one for each
12      month for --
13  A.  Correct. At the end of the month they're
14      compiled, at the end of the month or close to
15      the end of the month, because we use that
16      information there to tabulate a number of
17      things which is the two and a half percent that
18      was going J. Karam Management.
19  Q.  That's fair enough. So for this November one
20      it would generally be done sometime close to
21      December?
22  A.  Correct, or the first week, first couple of
23      days of December.
24  Q.  The time that this document was prepared Wilson

**96**

1      Credit had not paid its monthly rent for the
2      month of November?
3  A.  Correct.
4  Q.  In fact, there was no check attached to this?
5  A.  Correct.
6  Q.  And for all of the others we did get a copy of
7      the check that was paid, is that correct?
8  A.  Correct.
9  Q.  So as a result it had a due balance of 5666
10      from November?
11  A.  Right. Then on December's sheet that balance
12      would have been reflected and their balance
13      would have been twice as much.
14  Q.  I'm going to get to that in a second.
15      MR. MURPHY: Just so we'll know what we've
16      been talking about, for the record I'm going to
17      mark this as Exhibit No. 4 consisting of the
18      November 2003 rent roll for 45 North Main
19      Street.
20      (Exhibit No. 4, November 2003 Rent Roll,
21      marked for Identification.)
22      (There was a discussion off the record.)
23  Q.  If we then look at the December rent, as you
24      predicted that reflects a double payment is

**97**

1      due?
2  A.  Right.
3  Q.  So attached to the December rent roll is a
4      single check -- strike that -- two checks dated
5      December 18th from Consolidation USA, Inc., and
6      from Consolidation USA II, Inc., is that
7      correct?
8  A.  Hm-hm.
9  Q.  Each of those entities paid one month's rent --
10      strike that -- one-half of one month's rent?
11  A.  One-half of one month's rent.
12  Q.  So these payments are actually for the November
13      rent?
14  A.  Correct.
15      MR. MURPHY: May we mark this as Exhibit 5
16      consisting of the December 2003 rent roll for
17      45 North Main Street and the attached two rent
18      checks.
19      (Exhibit No. 5, December 2003 Rent Roll
20      and Checks, marked for Identification.)
21  Q.  As I understand from the records that were
22      produced, sir, these two checks attached to
23      Exhibit 5 are the last checks you ever received
24      from or on behalf of Wilson Credit?

**98**

1  A.  I think so.
2  Q.  We can go through these documents, but the next
3      one shows a balance of 11, and they just keep
4      on going up to August of '04 at which time they
5      owed almost $40,000?
6  A.  Correct.
7  Q.  You're not aware that any payments have been
8      made on their behalf since that?
9  A.  No.
10  Q.  When these checks came in, you're now getting
11      paid over a month and a half late on the
12      November rent. It's being split up between the
13      two entities. And you're not getting anything
14      on the December rent. Did that trigger any
15      activity on your behalf?
16  A.  Well, we were concerned. We're not a big
17      organization, and we don't have an awful lot of
18      manpower to write letters and do certain
19      things, so we just made some phone calls. And
20      in my conversations with Keith Newell, who
21      seemed to be the only one who was listening to
22      me, he kept on saying, We will catch up and
23      that I should not really be concerned.
24  Q.  When you say Newell seemed to be the only one

**99**

1      that was paying attention to you, what do you
2      mean by that?
3  A.  Well, I would call him and I would go through,
4      Is Jeffery Schreiber there? No, he's away
5      skiing. Obviously he's with his wife, so I
6      didn't even ask for her. Then I would say,
7      Well, is Keith Newell there? And they would
8      say yes, and I would speak to him or he'd call
9      me back or would not speak to me and had to
10      call again.
11  Q.  Is it fair to say that by the time you received
12      these checks in late December 2003 that you
13      were aware that Wilson had an inability to make
14      ends meet?
15  A.  I don't know. It seemed like you're phrasing
16      it -- I didn't care who paid the rent as long
17      as the rent came in. I was being told the rent
18      is going to be paid.
19  Q.  I understand that, but I want to suggest to you
20      for a second there are two different ways to
21      look at it. Obviously you're concerned that
22      money is being paid. But I'm just focussing on
23      Wilson Credit as an entity. Is it fair to say
24      that certainly by late December 2003 you were

**100**

```
 1      aware that it no longer had the financial
 2      ability on its own to make ends meet?
 3   A.  Yes. But I was aware of another problem as
 4      well, that the fact that the rent was late and
 5      that I still had not received a key to the
 6      premises prompted me to call quite a bit, and
 7      they were calling me back, and I was assured
 8      that I would be getting a key shortly.
 9   Q.  Why did you want a key?
10   A.  So I could go in there and I could see what was
11      doing.
12   Q.  See what was going --
13   A.  What was doing, what was going on.
14   Q.  What were the sort of things that you learned
15      in property management to look for?
16   A.  One of the things that I had talked to Keith
17      Newell about almost every time that I had
18      spoken to him was is the heat on, and he
19      assured me that they have a maintenance person
20      that they send over there every now and then to
21      just make sure that everything was fine and
22      that the heat was on.
23   Q.  I take it that you were concerned and one of
24      the reasons you wanted the key was to make sure
        (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**101**

```
 1      independently that the heat was on?
 2   A.  Independently I wanted to verify the fact that
 3      somebody had gone into the premises and the
 4      temperatures were set above freezing.
 5   Q.  Did you have any information as to whether
 6      Wilson employees were still working out of the
 7      premises?
 8   A.  We would see lights on there occasionally.
 9      They basically -- they would come in late in
10      the afternoon at around four-thirty,
11      five o'clock. That was the time that they
12      started. There were people there usually
13      during the daytime, but not an awful lot. In
14      the evenings, sometime after five o'clock, a
15      lot more activity picked up.
16          There were occasions that I stayed late at
17      work and I would see people hanging around the
18      side entrance and cigarette butts all over the
19      place.
20   Q.  At any time prior to January of '04, did you
21      become aware that Wilson had vacated the
22      premises, was no longer conducting business out
23      of that location?
24   A.  No. I did not have any reason to believe that.
        (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**102**

```
 1   Q.  When first were you aware they had vacated the
 2      premises?
 3   A.  I would say it was around the time that -- it
 4      was at the time the pipe broke that we got the
 5      key and we went into the space.
 6   Q.  Are you aware when they first vacated the
 7      premises?
 8   A.  As far as I'm concerned, they're still a
 9      tenant. I believe that -- legally when they
10      vacated the premises?
11   Q.  Just so we're clear, I'm not trying to play
12      little word games here, sir, but at some point
13      the premises stopped being an active work site.
14      And I'm not getting into whether under the
15      terms of the lease it was vacated --
16   A.  I believe it was in January of 2004 that we
17      started to -- their parking lot spaces were not
18      being used. We did not see any lights on. And
19      I had called to get the key, and my calls were
20      of a very, very urgent nature saying, I need
21      the key, I need the key.
22   Q.  Just a couple things. When did you first
23      observe that their parking spaces were not
24      being used?
        (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**103**

```
 1   A.  I did not observe it firsthand, but my parking
 2      lot attendant, Teddy, told me that their
 3      parking spaces were not being used.
 4   Q.  When did Teddy tell you that he first
 5      observed --
 6   A.  I believe it was the end of January. No, the
 7      end of December, but he said, Hey, maybe
 8      they're away for Christmas, maybe they're just
 9      taking some time off, then more so in the
10      beginning of January.
11   Q.  So at that point the fact that they weren't
12      using their parking spaces put you on a
13      heightened sense of alert that they had stopped
14      using it as a working environment?
15   A.  I guess.
16   Q.  Without guessing --
17   A.  Yeah.
18   Q.  That coupled with the fact that you didn't see
19      the lights on reinforced that they weren't
20      working there any longer?
21   A.  I started getting a lot more concerned around
22      then.
23   Q.  Fair to say that the lights were not observed
24      to be on as of the end of December as well?
        (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**104**

```
 1   A.  Yeah. That would probably be fair to say.
 2   Q.  Is it around the end of December that you
 3      started calling with a more urgent voice to
 4      folks to try and get the key?
 5   A.  Hm-hm. Yes.
 6   Q.  Who did you call beyond Mr. Newell to try and
 7      get the key?
 8   A.  Suzanne Schreiber, Jeffery Schreiber.
 9   Q.  Is this the period that they were away on their
10      skiing vacation?
11   A.  I think so. There were a couple of other
12      people in their organization, but I can't
13      remember. I can't remember their names.
14   Q.  Did you get a legal opinion as to whether you
15      could even enter the premises at that time?
16          MR. REILLY: That's a yes or no question.
17   A.  Yes.
18   Q.  As a result of getting that opinion, did you
19      conclude that you could properly enter the
20      premises?
21   A.  No.
22   Q.  As a result of that opinion, did you undertake
23      to contact the Wilsons to get permission to
24      enter the premises?
        (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**105**

```
 1   A.  Yes.
 2   Q.  What did you do to contact the Wilsons?
 3   A.  We called them.
 4   Q.  Did you have any feedback from them?
 5   A.  They said that the key is in the possession of
 6      the Schreibers.
 7   Q.  Did you ever confirm that with anybody else as
 8      being a true statement of fact?
 9   A.  Yeah, I did. Keith Newell told me he had the
10      keys.
11   Q.  Did he tell you why he would not give them to
12      you?
13   A.  Originally he said there were problems with
14      security, security issues.
15   Q.  I understood that occurred back in September
16      and October?
17   A.  That was September, October, and November. I
18      called to his attention that we're having
19      through our keys and we don't have a key to
20      this premise, these premises. He said or
21      somebody said, Well, there's a reason for that,
22      and the reason is because we have sensitive
23      documents, people's credit reports, financial
24      data that's open to public view if somebody
        (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**106**

```
 1     were unauthorized to go in there.  So we have
 2     requested this to be a secured premises.
 3  Q. Did you ever make a formal demand upon the
 4     tenant for access to the premises to inspect it
 5     as you had a right under the lease?
 6  A. Yeah.  I did inspect it on several occasions.
 7     I believe it was in the months of September and
 8     October.  I inspected it.  I inspected it on
 9     several occasions with regards to air
10     conditioning problems, electrical problems.
11  Q. Those were problems the tenant called your
12     attention to and you came in to inspect them
13     and have them repaired?
14  A. Yeah.  There was a question as to the
15     temperature setting for the air conditioning
16     units and stuff like that.  They wanted to know
17     how to turn on the thermostats or the
18     regulators.  They were actually turning the
19     wrong ones on.  I guess they had access to the
20     thermostats.  They weren't locked.
21         So we showed them how to switch over from
22     the off position to the on position and
23     regulate it manually which they weren't doing.
24     In that space there was probably about 20
       (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**107**

```
 1     thermostats.
 2  Q. Prior to the loss and after these two
 3     inspections in September and October, did you
 4     ever have any other occasion to conduct an
 5     inspection of the premises?
 6  A. No.
 7  Q. Fair to say that as the financial ability of
 8     the Wilsons to pay became more well-known to
 9     you, and you've indicated you had very specific
10     issues with regard to their ability to pay for
11     the heat, whether they were keeping it above
12     freezing, what did you do in December and early
13     January to ensure that the premises were being
14     properly heated?
15  A. I was watching -- we were watching the
16     temperature in the area, what the weather
17     forecasts were.  As it got colder, we stepped
18     up our inquiries as to when we were going to
19     get a key.
20  Q. Anything else beyond that that you did to
21     ensure that the premises were heated properly?
22  A. No.
23         MR. MURPHY:  I am going to make a formal
24     demand for the identity of the lawyer and the
       (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**108**

```
 1     advice that was given with regard to his
 2     ability to enter the premises for the reason
 3     that the steps he took to maintain the heating
 4     is the key issue in the case, and if he's got a
 5     legal opinion he's going to rely on to the
 6     effect he did not enter the premises that would
 7     be discoverable.
 8         MR. REILLY:  I agree with you that if we
 9     intend to rely on legal opinion as one of the
10     reasons that he did not enter the premises that
11     you have a right to it.  I don't know right now
12     that we intend to do that.  If we do, I'll tell
13     you and I'll give you a chance to ask Mr. Wood
14     about it.
15         I'm not prepared to waive the privilege
16     right now.  I would instruct him not to answer
17     any questions about conversations with counsel
18     on that subject.
19         MR. MURPHY:  Fair enough.
20  Q. You've heard your attorney.  I think
21     technically I can ask you if you are going
22     to follow his advice to not waive the
23     attorney/client privilege and not discuss
24     conversations with your attorney?
       (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**109**

```
 1  A. I'll follow his advice.
 2  Q. Can you identify who the attorney was that you
 3     consulted with?  Is that Attorney Frank again?
 4  A. I believe so.
 5  Q. Did you receive any documents from Attorney
 6     Frank giving you an opinion as to what you
 7     could or could not do under the circumstances?
 8  A. No.  We had a conversation.
 9  Q. Again, please don't tell me any conversations
10     based on the position that your attorney has
11     taken.  Do you recall when that conversation
12     took place?
13  A. No, not specifically.  But from my own
14     experience in managing residential property if
15     a tenant doesn't want you in their apartment
16     they can tell you that they don't want you in
17     their apartment.  You can make all the requests
18     upon them to get into their apartment as
19     frequently as you want.  If they say you can't
20     get in the apartment, you can't get in the
21     apartment.
22  Q. Did Attorney Frank look at the lease that you
23     had with Wilson Credit during your conversation
24     with him?
       (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**110**

```
 1  A. I believe so.
 2  Q. Do you have a memory one way or another?
 3  A. No.
 4  Q. Do you recall how long the conversation took
 5     place with Attorney Frank?
 6  A. You mean duration in time?
 7  Q. Correct.
 8  A. Probably about five minutes.
 9  Q. Do you recall where that conversation took
10     place?
11  A. In his office.
12  Q. Do you recall what documents, if any, you
13     brought for him to review?
14  A. No.
15  Q. Is it fair to say that you had this
16     conversation with him because you were
17     concerned about Wilson not adequately heating
18     the premises and it falling into disrepair?
19         MR. REILLY:  Objection.  I instruct the
20     witness not to answer.
21         MR. MURPHY:  Let me rephrase the question.
22  Q. If I phrased it differently, I don't want you
23     to talk about the conversation that you had,
24     what you told Attorney Frank.  What I am trying
       (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**111**

```
 1     to find out is if you went to Attorney Frank
 2     because you were concerned and the reason you
 3     wanted to have this inspection was that you
 4     were concerned that Wilson wasn't paying the
 5     heating bills and that the property could fall
 6     into disrepair if you couldn't inspect it?
 7         MR. REILLY:  Objection, instruct the
 8     witness not to answer.
 9         MR. MURPHY:  On what basis?
10         MR. REILLY:  I think that's a covert way
11     of getting into the subject of the
12     conversation.  I gave you the right to ask
13     whether he had a discussion on the subject of
14     access, and he's answered that.  When you start
15     to get into his state of mind as to why he's
16     seeking legal counsel, I think you're going
17     over the line, and I'm going to instruct him
18     not to answer.
19         You have a right to know whether he
20     consulted with counsel on the subject.  You
21     have inquired there.  I don't think you have a
22     right to go further.
23  Q. But you did have conversations with Mr. Newell
24     on this point when you asked Mr. Newell if the
       (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**124**

```
1  A.  To the best of my knowledge, they were doing
2      business right up until the date of loss.  They
3      had activities going on.  They were receiving
4      mail there.
5  Q.  Let me redefine doing business.  We had chatted
6      earlier about the fact that their parking
7      spaces were not being used and that the lights
8      weren't being used which led you and
9      Mr. Freitas to conclude that they were not
10     working in the space.
11         For what period of time did you conclude
12     that they were not working in the space prior
13     to the date of loss?
14 A.  The end of December.
15 Q.  Can you be any more specific than that?
16 A.  I'd probably say it was somewhere around
17     Christmas, just before Christmas.
18 Q.  Are you sure they were working in the month of
19     December in that building?
20 A.  We saw activity.
21 Q.  What sort of activity did you see in December
22     prior to --
23 A.  People coming and going.
24 Q.  Sir, you had indicated that you saw a letter
```
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**125**

```
1      from either Bristol or Karam to Wilson
2      regarding the method of handling the utilities.
3      Are you aware of any other changes or
4      alterations to the lease between 45 North Main
5      Street and Wood Development?
6  A.  No.
7  Q.  Was there ever any formal assignment of the
8      lease between 45 North Main Street, LLC, and
9      Wilson to Wood Development?
10 A.  No.
11 Q.  Did Wood Development have any policies or
12     procedures as to how they would deal with
13     tenants who engaged in a slow or no payment of
14     their rent?
15 A.  Not really.  The best policy that we had was to
16     work with the tenant through a difficult period
17     because the space was relatively large and it
18     would probably take some time to find a
19     suitable replacement party.
20 Q.  When you say the space was large, are you
21     referring specifically to Wilson?
22 A.  Wilson Credit.  We analyzed everyone on a
23     situation-to-situation basis and found it
24     easier to deal with problem tenants than to try
```
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**126**

```
1      to find a new tenant.
2  Q.  Is it fair to say that it was the policy of
3      Wood Development to follow up with any tenant
4      who didn't pay their rent by the 1st of the
5      month?
6  A.  No.  That was not our policy.  Our policy was
7      that we usually waited longer than that.
8  Q.  How long would you wait?
9  A.  Sometimes we would wait ten days.  Sometimes we
10     would wait 15 days.  It was usually when
11     somebody called it to my attention or when we
12     would check the records to see what was coming
13     in on a fairly regular basis.
14 Q.  Were all these policies just oral, your policy?
15 A.  Yes.
16 Q.  What would you do if there was a recurrent
17     nonpayment or late payment of rent?
18 A.  Like I said, it was easier to work with an
19     existing tenant than it was to try to find a
20     new tenant or replace the tenant.
21 Q.  You would take that position for all spaces?
22 A.  No, not all spaces, on a space-by-space basis.
23     This space being a relatively large space my
24     feeling was to try and get the tenant to catch
```
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**127**

```
1      up and reposition things themselves.
2  Q.  Is it fair to say that since you were new to
3      the commercial landlord business at the time
4      that this loss occurred you really didn't have
5      a formal policy as to how you dealt with this?
6  A.  We had a policy.  It wasn't a formal policy.
7      It was a relatively informal policy.  We had
8      other tenants that basically fell behind in the
9      rent, and we dealt with them in a manner and in
10     a fashion that were basically dictated by the
11     terms and the atmosphere and the circumstances
12     surrounding the event.
13 Q.  Each case would be on a case-by-case basis?
14 A.  Each case was on a case-by-case basis.  I can
15     tell you that one of our attorney tenants
16     basically came -- well, he didn't come to us.
17     We went to him and said, Hey, you're two months
18     behind.  What's up?  He said, We're getting
19     close to settling a large product liability
20     case or something like that, or personal injury
21     death action, and we're sorry for the
22     inconvenience.  We'll catch up in a couple
23     weeks.  Sure enough, in a couple weeks they
24     caught up.
```
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**128**

```
1         MR. REILLY:  Story with a happy ending.
2         MR. MURPHY:  Thank goodness for those
3      large product liability cases.
4  Q.  I show you a document that appears to be a
5      quitclaim deed for sale of the property from
6      45 North Main Street to Wood Development
7      Limited Partnership.
8  A.  Yes.
9  Q.  As far as you know, it's a complete and
10     accurate copy of the deed?
11 A.  Yeah.
12 Q.  It appears to have a notary public by
13     Arthur Frank?
14 A.  I believe so.
15 Q.  That's the same Arthur Frank that we've been
16     talking about?
17 A.  Yes.
18 Q.  Was he acting as your attorney for --
19 A.  No.  At that time he was acting as the attorney
20     for the seller.
21 Q.  For 45 North Main Street?
22 A.  45 North Main Street.  His relationship with
23     them goes way beyond my relationship with him.
24 Q.  Fair enough.  On the last page of the deed is a
```
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**129**

```
1      diagram of the site?
2  A.  Hm-hm.
3  Q.  Is that correct?
4  A.  Yes.
5  Q.  That shows the existing building?
6  A.  Yes.
7  Q.  What's beneath the existing building on the
8      corner of Purchase and --
9  A.  This is a parking lot with a bank drive-thru
10     window.
11 Q.  Where within the space is the property leased
12     to Wilson?
13 A.  Do you want me to draw?
14 Q.  Perhaps you could just point out to me.
15 A.  Their space goes from approximately here like
16     that (indicating).
17 Q.  So as one is looking at this diagram, the
18     left-most, from my perspective, third of the
19     building the entire length from top to bottom
20     on this page of the building was the Wilson
21     space?
22 A.  Correct.
23 Q.  They had the first floor and the basement along
24     that same footprint?
```
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

148

1 A. (Writing.)
2 MR. MURPHY: We'll mark that as Exhibit 7,
3 and we can agree that this is not to scale.
4 (Exhibit No. 7, Diagram, marked for
5 Identification.)
6 Q. So as I understand it, before we began this
7 diagram you were standing on the first floor --
8 A. The only area that we had access to was right
9 here (indicating).
10 Q. What's that area, sir?
11 A. It's like to the left of the doorway just prior
12 to going upstairs.
13 Q. So you just drew an X to the left of the
14 delivery door which would essentially be the
15 first floor landing?
16 A. Hm-hm.
17 Q. As you came in the entrance, there was a
18 stairway that went upstairs that was locked to
19 prevent access from anyone going upstairs, and
20 there was a second door that prevented access
21 downstairs?
22 A. Correct.
23 Q. Any time you wanted to go upstairs or
24 downstairs you could only do that with the
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

149

1 permission and key of the restaurant owner, is
2 that fair?
3 A. Correct.
4 Q. But going back --
5 A. The restaurant owners were not there all the
6 time.
7 Q. The area where you were standing was on this,
8 essentially where the X is on this diagram when
9 you said you heard the motors running?
10 A. Correct.
11 Q. That would have been through this locked door
12 at the top of the stairs, the locked door into
13 the anteroom, and the locked door into the
14 utility room away?
15 A. Right.
16 Q. Is that the only time that you checked to see
17 if the utilities were working?
18 A. Yeah.
19 Q. On what date did that occur to the best of your
20 knowledge?
21 A. I would say once in October, once in November,
22 and once in December.
23 Q. I'm sorry. I thought you told me you had only
24 done it once?
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

150

1 A. No. I had done it more than once.
2 Q. When in December did you do that?
3 A. I would probably say middle of December.
4 Q. It was by the end of December that you were
5 getting really concerned about the nonpayment
6 of rent and the heat being turned off?
7 A. It was starting to get colder.
8 Q. How come you didn't do anything at the end of
9 December to go down and make sure that the
10 utilities were working?
11 A. I was just under the assumption that they were.
12 Q. Did you ever call the utilities to make sure
13 that monies were being paid in a timely fashion
14 to ensure that heat was still being provided to
15 the facility?
16 A. Yes, but after the fact. After the fact I
17 called them and asked them for certain
18 information, and they said that was not -- they
19 couldn't divulge that information. They told
20 me if it was the subject matter of a lawsuit
21 that they would be able to divulge it if they
22 were subpoenaed.
23 Q. No. 1, you never called them to make sure the
24 gas was still on prior to the date of loss?
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

151

1 A. I didn't think it was my responsibility.
2 Q. No. 2, when you did call them after the date of
3 loss what was it they said they couldn't give
4 you?
5 A. I asked them whose name the meter was in, and I
6 got a lot of resistance as to when the heat was
7 shut off and what the time frame was. Later on
8 I found out that the meter was shut off on New
9 Years' Eve, December 31st.
10 Q. What utility was this that you asked?
11 A. Gas company.
12 Q. What did the gas company -- did they tell you
13 who the name of the person on the utility was?
14 A. Wilson Credit.
15 Q. So notwithstanding the resistance they did give
16 you the info?
17 A. I didn't get it through normal channels.
18 Q. What channels did you get it through?
19 A. Through an employee who worked for the
20 president of the gas company.
21 Q. Did they tell you why it was shut off on New
22 Years' Eve?
23 A. Nonpayment. And I asked them if they had an
24 obligation to inform the owner of the property,
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

152

1 and they said that not normally but now they
2 would.
3 Q. Who is this person from the president's office
4 that you spoke to?
5 A. A fellow by the name of Hank Nadeau.
6 Q. How do you spell Hank's last name?
7 A. N-A-D-E-A-U.
8 Q. What's his position?
9 A. I'm not sure, but I think it has something to
10 do with credit. He was the credit --
11 Q. When you say he was in the office of the
12 president, what do you mean by that?
13 A. The former president of the gas company. The
14 gas company was sold at around that time.
15 Q. New England Gas Company?
16 A. New England Gas Company was sold. Before it
17 was New England Gas Company, it used to be
18 called Fall River Gas.
19 Q. Did you obtain any other information from New
20 England Gas Company?
21 A. No.
22 Q. Did you have any dealings with the electric
23 company?
24 A. I tried to find out some information after I
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

153

1 had the meter switched over to my name and was
2 not successful. They told me that they could
3 not give me that information. I asked them
4 whose name the meter was under, and they
5 wouldn't tell me anything.
6 Q. Did you have to do anything to establish that
7 you were, in fact, the owner of the property
8 before you switched over to --
9 A. I told them I was the owner of the property.
10 Q. All you had to do was say, I'm the owner?
11 A. Yeah.
12 Q. Once you said you were the owner, they switched
13 you over without any other problem?
14 A. Oh, yeah. They said, You have plenty of credit
15 with us. Then I asked them also, I said,
16 Before you shut it off don't you get in touch
17 with the owners? They said no. Then I
18 explained to them there was some serious damage
19 done to the property, and they said, Well,
20 we'll put a notation in the file that if this
21 ever happens again that we'll notify you.
22 Q. A verified complaint was filed on your behalf
23 against Wilson Credit Services?
24 A. Yes.
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

184

| | |
|---|---|
| 1 | Q. |
| 2 | A. |
| 3 | |
| 4 | |
| 5 | |
| 6 | Q. |
| 7 | A. |
| 8 | Q. |
| 9 | A. |
| 10 | Q. |
| 11 | |
| 12 | |
| 13 | A. |
| 14 | Q. |
| 15 | |
| 16 | A. |
| 17 | Q. |
| 18 | A. |
| 19 | Q. |
| 20 | |
| 21 | A. |
| 22 | |
| 23 | |
| 24 | |

1 Q. Why did you have two phone calls on the 8th?
2 A. To say you promised me the key and I have not
3 gotten it yet. He told me, if I spoke to him,
4 it was in the mail and I should be getting it
5 shortly.
6 Q. When did you get it?
7 A. I believe I got it on the 9th.
8 Q. Did you really?
9 A. Yeah.
10 Q. Did you have any information as to when the
11 loss actually occurred if you discovered it on
12 the 9th?
13 A. When we discovered it, it was on the 9th.
14 Q. Is it your belief based on the damage you saw
15 that it happened on or about the 9th?
16 A. No.
17 Q. What's your belief?
18 A. I believe that it happened before that.
19 Q. Do you have any information as to how much
20 before that?
21 A. It would be purely speculative, I think, on my
22 part, but I will tell you that based upon the
23 first water bill that came in after this water
24 damage the water bill had jumped from on an

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

185

1 average of $200 a period, in other words,
2 whether they billed quarterly or monthly --
3 each city and town does it a different way.
4 For example, in New Bedford they do it monthly,
5 the water and sewer monthly, because they don't
6 want you to get too far ahead of them.
7 The bills are higher lately. It's like
8 equivalent to a mortgage payment when you pay
9 the water bill.
10 Anyway, in Fall River I believe I was
11 paying quarterly, and on average the quarter
12 bill for this property was somewhere between
13 $180 and $200 a quarter. The first bill we got
14 after this pipe had broke was for over $2,000.
15 Q. Does that give you any approximation as to
16 volume of water that was used?
17 A. It was quite a bit.
18 Q. For instance, were there inches of water in the
19 basement?
20 A. Yes.
21 Q. How many inches of water?
22 A. In some spots it actually sogged your socks.
23 In other spots it was just around the sole of
24 your foot. In other spots it had actually

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

186

1 frozen and turned into a skating rink.
2 Q. So somewhere between a quarter of an inch to
3 2 inches?
4 A. I would say so.
5 Q. Have you considered a suit against
6 Mr. Schreiber for failing to give you a key on
7 an earlier basis?
8 A. Yes.
9 Q. Are you going to pursue that?
10 A. Yes, I'd like to pursue that. Can we just have
11 a quick break off the record?
12 (There was a discussion off the record.)
13 Q. To your knowledge Mr. Schreiber had the only
14 key that was available to check out either his
15 space or the utility room from his space?
16 A. I don't know whether he had the only key, but
17 he had the key.
18 Q. The only one you were aware of?
19 A. Yes.
20 Q. Was any other tenant affected by this loss?
21 A. No.
22 Q. These came together paper-clipped. I'm not
23 sure if they're supposed to be that way, but
24 I'm not going to pull them apart. One is an

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

187

1 e-mail from you apparently to Keith Newell when
2 the loss occurred. The second one is a fax
3 cover sheet from Jaimie to you.
4 A. The question?
5 Q. Was Jaimie involved in the resolution of this
6 loss? I see it's a January 9, '04, e-mail
7 faxed to you which says, I tried to get Wilson
8 Credit heat checked, but no gas or electric to
9 supply something in heaters. Need these turned
10 on ASAP, and call Miller at Air Master or
11 Sardinha. What was his involvement? Why did
12 he get involved?
13 A. When the mail came on that Friday morning and I
14 opened up the key, I called Jaimie and said, I
15 have a key, and I said, I'm going to have a
16 couple of copies made and I'll give you a copy.
17 He said, Great.
18 So I left the key and -- I went and had
19 keys made, and I left the key for him in the
20 office. He said he was going to go over there
21 and check it. I don't recall exactly what time
22 of day, but I was on my way to another
23 property, and I got a call from either my
24 secretary or from my maintenance man saying

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

188

1 that I better get back.
2 Q. Do you remember what time of day that was?
3 A. It was in the early afternoon.
4 Q. Jaimie was the one who went over and discovered
5 it?
6 A. Jaimie was the one who went over and discovered
7 it and immediately called my maintenance -- or
8 called the office and my maintenance man went
9 over there, and they went through the space
10 together.
11 Q. Why would Jaimie be the person to come over
12 your place, pick up the key and go over and
13 inspect the place?
14 A. That was part of his -- I don't know. I don't
15 know. I think he went over there with -- the
16 way I think it worked out is he went over with
17 my guy Gary, and they went over there together.
18 I don't know what the logistics were.
19 Q. Why did you call Jaimie as soon as you got the
20 key? Was this a pre-existing plan?
21 A. Oh, yeah, no, because we had been talking to --
22 I had been talking to him about the fact that I
23 kept on requesting the key and that I was
24 waiting to get it, and he said, Well, call me

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

189

1 when you get it. I got it and I called him. I
2 had an appointment somewhere else, so my
3 superintendent went over there with him.
4 Q. Who was the superintendent who went with him?
5 A. Gary.
6 Q. We had his name earlier.
7 A. Freitas.
8 Q. Did either Gary or Jaimie to your knowledge
9 make any notes or take any photographs of what
10 they observed at that time?
11 A. No.
12 Q. Is it your understanding that prior to getting
13 the key from Mr. Schreiber on January 9th you
14 had no right or ability to gain access to that
15 property?
16 A. Yes.
17 Q. Is it you had no legal right?
18 A. I believe so. I had no legal right.
19 Q. I direct your attention to Paragraph 17.2 of
20 the lease called Access to Premises. Have you
21 seen that document before?
22 A. Hm-hm.
23 Q. You're aware that the language generally
24 provides that the tenant shall permit the

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

190

```
1            landlord to --
2    A.     Gain access to the premises.
3    Q.     -- upon reasonable advanced notice to gain
4            access to inspect it to ensure that the
5            property is safe?
6    A.     Right. And the conversations that I've had
7            with the Schreiber organization and Keith
8            Newell and everyone else there is, Have your
9            guy come down there; I'll have him walk me
10           through the premises; I just want to make sure
11           everything is fine.
12                  They kept on assuring me that everything
13           was fine and that they were there on a regular
14           basis and there were no problems.
15   Q.     We'll put that to one side. All I'm talking
16           about is the terms of the lease. It's a fair
17           statement that you understood that pursuant to
18           Paragraph 17.2 of the lease you could gain
19           access to the premises on your own to ensure
20           that it was being maintained in a reasonably
21           safe condition?
22   A.     Correct.
23   Q.     You didn't do it because you didn't have the
24           key?
```
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

191

```
1    A.     Correct.
2    Q.     It would have cost you the cost of a locksmith
3            to gain access to the property, is that
4            correct?
5    A.     Correct.
6    Q.     That's the only thing that kept you from
7            gaining access to it?
8    A.     No.
9    Q.     What else kept you from gaining access to it?
10   A.     The tenant basically telling me or
11           representative of the tenant telling me that we
12           couldn't have access because of the security
13           issues to the stuff that was in the premises.
14   Q.     That was not in the lease?
15   A.     Not that I know of, no.
16   Q.     As far as at least the lease is concerned, you
17           understood that you had the right to gain
18           access to the premises for reasonable
19           inspection of the premises?
20   A.     Yes.
21   Q.     Did Jaimie have any further involvement other
22           than going over on January 9th to inspect the
23           premises beyond what you've told me?
24   A.     Afterwards?
```
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

192

```
1    Q.     Right. Once he went over there and saw it, did
2            he do anything else in the --
3    A.     Afterwards I believe he got in touch with the
4            people at Air Master and the plumbing company.
5            And when I showed up, they were all there. And
6            the plumber had turned off the water to the
7            building.
8    Q.     Anything else he was involved in?
9    A.     I'm not sure whether he called the electric
10           company as well or -- when I say the electric
11           company, I mean he may have called the
12           electricians, and I had a relationship with the
13           electricians as well.
14   Q.     Just putting to one side the details, other
15           than generally the first day or so in getting
16           involved in helping coordinate things, did
17           Jaimie have any long-term involvement in
18           negotiating resolution or following up with
19           Wilson or its agents or anything of that
20           nature?
21   A.     No.
22   Q.     He just helped on the day of accident and
23           emergency --
24   A.     We talked as to what I should do and how I
```
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

193

```
1            should handle the situation and stuff like
2            that.
3    Q.     When the plumber turned off the water, was
4            there a water valve for just the Wilson
5            property or did the whole building have to --
6    A.     Originally I think he turned off the water for
7            the whole building.
8    Q.     But, again, was there a valve that controlled
9            just the Wilson space?
10   A.     I believe so.
11   Q.     Where was that valve located?
12   A.     In the utility room.
13   Q.     That's the utility room that we've described as
14           being where the boiler is and whatnot for
15           Wilson and the restaurant?
16   A.     Hm-hm.
17   Q.     That's yes for the record?
18   A.     Yes.
19   Q.     We had marked earlier these documents. I came
20           up with a February 4th letter. Thereafter, you
21           folks also produced a copy of the January 30th
22           letter to Jeff Schreiber from Jaimie attaching
23           the bills that you were referring to?
24   A.     Hm-hm.
```
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

194

```
1    Q.     Is this the letter that you were referring to
2            before?
3    A.     Yeah.
4    Q.     They include a number of utility bills.
5            There's also some billing from the Fall River
6            Gas Company. Do you have any understanding or
7            information as to what that is about?
8    A.     The air conditioning units were run by gas as
9            well. They're gas-fired air conditioning
10           units.
11   Q.     So this is just a random note that Fall River
12           Gas Company checked the --
13   A.     They went over to see why, I believe it was,
14           the air conditioning wasn't working.
15   Q.     That was June 26, '02?
16   A.     Yeah.
17   Q.     That's got nothing to do with anything here?
18   A.     No. I think it has to do with the tenant's
19           responsibility.
20   Q.     What does it have to do with the tenant's
21           responsibility?
22   A.     The tenant's responsibility was to pay for the
23           utilities, for the gas, or the understanding of
24           the tenant's responsibility.
```
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

195

```
1    Q.     So are you suggesting this June 26, '02, bill
2            was part of the $3,009.65 referenced in --
3    A.     I don't know because I didn't add it up. If
4            you go to, I think, the last page there's a
5            check there actually from Wilson Credit to --
6    Q.     And that pays that amount?
7    A.     Hm-hm. I never had a copy of that check, but
8            when I was putting this all together I said --
9            is that Brandon Wilson's signature on the
10           bottom of that saying --
11   Q.     You're welcome to look at it. It's just a
12           letter from Jaimie to Brandon saying this is
13           the date of our commencement. This is the date
14           you're going to start paying rent. This is the
15           amount of the rent. We won't send you an
16           invoice. If you're in agreement, please sign.
17                  Who to your knowledge was the power behind
18           Wilson Credit from the Wilson perspective? Was
19           it Brian or Brandon?
20   A.     I don't know. I don't really know.
21   Q.     Did you ever deal with either of those
22           individuals?
23   A.     Yeah.
24   Q.     Could you identify them by appearance?
```
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**202**

1   the financial viability of a party?
2 A. I don't know.
3 Q. You were aware that on its terms that
4   Consolidation USA had loaned money to Wilson
5   Credit?
6 A. Yes.
7 Q. And Consolidation USA was trying to protect its
8   interest in that loan to Wilson Credit by
9   having the lease assigned to it?
10 A. Correct.
11 Q. And that read in conjunction with the operating
12   agreement for Wilson which was also produced to
13   you, is that correct?
14 A. Correct.
15 Q. That agreement was actually amended in
16   March 2002 to restrict the member's ability to
17   transfer their interest in the property?
18 A. Yes.
19 Q. You were aware of that?
20 A. Yes.
21 Q. You were aware that that was generally done
22   when someone was concerned about the financial
23   viability of a business entity?
24 A. I don't know if that's what it would be done
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**203**

1   for, but I know that when people start up a
2   business they usually restrict the ability to
3   transfer interest for one reason or another.
4 Q. It's to transfer, to sign, sell, give, pledge,
5   hypothecate, or otherwise encumber its interest
6   in the company?
7 A. Correct.
8 Q. It basically doesn't let any member do anything
9   to get out of the business?
10 A. Right.
11 Q. It's fair to say that that is done in the
12   situation where there's financial stability to
13   prevent one member from jumping ship?
14 A. I don't know.
15 Q. Do you read this document to be reflective in
16   conjunction with the collateral assignment of
17   lease that Wilson was not a financially viable
18   company?
19 A. Yes.
20 Q. This third document that I referenced earlier
21   is the May 7, '03, letter from Jeffery
22   Schreiber to somebody called Mark Arnold at
23   Debt Management, Inc. This is again
24   seven months before the loss that takes place
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**204**

1   in this case, is that correct?
2 A. Yes.
3 Q. This was in the documents you received from
4   Mr. Karam?
5 A. Yes.
6 Q. It indicates that Wilson Credit is hiring Mark
7   Arnold to run Wilson Credit?
8 A. Yes.
9 Q. You are aware that it says in it, Unfortunately
10   over the past year Wilson Credit has been
11   mismanaged and is presently insolvent, is
12   unable to pay its bills as they became due.
13   Were you aware of that when you came on?
14 A. Well, I'm aware of the letter. I'm not aware
15   of anything that is -- having now know
16   Mr. Schreiber in a little bit more intimate
17   detail, I am not aware that anything in there
18   is truth or falsity. If he told me the sun was
19   shining, I'd have to go there and take a look
20   at it for myself. The reputation --
21 Q. We can agree that sitting here after everything
22   has transpired that's your belief. What I'm
23   doing is bringing you back to June of '02.
24 A. Correct.
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**205**

1 Q. In June of '02 this is part of the packet that
2   you got about Wilson Credit?
3 A. Correct.
4 Q. It says in as frank language as possibly can be
5   that Wilson Credit is a failed company and
6   cannot pay its bills?
7 A. Right.
8 Q. That's not something you had discussed or we
9   had seen earlier in the day, but in light of
10   this it's clear to say that you knew that
11   Wilson was an extremely risky tenant to have in
12   there in terms of its ability to pay?
13 A. That's your characterization. My belief at
14   that point in time was that Wilson Credit was
15   the tenant and that they were being backed up
16   by Consolidated USA I and II, and that all of
17   this stuff that was going on where they were
18   collateralizing their assets and restructuring
19   the company, my thinking or my belief was that
20   all of this stuff stood to benefit me because
21   now in addition to Wilson Credit there was
22   going to be Consolidated and the Schreibers
23   behind it.
24 Q. You knew that the Schreibers had no legal
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**206**

1   obligation to support the company?
2 A. Based upon their guaranty, their limited
3   guaranty, but in my conversations with them
4   they made representations to me that the terms
5   of the lease were satisfactory to them and they
6   wanted to maintain the viability of the lease.
7 Q. I understand that, and having somebody's word
8   is better than nothing, but I'm just focussing
9   on one thing. You knew at this point in time
10   there was no legal obligation of the Schreibers
11   or Consolidation USA I or II to continue to pay
12   the bills of Wilson Credit?
13 A. Correct.
14 Q. Did you read in here where he wrote that,
15   quote, I am the signer on the lease covering
16   25 North Main Street, Fall River,
17   Massachusetts, close quote.
18 A. Yes.
19 Q. That was a false statement, wasn't it?
20 A. Actually his wife is the signer of the lease.
21 Q. Was it the wife?
22 A. Yeah. It was Wilson, and also on the guaranty
23   was his wife.
24 Q. So just referring to Page 32 of the lease, it's
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**207**

1   Patrick Wilson who is the signer of the lease?
2 A. Hm-hm.
3 Q. Mr. Schreiber did not sign anything?
4 A. That's right. The wife signed.
5 Q. The wife signed a guaranty?
6 A. Correct.
7 Q. So that does not give that person any rights
8   under the lease. It only gives them the
9   financial obligation to pay in the event the
10   tenant defaults?
11 A. Hm-hm.
12 Q. Is that a correct statement?
13 A. Correct.
14 Q. As you understand it?
15 A. Correct.
16 Q. So the statement by Mr. Schreiber here is
17   false?
18 A. I guess so.
19 Q. Did you ever do anything to correct that?
20 A. No.
21 Q. Did you ever do anything to follow up on
22   determining what involvement Debt Management,
23   Inc., had in the runnings of Wilson Credit?
24 A. No. But, like I said, all of this
(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

INDENTURE OF LEASE

Between

FORTY FIVE NORTH MAIN LLC,
Landlord

and

WILSON CREDIT SERVICES, LLC,
Tenant





# FIRST BRISTOL CORPORATION

June 10, 2002

Mr. Brandon Wilson
Wilson Credit Services, LLC
25 North Main Street
Fall River, MA 02720

RE:    **Letter Agreement Establishing "Term Commencement Date" of Lease**
       **Premises: 25 North Main Street**
       **Fall River, MA 02720**

Dear Mr. Wilson:

The purpose of this letter is to confirm the "Term Commencement Date" of your lease as June 1, 2002. The "Minimum Rent" under this lease shall commence on June 1, 2002 at $5,666.66 per month.

You will note that your rent is due and payable on the first of every month for that month. We do not generate monthly rent invoices.

If you are in agreement with the terms outlined above, please sign in the space provided below. I would ask that you return one executed original of this Letter Agreement to us and retain one original for your files.

Sincerely,

James M. Karam
Development Director

Agreed and Accepted:

Tenant: Wilson Credit Services, LLC

By: _Brandon Wilson_
Brandon Brian Wilson

INDENTURE OF LEASE


THIS INDENTURE OF LEASE made and entered into on the Execution Date as stated in Exhibit ''1'' between the Landlord and the Tenant named in Exhibit ''1''.


W I T N E S S E T H

That Landlord does hereby lease to Tenant, and Tenant does hereby hire and take from Landlord, the premises hereinafter described (hereinafter referred to as ''premises''), subject to restrictions of record, and the covenants, terms, and conditions of this Lease for the term hereinafter stated:


ARTICLE 1

Reference Data

Each reference in this Lease to any of the terms contained in any Exhibit attached to this Lease shall be deemed and construed to incorporate the data stated under that term in such Exhibit.


ARTICLE 2

Description of Demised Premises

Section 2.1    Demised Premises.

The premises are that portion of the building as described in Exhibit ''1'' (hereinafter referred to as "Building), substantially as shown hatched or outlined on the Lease Plan (Exhibit "2") attached hereto.

Section 2.2    Appurtenant Rights.

Tenant shall have, as appurtenant to the premises, rights to use in common, subject to reasonable rules from time to time made by Landlord, the following: (a) the common lobbies, hallways, stairways and elevators of the Building serving the premises in common with others, (b) the common walkways necessary for access to the Building, (c) if the premises include less than the entire rentable area of any floor, the common toilets and other common

8.1.1    Landlord will require Tenant to contract with the electric utility company for the purchase by Tenant of electric current directly from such company to be billed directly to, and paid for by, Tenant.

8.1.2    Landlord, upon written request and at the sole cost and expense of Tenant, will furnish and install such additional wiring, conduits, feeders, switchboards, interior premises electrical outlets and fixtures and other appurtenances as reasonably may be required to supply additional requirements of Tenant if current therefor be available to Landlord, provided that the same shall be permitted by applicable laws and insurance regulations and shall not cause permanent damage to the Building or the premises or cause or create a dangerous condition or entail excessive or unreasonable alterations or repairs.

8.1.3    Tenant, at Tenant's expense, shall purchase and install all replacement lamps used in the premises.

8.1.4    Landlord shall not in any way be liable or responsible to Tenant for any loss, damage or expense which Tenant may sustain or incur if the quantity, character, or supply of electrical energy as supplied by the electric utility company is changed or is no longer suitable for Tenant's requirements.

8.1.5    Tenant agrees that it will not make any material alteration or addition to the electrical equipment, appliances or fixtures in the premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld, delayed or conditioned.

Section 8.2    Water Charges.

Landlord shall furnish hot and cold water for ordinary premises cleaning, sanitary, kitchen and drinking purposes. If Tenant uses or consumes water for any purpose other than for the aforementioned purposes, Landlord may (i) assess a reasonable charge for the additional water so used or consumed by Tenant or (ii) install a water meter and thereby measure Tenant's water consumption for all purposes.

Section 8.3    Heat, Cleaning.

8.3.1    Landlord, at its expense, shall: (i) furnish heat to the premises, the cost of such heat to be paid for by the Tenant; and (ii) cause the common areas of the Building to be

Miscellaneous Covenants

Tenant covenants and agrees as follows:

Section 17.1    Rules and Regulations.

Tenant will faithfully observe and comply with the Rules and Regulations annexed as Exhibit ''3'' hereto and such other and further reasonable Rules and Regulations of general applicability as Landlord hereafter at any time may make and may communicate in writing to Tenant.

Section 17.2    Access to Premises.

Tenant shall: (i) permit Landlord to erect, use and maintain pipes, wires, ducts and conduits in and through the premises, provided the same do not materially reduce the floor area or materially, adversely affect the appearance and the Tenant's use thereof; (ii) upon reasonable advance notice permit Landlord and any mortgagee of the Building or the Building and land or of the interest of Landlord therein, and their representatives, to have reasonable access to and to enter upon the premises at all reasonable hours for the purposes of inspection or of making repairs, or of complying with all laws, orders and requirements of governmental or other authorities, or of exercising any right reserved to Landlord by this Lease; and (iii) upon reasonable advance notice permit Landlord, at reasonable times, to show the premises during ordinary business hours to any mortgagee, prospective lessee, prospective purchaser, prospective mortgagee, or prospective assignee of any mortgage of the Building or of the Building and the land or of the interest of Landlord therein, and during the period of twelve (12) months next preceding the Termination Date, to any person contemplating the leasing of the premises or any part thereof. If Tenant shall not be personally present to open and permit entry into the premises at any time when for any reason entry therein shall be necessary or permissible, Landlord or Landlord's agents may enter the same by a master key, or may forcibly enter the same, without rendering Landlord or such agents liable therefor (if during such entry Landlord or Landlord's agents shall accord reasonable care to Tenant's property) and without in any manner affecting the obligations and covenants of this Lease.

Section 17.3    Accidents-Sanitary and Other Systems.

Tenant shall give to Landlord notice promptly after Tenant ........... fire or accident in the premises or in the

acceptance of all of the terms and conditions set forth in the Landlord's Proposal Notice. If Tenant should fail to so notify Landlord within said period, Landlord is free to accept its offer and Tenant has thereby waived its Right of First Refusal as to said space. If Tenant does so notify Landlord, then the space shall be rented to Tenant on such terms, the term of said rental to commence within thirty (30) days thereafter or on such date as is mutually agreeable to the Landlord and the Tenant.

The term of any lease of such additional space shall be co-terminous with the term of this Lease.

IN WITNESS WHEREOF, the parties hereto have executed this Indenture of Lease in multiple copies, each to be considered an original hereof, as a sealed instrument as of the day

and year noted in Exhibit ``1'' as the Execution Date.

LANDLORD:
**FORTY FIVE NORTH MAIN LLC**

By:

James J. Karam, Manager

TENANT:
**WILSON CREDIT SERVICES, LLC**

By:

_____,      its

IF TENANT IS A CORPORATION, A SECRETARY'S OR CLERK'S CERTIFICATE OF THE AUTHORITY AND THE INCUMBENCY OF THE PERSON SIGNING ON BEHALF OF TENANT SHOULD BE ATTACHED.

FOR VALUE RECEIVED, and in consideration for, and as an inducement to Landlord making the within Lease with Tenant, the undersigned unconditionally, jointly and severally, guaranty to the Landlord, its successors and assigns, the full payment, performance and observance of all of the covenants, terms and conditions herein contained to be paid, performed and observed by Tenant, without requiring any notice of nonpayment, nonperformance or nonobservance, or proof, notice, demand, whereby to charge the undersigned therefore, all of which the undersigned hereby expressly waive and expressly agree that the validity of this Lease and the obligations of the guarantors, and each of them, hereunder shall in no way be terminated, affected or impaired by reason of the assertion by Landlord against Tenant of any of the rights or remedies reserved to the Landlord pursuant to the provisions of the within Lease, or by Landlord granting any indulgence or giving of additional time to Tenant for the payment or the performance of any of the obligations of this Lease, in one or more instances. As long as the Tenant is not then in default under the terms and conditions of this Lease, this Guaranty shall remain in full force and effect for the period of Three Hundred Sixty-Five (365) days from the Term Commencement Date hereof. Landlord need not pursue any remedies against Tenant before enforcing this Guaranty.

Executed in the presence of:                GUARANTOR:

                                            CONSOLIDATION USA, INC.

_____          By: _____
                                     Suzanne Schreiber , its President

                                            CONSOLIDATION USA II, INC.

_____          By: _____
                                     William D. Kwiatek, its President


                    COMMONWEALTH OF MASSACHUSETTS

COUNTY OF Suss ex

2.  Landlord:      FORTY FIVE NORTH MAIN LLC
                    222 Milliken Place
                    P.O. Box 2516
                    Fall River, MA 02722

    Tenant:        WILSON CREDIT SERVICES, LLC
                   99 Rosewood Drive
                   Danvers, MA 01923

    Guarantors:    CONSOLIDATION USA, INC. &
                   CONSOLIDATION USA II, INC.
                   99 Rosewood Drive
                   Danvers, MA 01923

3.  Premises:      12,600 square foot office space at 25 North
Main Street,
                   Fall River, MA. Approximately 6,800 square
                   feet is 1st floor space for which Tenant shall
                   be charged & approximately 5,800 square feet
                   is basement space for which Tenant shall *not*
                   be charged.

4.  Term:              Five (5) year initial term.
    Option Period(s):  One (1) Five (5) year Option Period.

5.  Specified Commencement Date:    May 1, 2002.

6.  Term Commencement Date: June 1, 2002.

7.  Termination Date: May 31, 2007.

8.  Tenant Use:        collection agency.

9.  Rent: Initial Term
    (a)  Yearly Rent:        $68,000.00
    (b)  Monthly Rent:       $68,000.00/12 = $5,666.66

    Rent: Option Period - See Section 6.2 hereinbefore.

10. Intentionally Omitted.

11. Tax Base:          Taxes as Assessed June 30, 2001.

12. Total Rentable Area:        34,800 sq. ft.

13. Landlord/Tenant       Liability            Coverage:



EXHIBIT

**C**



# Philadelphia Insurance Companies

One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004

PHILADELPHIA INDEMNITY INSURANCE COMPANY

## COMMERCIAL LINES POLICY COMMON POLICY DECLARATIONS

Policy Number:   PHPK052406

Named Insured and Mailing Address:                              Agent:
MARTIN WOOD
13 HORSENECK ROAD
SOUTH DARTMOUTH, BRISTOL, MA    02147


Policy Period: From: 06/10/2003 To: 06/10/2004   at 12:01 A.M. Standard Time at your mailing address shown above.

Business Description:   OFFICE

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE
AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.
THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

|  | PREMIUM |
|---|---|
| Commercial Property Coverage Part | |
| Commercial General Liability Coverage Part | |
| Commercial Crime Coverage Part | |
| Commercial Inland Marine Coverage Part | |
| Commercial Auto/Garage Coverage Part | |
| Businessowners | |
| Workers Compensation | |
| Federal Terrorism Risk Insurance Act Coverage | Included |
| UltimateCover Property Coverage Part | $      5,535.00 |

TOTAL $      5,535.00


FORM(S) AND ENDORSEMENT(S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE:*
Refer To Forms Schedule

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

07/14/2003
Countersignature Date                              Authorized Representative

REGMNT

UltimateCover Program

This Endorsement Changes the Policy. Please Read It Carefully.

# Causes of Loss Form

Words and phrases that appear in quotation marks have special meaning. Refer to Section F., Definitions.

A. Covered Causes of Loss

Covered Causes of Loss means Risks of Direct Physical Loss unless the "loss" is:

1. Excluded in Section B., Exclusions; or

2. Limited in Section C., Limitations;

that follow.

B. Exclusions

1. We will not pay for "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

   a. Ordinance or Law

   The enforcement of any ordinance or law:

   (1) Regulating the construction, use or repair of any property; or

   (2) Requiring the tearing down of any property, including the cost of removing its debris.

   b. Earth Movement

   Any earth movement (other than sinkhole collapse or volcanic action, eruption, explosion or effusion), such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But if "loss" by fire or explosion results, we will pay for that resulting "loss".

   This exclusion does not apply to the following:

   (1) Business Personal Property in transit or away from premises you own, lease, rent or control;

   (2) The Accounts Receivable Coverage Extension; or

   (3) The Valuable Papers and Records - Cost to Research Coverage Extension.

   c. Governmental Action

   Seizure or destruction of property by order of governmental authority.

   But we will pay for "loss" caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Policy.

Includes copyrighted material of ISO Commercial Risk Services, Inc.
Copyright, ISO Commercial Risk Services, Inc., 1990

d. Nuclear Hazard

  (1) Any weapon employing atomic fission or fusion; or

  (2) Nuclear reaction or radiation, or radioactive contamination from any other cause.

  But we will pay for direct "loss" caused by resulting fire if the fire would be covered under this Policy.

e. Utility Services

  The failure of power or other utility service supplied to the described premises, however caused, if the failure occurs away from the described premises.

  But is "loss" by a Covered Cause of Loss results, we will pay for that resulting "loss".

  This exclusion does not apply to the following Coverages:

  (1) Accounts Receivable Coverage Extension;

  (2) "Computer Property" for interruption of electrical power supply when the cause of such event occurs within 1,000 feet of the premises; or

  (3) Utility Services - Direct Damage Additional Coverage Extension.

f. War and Military Action

  (1) War, including undeclared or civil war;

  (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

  (3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

g. Flood

  "Flood".

  But if "loss" by fire, explosion, theft or sprinkler leakage results, we will pay for that resulting "loss".

  This exclusion does not apply to the following:

  (1) Business Personal Property in transit or away from premises you own, lease, rent or control;

  (2) The Accounts Receivable Coverage Extension; or

  (3) The Valuable Papers and Records - Cost to Research Coverage Extension.

2. We will not pay for "loss" caused by or resulting from any of the following:

a. Artificially generated electric current, including electric arcing, that disturbs electrical devices, appliances or wires.

  But if "loss" by fire or explosion results, we will pay for that resulting "loss".

Includes copyrighted material of ISO Commercial Risk Services, Inc.
Copyright, ISO Commercial Risk Servi. as, Inc., 1990

This exclusion does not apply to "computer property".

b. Delay, loss of use, loss of market or any other consequential loss.

c. Smoke, vapor or gas from agricultural smudging or industrial operations. This exclusion does not apply to "computer property".

d. (1) Wear and tear;

(2) Rust, corrosion, fungus, decay, deterioration, spoilage, contamination, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

(3) Smog;

(4) Settling, cracking, shrinking or expansion;

(5) Insects, birds, rodents or other animals;

(6) Mechanical breakdown, including rupture or bursting caused by centrifugal force. However, this does not apply to any resulting "loss" caused by elevator collision;

(7) Dampness or dryness of atmosphere; changes in or extremes of temperature; freezing or thawing.

Paragraphs d. (3), (4), (6) and (7) do not apply to "computer property".

But if "loss" by the "specified causes of loss" or building glass breakage results, we will pay for that resulting "loss".

e. Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if "loss" by fire or combustion explosion results, we will pay for that resulting "loss". We will also pay for "loss" caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

f. Water, other liquids, powder or molten material that leaks or flows from plumbing, heating , air-conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

(1) You do your best to maintain heat in the "buildings"; or

(2) You drain the equipment and shut off the supply if the heat is not maintained.

This exclusion does not apply to "computer property".

g. Dishonest or criminal acts by you, any of your partners, employees, directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

(1) Acting alone or in collusion with others; or

(2) Whether or not occurring during the hours of employment.

This exclusion does not apply to:

(1) Acts of destruction by your employees (but theft by employees is not covered);

Includes copyrighted material of ISO Commercial Risk Services, Inc.
Copyright, ISO Commercial Risk Services, Inc., 1990

(2) Property in the custody of a carrier for hire (provided the carrier is not in collusion with you, any of your partners, directors, trustees or authorized representatives); or

(3) "Loss" to "computer property" (provided your employees are not in collusion with you, any of your partners, directors, trustees or authorized representatives).

h. Rain, snow, ice or sleet to personal property in the open.

i. Collapse, except as provided below in the Additional Coverage for Collapse. But if "loss" by any of the Covered Causes of Loss results at the described premises, we will pay for that resulting "loss".

j. Discharge, dispersal, seepage, migration, release or escape of "pollutants".

But we will pay for resulting "loss" to Covered Property when the discharge, dispersal, seepage, migration, release or escape of "pollutants" is caused by any of the "specified causes of loss".

k. Processing or work upon the property.

But we will pay for "loss" caused by resulting fire or explosion.

This exclusion does not apply to "computer property".

l. Alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of "money", "securities" or other property.

This exclusion applies only to the extent of the wrongful giving, taking or withholding.

m. Bookkeeping, accounting, or billing errors or omissions.

n. Unexplained disappearance. This exclusion does not apply to "computer hardware".

o. Shortage found upon taking inventory or audit. This exclusion does not apply to "computer hardware".

p. Electrical or magnetic disturbance or erasure of records of accounts receivable that have been converted into electronic format, when such "loss" is caused by or results from:

(1) Programming errors or faulty machine instructions;

(2) Faulty installation or maintenance of data processing equipment or component parts; or

(3) An occurrence that took place more than 1,000 feet from your premises.

But we will pay for such "loss" caused by lightning.

q. Voluntary parting with any property by you, or by anyone else to whom you have entrusted the property, if induced to do so by any fraudulent scheme, trick, device or false pretense.

r. Changes in your electrical supply to "computer property", including interruption of power, power surge, blackout or brownout, if the cause of such event originates more than 1,000 feet from any of the premises listed in the Declarations, Extension of Declarations or attached Schedule.

Includes copyrighted material of ISO Commercial Risk Services, Inc.
Copyright, ISO Commercial Risk Services, Inc., 1990

3. We will not pay for "loss" caused by or resulting from any of the following. But if "loss" by a Covered Cause of Loss results, we will pay for that resulting "loss."

   a. Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph 1. above to produce the "loss".

   b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

   c. Faulty, inadequate or defective:

      (1) Planning, zoning, development, surveying, siting;

      (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

      (3) Materials used in repair, construction, renovation or remodeling; or

      (4) Maintenance;

     Of part or all of any property on or off the described premises.

     This exclusion does not apply to "computer property".

4. Special Exclusions

   The following provisions apply only to the Coverage Forms listed below, if these Coverage Forms are attached to this Policy.

   a. Business Income, Extra Expenses and Business Income with Extra Expenses Coverage Forms.

     We will not pay for:

      (1) Any loss caused by or resulting from:

         (a) Damage or destruction of finished "stock"; or

         (b) The time required to reproduce finished "stock".

       This exclusion does not apply to Extra Expenses.

      (2) Any loss caused by or resulting from direct physical "loss" to communication antennas or satellite dishes, including their lead-in wiring masts or towers.

      (3) Any increase of loss caused by or resulting from:

         (a) Delay in rebuilding, repairing or replacing the property or resuming "operations" due to interference at the premises of the rebuilding, repair or spring replacement by strikers or other persons; or

         (b) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of "operations", we will cover such loss that affects your Business Income during the "period of restoration".

      (4) Any Extra Expenses caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

Includes copyrighted material of ISO Commercial Risk Services, Inc.
Copyright, ISO Commercial Risk Services, Inc., 1990

(5) Any other consequential loss.

(6) Any loss caused by or resulting from error in machine programming or instructions to any machine.

(7) Any loss caused by or resulting from direct physical "loss" to property at locations not specifically identified. This exclusion does not apply to coverage provided to Business Income from Dependent Property - Additional Coverage.

(8) Any loss caused by or resulting from direct physical "loss" to:

   (a) "Buildings"; or

   (b) Additions to existing "buildings";

   That are under the course of construction.

b. Legal Liability Coverage Form

   (1) The following Exclusions do not apply to insurance under this Coverage Form;

      (a) Paragraph B.1.a., Ordinance or Law;

      (b) Paragraph B.1.c., Governmental Action;

      (c) Paragraph B.1.d., Nuclear Hazard;

      (d) Paragraph B.1.e., Utility Service; and

      (e) Paragraph B.1.f., War and Military Action.

   (2) The following additional exclusions apply to insurance under this Coverage Form:

      (a) Contractual Liability

         We will not defend any claim or "suit" or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement.

      (b) Nuclear Hazard

         We will not defend any claim or "suit" or pay any damages, "loss", expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

C. Limitations

1. We will not pay for "loss" to:

   a. Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for "loss" to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

   b. Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

Includes copyrighted material of ISO Commercial Risk Services, Inc.
Copyright, ISO Commercial Risk Services. Inc., 1990

c. The interior of any "buildings", or to personal property in "buildings", caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

   (1) The "buildings" first sustain damage by a Covered Cause of Loss to their roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

   (2) The "loss" is caused by or results from thawing of snow, sleet or ice on the "buildings".

2. For "loss" by theft, the following types of property are covered only up to the Limits of Insurance shown:

  a. $2,500 for furs, fur garments and garments trimmed with fur.

  b. $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This Limit of Insurance does not apply to jewelry and watches worth $100 or less per item.

  c. $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

3. We will not pay for "loss" to property in transit caused by or resulting from breakage; leakage; contamination; being spotted, discolored, molded, rusted, frosted, rotted, soured, steamed or changed in flavor.

  But we will pay for such "loss" caused by: the "specified causes of loss"; an accident to the vehicle or railroad car carrying the Covered Property; burning, collision or crashing of the aircraft carrying the Covered Property; or the stranding, sinking, burning or collision of the vessel carrying the Covered Property.

D. Additional Coverage - Collapse

We will pay for "loss" caused by or resulting from risks of direct physical "loss" involving collapse of "buildings" or any part of "buildings" caused only by one or more of the following:

1. The "specified causes of loss" or breakage of building glass, all only as insured against in this form;

2. Hidden decay;

3. Hidden insect or vermin damage;

4. Weight of people or personal property;

5. Weight of rain that collects on a roof.

We will not pay for "loss" to the following types of property, if otherwise covered in this Policy, under items 2., 3., 4. and 5., unless the "loss" is a direct result of the collapse of "buildings"; outdoor communication antennas or satellite dishes, including their masts or lead - in wiring; awnings, gutters and downspouts; yard fixtures; outdoor swimming pools; fences; beach or diving platforms or appurtenances; retaining walls.

Collapse does not include settling, cracking, shrinkage, bulging or expansion.

This Additional Coverage will not increase the Limits of Insurance provided by this Policy.

Includes copyrighted material of ISO Commercial Risk Services, Inc.
Copyright, ISO Commercial Risk Services, Inc., 1990

E. Additional Coverage Extensions

1. Water Damage, Other Liquids, Powder or Molten Material Damage

If "loss" caused by or resulting from covered water or other liquid, powder or molten material occurs, we will also pay the cost to tear out and replace any part of "buildings" to repair damage to the system or appliance from which the water or other substance escapes.

We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

a. Results in discharge of any substance from an automatic fire protection system; or

b. Is directly caused by freezing.

This Coverage Extension will not increase the Limits of Insurance provided by this Policy.

2. Utility Services - Direct Damage

We will pay for direct physical "loss" caused by interruption of utility service to the described premises. The interruption must be caused by direct physical "loss" by any of the Covered Causes of Loss to the following types of property not on the described premises supplying water, communication and power to the described premises.

Power Supply Services, meaning the following types of property supplying electricity, steam or gas to the described premises.

a. Utility Generating Plants;

b. Switching stations;

c. Substations;

d. Transformers; and

e. Transmission Lines.

But not overhead transmission lines.

Water Supply Services, meaning the following types of property supplying water to the described premises.

a. Pumping Stations; and

b. Water mains.

Communication Supply Services, meaning property supplying communication services, including telephone, radio, microwave or television services to the described premises, such as:

a. Communication transmission lines, including optical fiber transmission lines;

b. Coaxial cables; and

c. Microwave radio relays except satellites.

But not overhead transmission lines.

Includes copyrighted material of ISO Commercial Risk Services, Inc.
Copyright, ISO Commercial Risk Services, Inc., 1990

The most we will pay under this Coverage Extension for the sum of all occurrences at all premises during each separate 12 month period of this policy is $10,000.

This Coverage Extension is in addition to the Limits of Insurance provided by this Policy.

3. Voluntary Parting

We will pay for "loss" caused by or resulting from voluntary parting with any property by you, or by anyone else to whom you have entrusted the property, if induced to do so by any fraudulent scheme, trick, device or false pretense.

The most we will pay under this Coverage Extension in any one occurrence is $10,000.

This Coverage Extension will not increase the Limits of Insurance provided by this Policy.

F. Definitions

1. "Buildings" means buildings or structures.

2. "Computer Property" means "data", "hardware" and "media".

   a. "Data" means facts, figures, concepts or instructions that are in a form that can be communicated, interpreted, or processed by computer systems (including records of accounts receivable and "valuable papers and records" when they are converted into "data" form).

   It does not include Valuable Papers unless converted to electronic form.

   b. "Hardware" means a network of equipment and components which accept information, process and analyze that information according to a plan, and then produces the desired results. It includes disk and tape drives, printers, display screens, remote terminals, computers which control manufacturing or production equipment or machinery, and computerized telephone systems, but it does not include computer "media", or production machinery or equipment.

   c. "Media" means materials on which "data" can be recorded, such as magnetic tapes, disk packs, paper tapes and cards.

3. "Flood" means:

   a. Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not; or

   b. Mudslide or mudflow.

4. "Loss" means accidental loss or damage.

5. "Money" means:

   a. Currency, coins and bank notes whether or not in current use; and

   b. Travelers' checks, register checks and money orders held for sale to the public.

Includes copyrighted material of ISO Commercial Risk Services, Inc.
Copyright, ISO Commercial Risk Services, Inc., 1990

6. "Operations" means:

   a. Business activities you perform at the described premises; and

   b. The tenantability of the described premises, if coverage for Business Income including "Rental Value" or "Rental Value" applies.

7. "Period Of Restoration" means the period of time that:

   a. Begins:

     (1) 72 hours after the time of direct physical "loss" for Business Income Coverage; or

     (2) Immediately after the time of direct physical "loss" for Extra Expense Coverage;

   b. Ends on the earlier of:

     (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

     (2) The date when business is resumed at a new permanent location.

   c. "Period of Restoration" does not include any increased period required due to the enforcement of any ordinance or law that:

     (1) Regulates the construction, use or repair, or requires the tearing down of any property; or

     (2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

     The expiration date of this policy will not cut short the "period of restoration".

8. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

9. "Rental Value" means:

   a. Total anticipated rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you; and

   b. Amount of all charges which are legal obligation of the tenant(s) and which would otherwise be your obligations; and

   c. Fair rental value of any portion of the described premises which is occupied by you.

10. "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

   a. Tokens, tickets, revenue and other stamps whether or not in current use; and

   b. Evidences of debt issued in connection with credit or charge cards, which are not of your own issue;

   But does not include "money". Lottery tickets held for sale are not "securities".

Includes copyrighted material of ISO Commercial Risk Services, Inc.
Copyright, ISO Commercial Risk Services, Ir ..., 1990

11. "Specified Causes of Loss" means the following:  fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

  a. Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite.  This Cause of Loss does not include:

    (1) The cost of filling sinkholes; or

    (2) Sinking or collapse of land man-made underground cavities.

  b. Falling objects does not include "loss" to:

    (1) Personal property in the open; or

    (2) The interior of "buildings", or property inside "buildings", unless the roof or an outside wall of the "buildings" is first damaged by a falling object.

  c. Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking or cracking of any part of a system or appliance containing water or steam.

12. "Stock" means "finished stock", "merchandise", and "stock in process".

  a. "Finished Stock" means property that you manufactured or processed which in the ordinary course of your business is ready for packing, shipment or sale.

  b. "Merchandise" means goods kept for sale by you that are not the product of your manufacturing or processing operations.

  c. "Stock in Process" means raw materials that have undergone any processing or manufacturing but which have not become "finished stock."

13. "Suit " includes an arbitration proceeding to which you must submit or submit with our consent.

Includes copyrighted material of ISO Commercial Risk Services, Inc.
Copyright, ISO Commercial Risk Services, Inc., 1990



BUSINESS AND TRIAL LAWYERS

# SCHREIBER & ASSOCIATES, P.C.

*Effective Legal Solutions to Modern Business Problems*

TELEPHONE (978) 722-2800 / FACSIMILE (978) 762-0168

STREET ADDRESS:
65 FLAGSHIP DRIVE
NORTH ANDOVER, MA 01845

MAILING ADDRESS:
P.O. BOX 210
DANVERS, MA 01923

May 7, 2003

Mark Arnold
Debt Management, Inc.
31 Hayward Street
Franklin, MA 02038

Re: <u>Wilson Credit Services, LLC</u>

Dear Mr. Arnold:

As you know, I am counsel to Consolidation USA, Inc., and Consolidation USA II, Inc. (the "Consolidation companies").

This letter confirms numerous discussions with my wife, Suzanne Schreiber, owner of Consolidation USA, Inc., and a member of Wilson Credit Services, LLC, as well as its secured lender. The Consolidation companies agree to retain your company, Debt Management, Inc. ("DMI"), as a special consultant to establish Wilson Credit Services, LLC, as a financially viable collection agency. As we discussed, unfortunately, over the last year, Wilson Credit Services, LLC, has been mismanaged, and it is presently insolvent. It is unable to pay its bills as they become due. Recently, in fact, the Consolidation companies had to advance a significant sum to the telephone company in order to avoid termination of phone service. The Consolidation companies will have to advance over $60,000 to pay bills in the ordinary course of business just to keep the doors open.

After a meeting I had on Saturday, April 26, 2003 with Patrick Wilson and Brandon Wilson, you have full authority to enter the premises and manage the building as special consultants. I am a signer on the lease covering 25 North Main Street, Fall River, Massachusetts. You have my authority to

Mark Arnold
May 7, 2003
Page 2

enter the building.  Patrick Wilson as well as the Consolidation
companies, who are the owners of Wilson Credit Services, LLC,
have agreed that you shall have authority to enter the premises,
manage the operations, hire employees, terminate employees, and
in all respects operate the business so that the financial
reversals cease.

     You have been informed that Brandon Wilson, who is not a
member or owner of the company, has been acting as general
manger.  To the extent that Brandon Wilson, who previously agreed
to act as a subordinate to your position, is helpful, you may
wish to ask that he stay as an employee of the company.  To the
extent that Brandon Wilson obstructs or otherwise interferes with
your efforts, you have authority to terminate him or any other
employee of the company.

     Patrick Wilson's employment with the company is governed by
a certain operating agreement as amended, a copy of which is
enclosed.

     The Consolidation companies will provide whatever support
you need to establish Wilson Credit Services, LLC, or any
successor in interest as a financially viable entity.

     Finally, for these services, the Consolidation companies
have agreed to pay DMI $10,000 per month.  Initially, you have
agreed to this engagement for a period of 90 days.

     If you have any other questions, please do not hesitate to
contact me.

                         Very truly yours,

                         SCHREIBER & ASSOCIATES, P.C.

                         Jeff A. Schreiber

                         Jeffrey A. Schreiber

JAS/ksb
Enclosure
cc Jim Karam (By Facsimile Transmission)
   Fall River Police Department (By Facsimile Transmission)

UNITED STATES OF AMERICA

DISTRICT OF MASSACHUSETTS

C. A. No. 04-12590DPW

WOOD DEVELOPMENT, LLP,

     Plaintiff

VS.

PHILADELPHIA INDEMNITY

INSURANCE CO.,

     Defendant

DEPOSITION OF: JAMES M. KARAM

Murphy & Riley, P.C.

141 Tremont Street

Boston, MA 02111

Tuesday, November 29, 2005

10:00 A.M.

FEDERAL COURT REPORTERS (978)535-8333

THOMAS J. HOUTON, COURT REPORTER

EXHIBIT

E

26

1    about his concerns that Wilson Credit was

2    behind?

3        A.    Rent payments, no.

4        Q.    Did he ever contact you with any

5    concerns that he had about Wilson Credit?

6        A.    No.

7                MR. HILLYGUS: Off the record.

8

9                (Off record discussion)

10

11                MR. HILLYGUS: Back on the

12    record.

13        Q.    At some point did you become aware of

14    concerns that Mr. Wood had regarding lack of

15    access to the Wilson Credit premises?

16        A.    Yes.

17        Q.    What was the time frame for that?

18        A.    A few days before the flood or you

19    know, the day before the flood. I'm not sure

20    of the exact timing. I mentioned to Mr. Wood

21    that it was getting cold. I don't know the

22    time frame, but there was a few days when

23    nobody was in the space. I suggested we either

24    you know, get the locks changed or kick in

27

1    the door or something just to make sure there

2    is no leaky sink or something that you know,

3    heat issues.

4        Q.   How did you become aware that they

5    may not have been in the space?

6        A.   Just happened to walk by my office

7    which was you know, pretty close.  I was going

8    to lunch one day and I noticed that it was

9    dark in there.

10       Q.   This was during the day around

11   lunchtime?

12       A.   During the day, yes.

13       Q.   And did you recall how long before

14   the leak was discovered?

15       A.   Maybe a day or two.

16       Q.   Prior to that had Mr. Wood mentioned

17   any concerns he had about them abandoning the

18   space?

19       A.   No, no.

20       Q.   Prior to that, when was the last

21   discussion you had with Mr. Wood about that

22   property?

23       A.   I have no idea.

24       Q.   You said this was a day or two before

## COLLATERAL ASSIGNMENT OF LEASE

<u>DATE OF ASSIGNMENT:</u>

April  , 2002



<u>PLACE OF EXECUTION:</u>

Danvers, Massachusetts

<u>ASSIGNOR:</u>

Wilson Credit Services, LLC
25 North Main Street
Fall River, MA 02722

<u>ASSIGNEE:</u>

Consolidation USA, Inc.
99 Rosewood Drive
Danvers, MA 01923

<u>LEASED PROPERTY:</u>

The real property with the building thereon known and numbered as 25 North Main Street, Fall River, MA 02722.

\* \* \* \* \* \* \* \* \* \*

In consideration of Assignee's making the loan evidenced by the Revolving Demand Note and in order to further secure the payment of the indebtedness of Assignor to Assignee and the performance of every obligation of Assignor under the Revolving Demand Note, Security Agreement and any and all loan documents, Assignor hereby transfers and assigns, subject to the terms hereof, to Assignee the entire lessee's interest in each of the leases set forth on Exhibit A hereto attached and in all leases now or hereafter existing for the leased property, it being understood that the expression "lease" used herein shall refer to each of said leases, and any extension or renewal thereof, and the expression "lessee's interest" used herein shall refer to lessee's interest in each of said leases TOGETHER with rights and obligations arising from each said lease.

THE ASSIGNOR WARRANTS, with respect to each existing lease, that Assignor is the record owner of the entire lessee's interest in said lease; that said lease is valid and enforceable and has not been altered, modified or amended in any manner whatsoever save as herein set forth or heretofore delivered to Assignee; that the Assignor is not in default under any of the terms, covenants or conditions thereof; and that to the best of Assignor's knowledge, the Lessor named therein is not in default under any of the terms, covenants or conditions thereof; that the lessee's



interest in said lease has not been assigned or pledged.

THE ASSIGNOR COVENANTS with Assignee to observe and perform all the obligations imposed upon the lessee under each lease now or hereafter existing and not to do or permit to be done anything to impair the security thereof; not to execute any other assignment of lessee's interest in said lease; not to modify any lease or any lease hereinafter entered into, or consent to any assignment or subletting, in whole or in part, of any lease without Assignee's prior written consent.

THIS ASSIGNMENT is made on the following terms, covenants and conditions:

1.  So long as there shall exist no default by the Assignor hereunder or under the Revolving Demand Note, Security Agreement and any and all loan documents or in the performance of any obligation under any lease on the part of the Assignor to be performed, this Collateral Assignment of Lease shall not take affect.

2.  At any time upon or during the continuation of any such default, Assignee, without in any way waiving such default, may, at its option, without notice and without regard to the adequacy of the security for the indebtedness, either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court, take possession of the Leased Property or any part thereof and have, hold, manage, lease and operate the same on such terms and for such period of time as Assignee may deem proper.

3.  Assignee shall not be liable for any liability, loss or damage sustained by Assignor arising out of Assignee's possession of the Leased Property unless such liability, loss or damage is caused by the gross negligence or willful misconduct or bad faith of Assignee. Nor shall Assignee be obligated to perform or discharge nor does Assignee hereby undertake to perform or discharge any obligation, duty or liability under any lease or under or by reason of this Assignment and Assignor shall, and does hereby agree, to indemnify Assignee for, and hold Assignee harmless from, any and all liability, loss or damage which may or might be incurred under any lease or under or by reason of this Assignment, unless such liability, loss or damage is caused by the gross negligence or willful misconduct or bad faith of Assignee and from any and all claims and demands whatsoever which may be asserted against Assignee by reason or any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in any lease. Should Assignee incur any such liability under any lease or under or by reason of this Assignment, or in defense of any such claims or demands, the amount thereof, including costs, expenses and reasonable attorney's fees, shall be secured hereby and Assignor shall reimburse Assignee therefor immediately upon demand and, upon the failure of Assignor so to do, Assignee may, at its option, declare all sums evidenced by the Revolving Demand Note and secured hereby and by the Security Agreement, immediately due and payable. And it is further understood that this Assignment shall not operate to place responsibility for the rental payments for the Leased Property upon Assignee, nor for the carrying out of any of the terms or conditions of any lease; nor shall it operate to make Assignee responsible or liable for any waste committed on the Leased Property or for any negligence in the management, upkeep, repair or control of the Leased Property resulting in loss or injury or death to

2

any licensee, employee or stranger.

4. Upon payment in full of the indebtedness of Assignor to Assignee (except in connection with the assignment by Assignee of such indebtedness to a third party) this Assignment shall become and be void and of no effect, but the affidavit, certificate, letter or statement of any officer, agent or attorney of Assignee showing any part of said indebtedness to remain unpaid shall be and constitute conclusive evidence of the validity, effectiveness and continuing force of this Assignment and any person may, and is hereby authorized to, rely thereon. Assignor hereby authorizes and directs the lessor named in any lease upon receipt from Assignee of written notice to the effect that Assignee is then the holder of the Revolving Demand Note, Security Agreement and all other loan documents, and that a default exists thereunder, or under this Assignment, to recognize Assignor as lessee and to continue so to do until otherwise notified by Assignee, without any obligation on the part of any lessor to inquire whether default has in fact occurred.

5. Assignee may take or release other security for the payment of the indebtedness of Assignor to Assignee, may release any party primarily or secondarily liable therefor and may apply any other security held by it to the satisfaction of said indebtedness without prejudice to any of its rights under this Assignment.

6. Nothing contained in this Assignment and no act done or omitted by Assignee pursuant to the powers and rights granted it hereunder shall be deemed to be a waiver by Assignee of its rights and remedies under the Revolving Demand Note, Security Agreement and any other loan documents. This Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Assignee under the terms of the Revolving Demand Note, Security Agreement and any other loan documents. The right of Assignee to collect the indebtedness and to enforce any other security interest held by it may be exercised by Assignee either prior to, simultaneously with, or subsequent to any action taken by it hereunder.

7. The term "lessor" shall be construed to include landlord, if the context so requires, and the term "lessee" shall be construed to include tenant, if the context so requires.

THIS ASSIGNMENT, together with the covenants and warranties herein contained, shall inure to the benefit of Assignee named herein and any subsequent holder of the Revolving Demand Note, Security Agreement and all other loan documents and shall be binding upon Assignor, its successors and assigns.

Notwithstanding any provision herein that may be to the contrary, this Assignment is intended to be an absolute assignment from Assignor to Assignee as collateral security as aforesaid, and not merely the passing of a security interest.

3

IN WITNESS WHEREOF, Assignor has executed this Assignment on the day and year first above-written.

Wilson Credit Services, LLC

_Patrick Wilson_ 4/8/02

Name:
Title: _Member_

## COMMONWEALTH OF MASSACHUSETTS

Essex, ss.                                                           April 8 , 2002

Then personally appeared the above-named _Patrick Wilson_ , in his capacity as managing member of Wilson Credit Services, LLC, and acknowledged the foregoing instrument to be his free act and deed and the free act and deed of Wilson Credit Services, LLC, before me.

_Kristina Byrd_

Notary Public
My Commission Expires: 8/5/05

4

EXHIBIT A

Any and all leases, tenancy at will agreements (written and unwritten) or use and occupancy agreements (written or unwritten), now or hereafter existing, pertaining to the real property known and numbered as 25 North Main Street, Fall River, Massachusetts.

EXHIBIT
G

# Philadelphia
# Insurance Companies

## Claims Department

P.O. Box 950, Bala Cynwyd. Pennsylvania 19004-0950
800.765.9749 • Fax: 800.685.9238 • www.phly.com

Friday, April 30, 2004

Martin Wood
13 Horseneck Road
South Dartmouth, Bristol, MA 02147

RE:    Claim Number:  **PHUC 04010129234 (water)**
Date of Loss  :  **January 09, 2004**
Location of Loss:  **45 North Main Street, Fall River, MA 02720**

Dear Mr. Wood:

The purpose of this writing is to advise that we have completed our investigation into the captioned claim, and unfortunately, The Philadelphia Indemnity Insurance Company will not be able to be of assistance to you regarding this matter.

On Tuesday, January 21st, 2004 we received a notice of your loss, through your agent, advising *"Due to extreme cold weather. Pipes burst and caused extensive damage...heat and electricity were not on."* for the property at the captioned location.

Philadelphia Insurance Companies responded by retaining the services of Eagle Adjusting Services Inc, Independent Property Adjusters, to inspect this loss, confirm its origin, and prepare a written evaluation of the relevant property damage. Mr. Don Deweese, of the firm, performed this inspection of the property on 01/27/04, followed by another meeting with James LaMonda.

They have completed their investigation and reported to us, their findings, which can be summarized as follows:

- **You did not have a key to the premises until late December 2003 or early January 2004**
- **The tenant was behind in their rent payments.**
- **You were responsible for maintaining heat.**
- **The tenant was responsible for electricity and gas.**

In addition the investigation consisted of reviewing the lease and we call your attention to the following Sections that state:

8.3.1   Landlord, at its expense, shall: (i) furnish heat to the premises, the cost of such heat to be paid for by the tenant;...

17.2   ...(ii)upon reasonable advance notice permit Landlord and any mortgagee of the building or the building and land or of the interest of Landlord therein, and their representatives, to

have reasonable access to and to enter upon the premises at all reasonable hours for the purposes of inspection or making repairs or of complying with all laws, orders and requirements of governmental or other authorities, or of exercising any right reserved to Landlord by this Lease; and (iii) upon reasonable advance notice permit Landlord, at reasonable times, to show the premises during ordinary business hours to any mortgagee, or prospective lessee, prospective purchaser, prospective mortgagee, or prospective assignee of any mortgage of the Building or of the Building and the land or of the interest of Landlord therein, and during the period of twelve(12) months next preceding the Termination Date, to any person contemplating the leasing of the premises or any part thereof. If Tenant shall not be personally present to open and permit entry into the premises at any time when for any reason entry therein shall be necessary or permissible, Landlord or Landlord's agent may enter the same by a master key or may forcibly enter the same, without rendering Landlord or such agents liable therefore (if during such entry Landlord or Landlord's agents shall accord reasonable care to Tenant's property) and without in any manner affecting the obligations and covenants of this lease.

Please refer to pages 1-3 of form PI-ULT-008-11-98, **Ultimate Cover Program, Causes of Loss Form.**

2.   We will not pay for **"loss"** caused by or resulting from any of the following:

**f.** Water, other liquids, powder, or molten material that leaks or flows from plumbing, heating, air-conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

(1) You do your best to maintain heat in the **"buildings"**; or
(2) You drain the equipment and shut off the supply if the heat is not maintained."

Based on the foregoing and the fact you failed to supply heat to the premises as required by the lease, we regret to advise that the freezing exclusion will apply and coverage will not be afforded for this loss. The lease also afforded you the opportunity to access the premises with a key to ensure that heat was being maintained. This would have been beneficial in light of the fact you were aware of a delinquency by the tenant due to their failure to pay rent in a timely fashion.

We trust your understanding of the above stated <u>no</u> coverage position is clear. However, should you disagree with our position, please promptly communicate your notice of disagreement to the undersigned in writing. Having adequately considered the detailed reasoning for our no coverage position, we request you describe the basis for your disagreement so we can provide to you an adequate reply and/or reevaluation of that position. Additionally, should you have any questions concerning this matter, you may call our Property Claims Specialist, Patricia Delia at 1-800-765-9749 ext. 7297.

Please note that nothing contained in this letter is intended to change or waive any of the other terms or conditions of the policy under which coverage is being reviewed.

Sincerely,


John P. Kirby
Assistant Vice President, Claims

c:  Herman W. LaPointe, Jr. Ins. Agency
    P.O. Box 4098
    Fall River, MA 02723

    Attn:  Angela McMullen