# UNITED STATES OF AMERICA
# DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.:  04-12590 DPW

|  |  |
|---|---|
| **WOOD DEVELOPMENT, LLP**, | ) |
| Plaintiff, | ) |
|  | ) |
|  | ) |
| v. | ) |
|  | ) |
| **PHILADELPHIA INDEMNITY INSURANCE CO.**, | ) |
| Defendant, | ) |
|  | ) |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.        INTRODUCTION

The Defendant, in bringing this Motion for Summary Judgment, has taken on an extraordinary burden. The burden, in general, is on the moving party in a Motion for Summary Judgment to establish that there are no material issues of fact to be decided by a jury. In this case, the Defendant insurance company is attempting to rely upon an exclusion from coverage. The burden of proof is on the company attempting to establish the exclusion.

The exclusion the company is relying on does not apply if the insured has used "best efforts" to maintain heat. "The best efforts" standard is equivalent to a reasonableness standard. The central factual question is whether the Plaintiff was negligent in its efforts to preserve heat in the property. Questions of whether a party took reasonable efforts to prevent a harm are, under the Massachusetts law, uniquely assigned to a jury and should almost never be decided by way of Summary Judgment.

There are numerous material facts showing the reasonable efforts of the Plaintiff to preserve the heat in the property. Summary Judgment is simply not appropriate.

Summary Judgment is appropriate only when the Summary Judgment records establish that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" Fed.R.Civ.P.56(C). The court, in considering a Motion for Summary Judgment, must view "the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Pac. Ins. Co. v. Eaton Vance Mgmt., 369 F.3d 584, 588 (1st Cir. 2004). The evidence produced in Summary Judgment must be competent evidence which can be admissible at trial. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990).

II.    **THE DEFENDANT HAS A HIGH SUMMARY JUDGMENT BURDEN WHEN ASSERTING THAT DENIAL OF A CLAIM IS JUSTIFIED BY AN EXCLUSION UNDER AN INSURANCE POLICY WHICH APPLIES A NEGLIGENCE STANDARD.**

The Defendant in its denial letter relies upon the freezing exclusion in the Defendant's insurance policy. (Defendant's Exhibit G – Denial of Coverage Letter) When an insurance company relies upon a separate and distinct exclusion, the company bears the burden of demonstrating that the exclusion applies. Great Southwest Fire Ins. Co. v. Hercules Bldg. & Wrecking Co.,35 Mass. App. Ct. 298, 619 N.E.2d 353 (1993). Raytheon Co. v. Cont'l Gas. Co.,123 F. Supp. 2d 22, 28 (D. Mass 2000). The exclusion is strictly construed against the

company. <u>Vappi & Co. v. Aetna Casualty & Surety Co.</u>, 348 Mass. 427, 204 N.E.2d 273 (1965).

<u>Quincy Mut. Fire Ins. Co. v. Abernathy</u>, 17 Mass. App. Ct. 907, 455 N.E.2d 644(1983) In this

case, the Defendant bears the burden of establishing that the Plaintiff did not use best efforts to

maintain heat in the property.

1.      The "Best Efforts" Provision of the Policy Imposes a Reasonableness

        Duty on the Plaintiff

        The policy language provides damage for freezing will not be paid unless "you do your

best to main heat in the buildings." (Defendant's Exhibit C, page 3 of 11, paragraph f (1).) There

is no Massachusetts case which directly applies the term "you do your best" in the context of an

insurance contract. Cases applying similar language in other context have found that "best

efforts" implies a standard of reasonableness. The court, for example, in <u>Macksey v. Egan</u>, 36

Mass. App. Ct. 463, 633 N.E.2d 408 (1994) dealt with a contract requiring the party to use "best

efforts". The trial court instructions were that "the defendants were required to do what was

contemplated and what was reasonable under all of the circumstances, and to perform their

activities with a good faith effort to the extent of their capabilities." (Id. at n.16.) The Appeals

Court approved that instruction. Similarly in <u>Stabile v. Stabile</u>, 55 Mass. App. Ct. 724, 774

N.E.2d 673 (2001) the court interpreted an obligation in a divorced decree that a husband "use

his best efforts". The court cited <u>Triple-A Baseball Club Assocs. v. Northeastern Baseball, Inc.</u>,

832 F.2d 214, 225-226 (1st Cir. 1987) and explained " 'best efforts' is the equivalent of acting in

good faith, although it does not mean every conceivable effort". The Defendant in its

memorandum seems to agree that, at least for the purposes of Summary Judgment, the court should apply a reasonableness standard to the question whether the best efforts were used.

The Defendant cites McCartney v. Pawtucket Mutual Ins. Co., 1994 WL 723056 (1994) (Conn. Super) as helpful to resolving this Motion for Summary Judgment. It should be noted that McCartney is the opinion of a trial court after a trial not a Summary Judgment decision that there are no material facts. In that case, the insured knew that oil deliveries had been cut off from her property. The trial judge found that the insured did not take reasonable care to assure that the cut off oil did not run out. In this case, as will be discussed below, the Plaintiff had no knowledge that the utilities had been cut off from the property. In fact, the Plaintiff had good reason to assume that the tenant in the property would continue to pay rent and their utilities. The McCartney case is not helpful to the resolution of this matter. Similarly, in Evangelista v. Hingham Mutual Fire Ins. Co., 19 Mass.L.Rptr.No.5, 105 (2005) the insured knew that the heat was cut off and failed to take any efforts to inspect the property from December 14 through March 11. In contrast, in this case, the Plaintiff was making several efforts a week to determine the status of the property and the Plaintiff did not know that the heat had been cut off in the property.

The Supreme Judicial Court in Palmer v. Pawtucket Mut. Ins. Co., 352 Mass 304, 255 N.E.2d 331 (1967), dealt with language similar to the exclusion in this case. The insurance policy required the insured to use "due diligence" to maintain the heat. The court found that the due diligence requirement had been met when the insured followed the recommendation of a heating contractor even though they failed to drain their pipes and the recommendation resulted

in a freeze-up. The court indicated that if the insurer intended to impose more particular

requirements, for example excluding the use of anti-freeze as a method of complying with the

obligation of due diligence, a more explicit prohibition of that method should have been stated.

The court described the due diligence standard as a "somewhat ambiguous fine print provision"

(*Id.* 333) The "best efforts" provision applied in this case is as ambiguous as the provision in the

Palmer case.


    Thus the court in deciding the Motion for Summary Judgment must determine whether

there is any material issue of fact as to whether the Plaintiff acted reasonably in complying with

the somewhat ambiguous provision that it used its "best efforts" to maintain heat.


### 2.    Summary Judgment is Strongly Disfavored when Applying a
### Reasonableness Standard.


    Under Massachusetts law, the application of the reasonable person standard is uniquely

within the province of the jury. Wilson v. Copen, 244 F.3d 178, 182, ft. n. 2 (D. Mass 2001)

citing Noble v. Goodyear Tire and Rubber Co., Inc., 34 Mass.App.Ct. 397, 402 n.2, 612 N.E.2d

250 (1993). It has repeatedly been held that "because juries are uniquely qualified to apply the

reasonable person standard and to decide questions of causation, a plaintiff usually is afforded

the right to have his claim tried before a jury."  O'Connor v. SmithKline Bio-Science Lab., 36

Mass. App. Ct. 360, 363, 631 N.E.2d 1018 (1994). Rosado v. Boston Gas Co., 27 Mass.App.Ct.

675, 678, 542 N.E.2d 304 (1989). ("Just precisely what constitutes reasonably prudent conduct in

particular circumstances is generally left for a jury to decide, guided by instructions from the judge about the factors which the jurors should consider.")

This deference to juries deciding questions of what constitutes reasonable conduct has been routinely applied in Massachusetts when an insurer attempts to avoid payment because of a failure by an insured to act reasonably. O'Donnell-Usen Fisheries v. Bathurst, 664 F.Supp. 37, 38 (D. Mass 1987) (questions of reasonable delay giving notice to an insurer is jury issue). Salafia v. CNA Ins. Cos., 2001 WL 43588 (Mass. App. Div. 8) (2001). (Question of whether a PIP application was submitted as soon as practicable. Reasonableness should be decided by a jury.)

The Defendant has an extremely heavy burden to show that the question of whether or not reasonable efforts had been used by Plaintiff to maintain heat is not one which should be decided by the jury.

### 3.    There are Numerous Material Issues of Facts as to whether "Best Efforts" were Used to Maintain the Heat in the Property

The evidence concerning the reasonableness of the Plaintiff's efforts to maintain heat in the property includes the following:

### a.    The tenant had the obligation to maintain heat.

Defendant points to language in the lease which provides that the landlord shall maintain the heat in the property. That language was modified in writing to require that the utilities be billed directly to tenants (Plaintiff's Exhibit B, Deposition of James Karam, Exhibits 6 and 7, page 39-41; Plaintiff's Exhibit A, Deposition of Wood Deposition, page 180-181). The testimony of both the prior owners of the property and of Mr. Wood was that for approximately 18 months prior to this loss, utility bills had been billed directly to the tenant and the tenant had paid them. (Plaintiff's Exhibit A, Deposition of Martin Wood, pages 117-118.) The letters from Mr. Karam to Wilson Credit (Plaintiff's Exhibit B, Deposition of James Karam, Exhibit 6 and 7) established that this was a written policy agreed to by Wilson Credit. The jury would be entitled to find that Mr. Wood's conduct was reasonable in assuming that a practice which had been going on for 18 months without interruption and which was confirmed in writing by the previous owner of the property, would continue and that utilities would be maintained.

     **b.**     **Wood had a Reasonable Basis for Assuming that Wilson Credit would Continue to Pay Rent and Maintain the Utility.**

Wood Development was aware that it had a tenant who paid a below-market reasonable rent. Suzanne Schreiber, who was paying the rent ultimately, indicated to Mr. Wood that because of the below-market rent and because the location was key to their operations in that portion of the state, it was her intention to continue to maintain the property (Plaintiff's Exhibit A, Deposition of Martin Wood, page 50).

From October of 2003 through January of 2004, both Suzanne Schreiber and Keith Newell, CFO of Consolidated USA I & II, continually reassured Mr. Wood that it was their intention to maintain the property and that although they were going through reorganization, all of the rent would be paid. (Plaintiff's Exhibit A, Deposition of Martin Wood, page 86.)

Sometime shortly after December 18, 2003, Wood received rent checks for the November rent from Consolidated USA I & II (Plaintiff's Exhibit A, Deposition of Martin Wood, page 97). The payment of the November rent, sometime around December 20, 2003, combined with the promises of continued tenancy would allow a jury to find that it was reasonable for Mr. Wood not to have broken into the leased property during the next 10 days.

The Defendant's position is that, as a matter of law, this court must find that it was unreasonable for Wood Development, having received a rent payment on approximately December 20, 2003, not to have to break into the property on or before December 31, 2003, despite receiving repeated reassurances from the tenant that they would continue to use it as an occupied business.

c.    **Mr. Wood used Reasonable Efforts to Inspect the Property.**

As an initial matter on several occasions in September and October of 2003, Mr. Wood did inspect the property in connection with repairs. (Plaintiff's Exhibit A, Deposition of Martin Wood, page 106).

Mr. Wood also made repeated requests to Keith Newell for the key. Mr. Newell initially indicated that because of the sensitive financial records, the key could not be produced. (Plaintiff's Exhibit A, Deposition of Martin Wood, page 191). After further calls from Mr. Wood, Mr. Newell and Suzanne Schreiber offered on multiple occasions to forward the key to Mr. Wood. (Plaintiff's Exhibit A, Deposition of Martin Wood, page 184).

The phone records produced by Mr. Wood established that he made multiple calls throughout the month of December of 2003, seeking assurance and following up on the status of his tenant. (Plaintiff's Exhibit A, Deposition of Martin Wood, page 182-184).

Approximately once a month, Mr. Wood went to the property and determined from outside the utility closet that the heating system was continuing to work and was producing heat. The last such inspection was in the middle of December of 2003. (Plaintiff's Exhibit A, Deposition of Martin Wood, page 143).

Finally, Mr. Wood inspected the property within hours of finally receiving the key on January 9, 2004.

This court cannot determine, as a matter of law, that the efforts outlined above were not reasonable under the circumstances. The question whether that conduct is reasonable is quintessentially one for the jury.

**III.**      **CONCLUSION**

This court should deny the Defendant's Motion for Summary Judgment.


Plaintiff Wood Development, LLP
By its Attorney

/s/ Michael W. Reilly

Michael W. Reilly BBO# 415900
Tommasino & Tommasino
2 Center Plaza
Boston, MA  02108
617-723-1720

# UNITED STATES OF AMERICA
# DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.:  04-12590 DPW

|  |  |
|---|---|
| **WOOD DEVELOPMENT, LLP**, | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| **PHILADELPHIA INDEMNITY INSURANCE CO.**, | ) |
| Defendant, | ) |
|  | ) |

### PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**I.       PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACT.**

**Defendant 1**

On or about June 1, 2003, Wood Development, LLP ("Wood") purchased a commercial development at 45 North Main Street in Fall River, Massachusetts (the "Property"). *(Exhibit A – Deposition of Marlin Wood, p. 49, lines 20-21).*

**Plaintiff Response**

Agreed.

**Defendant 2**

On or about June 1, 2003, Wood also acquired the rights to the commercial lease for a portion of the Property entered into between Forty Five North Main LLC and Wilson Credit Services, LLC ("Wilson Credit"). *(Exhibit A – Deposition of Martin Wood, p. 43, lines 11-15).*

**Plaintiff Response**

Agreed.

**Defendant 3**

Following acquisition of the Lease by Wood, Wilson Credit remained a tenant at the Property

pursuant to the terms of the Lease.

**Plaintiff Response**

Agreed.

**Defendant 4**

The Lease commenced on June 1, 2002. *(Exhibit B – Lease).*

**Plaintiff Response**

Agreed.

**Defendant 5**

As inducement to the original landlord to enter into the Lease with Wilson Credit, Consolidation

USA, Inc. and Consolidation USA II, Inc. agreed to a guaranty of the Lease for the initial year.

*(Exhibit B – Lease).*

**Plaintiff Response**

Agreed.

**Defendant 6**

It is a generally accepted practice in the commercial real estate field to require a guarantor where

the tenant is not financially stable and none of the other tenants at the Property required a

guarantor. *(Exhibit A – Deposition of Martin Wood, p. 45, lines 19- 21 and p. 4& lines 3-6).*

**Plaintiff Response**

Disputed. Wilson Credit was required to obtain a guaranty for the lease not because of concerns about the financial stability, but because the original landlord, 45 North Main Street, LLC, incurred renovation costs of approximately $20,000 and their practice was to obtain some sort security after they expended large amounts of money for a fix up before entering into a lease. (Plaintiff's Exhibit A, Deposition of Martin Wood, pages 46 - 47; Plaintiff's Exhibit B, Deposition of James Karam, page 18).

**Defendant 7**

Wood performed a due diligence and reviewed the Lease prior to obtaining the Property. *(Exhibit A – Deposition of Martin Wood, p. 35, lines 2-6).*

**Plaintiff Response**

Agreed.

**Defendant 8**

Subsequent to the acquisition of the Property, PIIC issued Policy No. PHIPHPK052406 to Martin Wood as the general partner of Wood Development, LLP (the "Policy"). *(Exhibit C - PIIC Policy).*

**Plaintiff Response**

Agreed.

**Defendant 9**

The Policy was effective June 10, 2003 to June 10, 2004 and provided first-party coverage for

the Property. *(Exhibit C- PIIC Policy).*

**Plaintiff Response**

Agreed.


**Defendant 10**

By letter dated May 7, 2003, Consolidation USA, Inc. and Consolidation USA II, Inc., the

guarantors of the Lease, retained Debt Management, Inc. to "establish Wilson Credit Services,

LLC as a financially viable collection agency." *(Exhibit D – May 7, 2003 Letter).*

**Plaintiff Response**

Agreed.


**Defendant 11**

The letter noted that Wilson Credit was "unable to pay its bills as they become

due" and was "presently insolvent." *(Exhibit D – May 7, 2003 Letter).*

**Plaintiff Response**

Disputed. The letter from Jeffrey Schreiber, who was not a guarantor or party to the lease, is

inadmissible hearsay as to the financial condition of Wilson Credit. It would not be admissible to

establish any facts concerning the financial condition of Wilson Credit.


**Defendant 12**

Wood reviewed this letter as part of its due diligence before purchasing the

Property. *(Exhibit A – Deposition of Marlin Wood, p. 203, line 20 top. 204, line 5).*

**Plaintiff Response**

Admit.


**Defendant 13**

At the time that Wood acquired the Property in June 2003, it was concerned about the financial

stability of Wilson Credit based on the expiration of the guaranty of the Lease and it sought to

extend the guaranty. *(Exhibit A – Deposition of Martin Wood, p. 51, lines 11-19).*

**Plaintiff Response**

Disputed. Martin Wood was reassured as to the financial stability of Wilson Credit based upon

his review of the rent rolls (Plaintiff's Exhibit A, Deposition of Martin Wood, pages 43 - 44),

based upon the representations of Suzanne Schreiber and Keith Newell of Schreiber &

Associates that it was their intention to meet the terms of the lease because they felt the location

was vital to their collection activities in the region. (Plaintiff's Exhibit A, Deposition of Martin

Wood, page 50) and based on Suzanne Schreiber telling him "don't worry about it.  Everything

is going to be fine. The rent there is a dream. It's not that much of money, and we would like to

stay on." (Plaintiff's Exhibit A, Deposition of Martin Wood, page 60).


**Defendant 14**

The failure of the guarantors to extend the guaranty despite extensive phone

inquiries and failed promises to do so caused further concerns regarding the

creditworthiness of Wilson Credit. *(Exhibit A – Deposition of Martin Wood, p. 58, lines

7-13).*

**Plaintiff Response**

Disputed. The cited portions of transcript do not support the Defendant's statement of fact. Mr. Wood said, in that portion of transcript, that the concern level got elevated during the period of the lease "from time to time, yes, but the rent kept on coming". Mr. Wood did not indicate that he had "further concerns" and does not link his concerns to the guaranty.

**Defendant 15**

Beginning in July 2003, the monthly rent due from Wilson Credit was paid on an increasingly late basis. *(Exhibit A – Deposition of Martin Wood, p. 80, line 18 to p. 82, line 6).*

**Plaintiff 15**

Agreed.

**Defendant 16**

The November 2003 rent was not paid until the middle of December and the December 2003 rent was never paid despite being due on December 1, 2003. *(Exhibit A - Deposition of Martin Wood, p. 97, line 3 to p. 98, line 9).*

**Plaintiff Response**

Agreed.

**Defendant 17**

The rent was paid by entities other than Wilson Credit that had no obligation to make such payments. *(Exhibit A – Deposition of Martin Wood, p. 85, lines 2-4).*

**Plaintiff Response**

Disputed. Consolidated USA I & II had made some sort of agreement with Wilson Credit to pay Wilson's rent. In light of the amount of reimbursement it could be inferred that Consolidated USA I & II had a responsibility to pay the rent of Wilson Credit. (Plaintiff's Exhibit C, Deposition of Suzanne Schreiber, page 27) Additionally, the cited portion of transcript indicates that the rent was paid by other entities beginning only in October of 2003 not throughout the period of the lease.

**Defendant 18**

Beginning in September 2003, Wood made numerous requests to obtain a key to the premises occupied by Wilson Credit. *(Exhibit A – Deposition of Martin Wood, p. 105, line 17 to p. 106, line2).*

**Plaintiff Response**

Disputed. The cited testimony indicates that there was a request made in September or October for the key. Martin Wood was told that because Wilson dealt with credit reports and financial information they had to maintain security and therefore Wilson Credit could not release a key. Mr. Wood indicated that he inspected the property on several occasions in September and October with regard to air-conditioning and electrical problems. (Plaintiff's Exhibit A, Deposition of Martin Wood, page 106).

**Defendant 19**

As the outside temperatures decreased, Wood's requests for a key increased.

*(Exhibit A - Deposition of Martin Wood, p. 107, lines 15-19).*

**Plaintiff Response**

Agreed.


**Defendant 20**

Wood was concerned as to whether heat was being maintained to the premises

and wanted to independently verify that fact. *(Exhibit A – Deposition of Martin Wood, p. 101,*

*lines 2-4).*

**Plaintiff Response**

Disputed. The cited portion of the transcript does not indicate that Mr. Wood was "concerned". It

does indicate that he wanted to verify that somebody had gone to the premises and the

temperature was set above freezing.


**Defendant 21**

In November 2003, Wood consulted an attorney regarding the removal of Wilson Credit from

the premises. *(Exhibit A – Deposition of Martin Wood, p. 90, lines 3-11).*

**Plaintiff Response**

Disputed. The cited portion of the transcript, presumably Plaintiff's Exhibit A, Deposition of

Martin Wood, pages 89 and 90, establishes that Mr. Wood consulted his attorney "regarding

what steps he could take to protect his interest". In fact, no notice to quit was sent by the attorney

until January 28, 2004, after the loss. (Plaintiff's Exhibit A, Deposition of Martin Wood, page 89

- 90.)

**Defendant 22**

In December 2003, there were no lights on at the premises occupied by Wilson

Credit and its parking spaces were not being utilized. *(Exhibit A – Deposition of Martin*

*Wood, p. 103, line 1 to p. 104, line 5).*

**Plaintiff Response**

Disputed. The testimony cited by the Defendant establishes that at some time in late December

after Christmas, the parking lot attendant observed lights were out. It was the belief of Mr. Wood

that Wilson Credit was probably "away for Christmas". Mr. Wood saw activity in the building

during the month of December. He saw people coming and going from the rented space.

(Plaintiff's Exhibit A, Deposition of Martin Wood, page 124.)


**Defendant 23**

Wood concluded around Christmas 2003 that Wilson Credit was not working in the space.

*(Exhibit A – Deposition of Martin Wood, p. 124, lines 5-17).*

**Plaintiff Response**

Disputed. As indicated above, Mr. Wood's assumption, when he learned the lights were not on,

was that the individuals at Wilson Credit were "away for Christmas" (Plaintiff's Exhibit A,

Deposition of Martin Wood, page 103.) To the best of Martin Wood's knowledge, Wilson Credit

was doing business at the leased property right up to the day of the loss. They had activities

going on and they were receiving mails. (Plaintiff's Exhibit A, Deposition of Martin Wood, page

124).

**Defendant 24**

On January 9, 2004, Wood obtained a key for the Wilson Credit offices by mail

and entered the premises. *(Exhibit A – Deposition of Martin Wood, p. /84, line 13).*

**Plaintiff Response**

Agreed.


**Defendant 25**

Subsequent to January 9, 2004, Wood learned that heat had been shut off to the

premises on December 31, 2003 for nonpayment of the gas bill. *(Exhibit A – Deposition*

*of Martin Wood, p. 151, lines 5-23).*

**Plaintiff Response**

Agreed.


**Defendant 26**

Prior to the discovery of the loss, Wood had been advised by its property manager that, due to

concerns about freezing and other maintenance issues, access should be gained by force if the

key was not obtained in short order. *(Exhibit E – Deposition of James Karam,  p. 26, line 13 to p.*

*27, line 3).*

**Plaintiff Response**

Disputed. Martin Wood testified that when he discussed Wilson Credit with Mr. Karam, Mr.

Karam asked him if the tenant was paying rent. Mr. Wood said that they were a little behind. Mr.

Karam advised "as long as the rent is forthcoming, even if it's late. He said, at this point, in time,

you may find it difficult to switch over to get a new tenant, he said he would try to work with them." (Plaintiff's Exhibit A, Deposition of Martin Wood, page 91)

**Defendant 27**

Wood has agreed that it had the ability to put the gas utility in its name and that this action would have ensured that heat was supplied to the premises. *(Exhibit A – Deposition of Martin Wood, p. 119, line 24 to p. 120, line 11).*

**Plaintiff Response**

Disputed. Martin Wood agreed that it was mechanically possible to place the name of the utilities in the name of the landlord. Martin Wood did not agree it was reasonable for a landlord to insist on paying utilities for a tenant when the tenant had agreed to and was legally obligated to pay those utilities.

**Defendant 28**

Wood had no difficulty in switching the gas to its name following the loss. *(Exhibit A – Deposition of Martin Wood, p. 134, line 1 to p. 135, line 1).*

**Plaintiff Response**

Agreed.

**Defendant 29**

The utility put a notation on the account following the loss to notify the owner, Wood, prior to disconnecting the utilities. *(Exhibit A - Deposition of Martin Wood, p. 151, line 23 to p. 153, line 21).*

**Plaintiff Response**

Disputed. The utilities, according to Mr. Wood, made the change after the owner agreed to pay the bills. Mr. Wood testified in the same section of his deposition that both the gas and electric utilities indicated that they would not have notified Mr. Wood of any disruption in service prior to Mr. Wood taking over payment of the bills after the loss.

**Defendant 30**

Wood has agreed that a locksmith could have been utilized to gain access to the Property. *(Exhibit A – Deposition of Martin Wood, p. 191, lines 2-5).*

**Plaintiff Response**

Disputed. Mr. Wood testified that although a locksmith could be used to enter the property, the tenant or its representative had told him because of the security issues, he could not gain access to the property. The tenant also continued to reassure Martin Wood that "everything was fine and they were on a regular basis and there were no problems." (Plaintiff's Exhibit A, Deposition of Martin Wood, page 190.)

**Defendant 31**

PIIC received notice of the loss on January 21, 2004 and, following an investigation of the circumstances surrounding the loss and the extent of damages, denied coverage for the loss by letter dated April 30, 2004. *(Exhibit G - Denial of Coverage Letter).*

**Plaintiff Response**

Agreed.

B.    ADDITIONAL RELEVANT FACTS

**Plaintiff 1**

In October of 2003, when Wilson Credit fell behind on the rent, Martin Wood contacted Keith

Newell, CFO of Consolidated USA I & II. Mr. Newell assured him that rent was going to be paid

by Consolidated USA I & II. Mr. Wood had a follow-up conversation with him several weeks

later to the same effect. (Plaintiff's Exhibit A, Deposition of Martin Wood, pages 77 – 78).

**Plaintiff 2**

In the period of October and November, Mr. Wood was not concerned with the solvency of

Wilson Credit. The rent was coming on a regular basis from Consolidated USA I & II. When it

was late he made a phone call, and the rent continued to be paid on a regular basis. (Plaintiff's

Exhibit A, Deposition of Martin Wood, page 80)

**Plaintiff 3**

In October of 2003, Keith Newell of Schreiber & Associates told Martin Wood that Wilson was

going through reorganization or restructuring and somebody else was coming to manage the

company. In the interim, another entity would be paying the rent for the property. (Plaintiff's

Exhibit A, Deposition of Martin Wood, page 86).

**Plaintiff 4**

In November of 2003, Brandon Wilson of Wilson Credit told Martin Wood that all check writing

was going to be done out of the Danver's office of Schreiber & Associates. Mr. Wood knew,

because he had seen the tax returns for Consolidated USA I & II, that they were financially

healthy. (Plaintiff's Exhibit A, Deposition of Martin Wood, pages 91 and 92). Some time after

December 18, 2003, Consolidated USA I & II sent checks to pay for the Wilson Credit

November rent. (Plaintiff's Exhibit A, Deposition of Martin Wood, page 97).


**Plaintiff 5**

In late December of 2003, after receiving two checks from Consolidated USA I & II, Martin

Wood was told by Keith Newell that rent was going to be paid. (Plaintiff's Exhibit A, Deposition

of Martin Wood, page 99).


**Plaintiff 6**

Up to the time the loss, Keith Newell, CFO of Consolidated USA I & II was continuously

reassuring Martin Wood that he had a maintenance person who he was sending over to the

insured property just to make sure everything was fine and the heat was on. (Plaintiff's Exhibit

A, Deposition of Martin Wood, page 100).


**Plaintiff 7**

Wilson Credit did business in the property beginning in the late afternoon, 4:30 p.m. or 5 p.m.

There were some people during the day but most activities on the property picked up after 5 p.m.

Martin Wood would see people when he left late at work, indicating the property was in use.

(Plaintiff's Exhibit A, Deposition of Martin Wood, page 101).

**Plaintiff 8**

Martin Wood was not aware that Wilson Credit had vacated the insured property and did not

have any reason to believe that property had been vacated until he discovered the loss.

(Plaintiff's Exhibit A, Deposition of Martin Wood, pages 101 and 102).


**Plaintiff 9**

Throughout November into January of 2004, the time of the loss, Martin Wood continued to seek

reassurance from Mr. Newell that the heat was remaining above the freezing point in the insured

property. (Plaintiff's Exhibit A, Deposition of Martin Wood, pages 111, 112).


**Plaintiff 10**

Prior to Wood Development purchasing the property, Wilson Credit and Schreiber & Associates

had agreed that the utilities would be switched into the name of Wilson Credit and would be paid

directly by Wilson Credit. (Plaintiff's Exhibit B, Deposition of James Karam, pages 39-41,

Exhibits 6 and 7 of Deposition of James Karam)


**Plaintiff 11**

At the time Wood Development bought the property, James Karam informed Mr. Wood that

Wilson Credit would be billed directly for the gas bills. Mr. Karam did not inform Mr. Wood that

there was any problem concerning Wilson Credit paying the gas bills. (Plaintiff's Exhibit B,

Deposition of James Karam, page 41).

**Plaintiff 12**

Prior to the purchasing the property, Martin Wood saw Exhibit 6 and 7 to the Deposition of Mr.

Karam. They confirmed that Wilson Credit was responsible for paying the utilities. Wood

Development did not receive any gas bills for the property up to the time of loss which

confirmed Wood's understanding that Wilson Credit would be paying for the utilities. (Plaintiff's

Exhibit A, Deposition of Martin Wood, pages 117 - 118).

**Plaintiff 13**

Prior to purchasing the property, Martin Wood reviewed Exhibit 6 and 7 of Deposition of James

Karam and considered the documents to be a written modification of the lease between the

landlord and the tenant. (Plaintiff's Exhibit A, Deposition of Martin Wood, page 77). He was put

at ease concerning the lease because it satisfied him that he did not have to worry because the gas

was under the name of the tenant. (Plaintiff's Exhibit A, Deposition of Martin Wood, pages 180 -

181).

In October, November and December of 2003, including the middle of December, Martin Wood

went to the head of the stairs where the lock utility room was and listened to satisfy himself that

the heating equipment was operating and he could feel heat. (Plaintiff's Exhibit A, Deposition of

Martin Wood, pages 149, 150).

**Plaintiff 14**

Throughout December of 2003, Martin Wood made multiple calls to Schreiber & Associates to

seek the rent, the key and the status of the property. His telephone records indicate calls to

Schreiber on December 4, 11, 15, 18, 22 of 2003, January 5, 8 of 2004. Many additional calls were made from his cell phone and from his wife's telephone which are not reflected on the records. (Plaintiff's Exhibit A, Deposition of Martin Wood, pages 182 – 184).

**Plaintiff 15**

Immediately upon receipt of the key to the property on January 9, 2004, Wood Development had inspected the property and discovered the loss. (Plaintiff's Exhibit A, Deposition of Martin Wood, pages 187 - 188).

**Plaintiff 16**

On multiple occasions, Suzanne Schreiber and Keith Newell assured Martin Wood that they would be responsible for the rent and he should not worry that the rent would be paid. (Plaintiff's Exhibit A, Deposition of Martin Wood, pages 199).

Plaintiff Wood Development, LLP
By its Attorney

/s/ Michael W. Reilly

Michael W. Reilly BBO# 415900
Tommasino & Tommasino
2 Center Plaza
Boston, MA  02108
617-723-1720

# EXHIBIT A

UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

C.A. No. 04-12590DPW

* * * * * * * * * * * * * * * * * * * * * * * * * * *

WOOD DEVELOPMENT, LLP,
  Plaintiff

vs.

PHILADELPHIA INDEMNITY
INSURANCE CO.,
  Defendant

* * * * * * * * * * * * * * * * * * * * * * * * * * *


DEPOSITION OF MARTIN WOOD, a witness

called by counsel for the Defendant, taken

pursuant to the applicable provisions of the

Federal Rules of Civil Procedure, before Joann

Denning, a Shorthand Reporter and Notary Public

in and for the Commonwealth of Massachusetts,

at the offices of Murphy & Riley, P.C., 141

Tremont Street, Boston, Massachusetts, on

Monday, October 24, 2005, commencing

at 10:34 a.m.



```
 1            Street when you purchased that building?
 2   A.       No.
 3   Q.       Why not?
 4   A.       One of the rules or procedures with regards to
 5            using this -- strike that -- with regards to
 6            using this reporting or credit service was that
 7            you had to have a signed credit application or
 8            a lease application and have the names,
 9            individual's date of birth as well as Social
10            Security number.
11   Q.       So is it your testimony that as a result of
12            taking over these leases you could not conduct
13            such an investigation under the terms of your
14            agreement with Info Systems, Inc.?
15   A.       I did not try.
16   Q.       The creditworthiness of the tenant would be an
17            extremely important piece of information to
18            have before taking over the building?
19   A.       Correct.
20   Q.       Other than your discussions with the Karams, is
21            there anything else that you did to satisfy
22            yourself of the creditworthiness of the tenant
23            at 45 North Main Street?
24   A.       Yes.
```

```
 1   Q.   What else did you do, sir?
 2   A.   I took a look at their rent roll sheets to
 3        determine how punctual the rent was paid.
 4   Q.   Anything else?
 5   A.   No.  That was it.
 6   Q.   Did you know Mr. Schreiber personally or by
 7        reputation?
 8   A.   I know by reputation.
 9   Q.   What was your knowledge about his reputation in
10        2002?
11   A.   I know that he was an attorney.
12   Q.   Anything else about his reputation that you
13        knew at that time?
14   A.   No.
15   Q.   How about his wife Suzanne, did you have any
16        information about her?
17   A.   No.
18   Q.   Did you have any information about Wilson
19        Credit that you have not told me about today?
20   A.   No.
21   Q.   What was the significance of the fact that they
22        had a guarantor for the lease?
23   A.   Made me feel more comfortable.
24   Q.   Was a guarantor something that Mr. Karam had
```

```
 1           tenancy?

 2   A.      No.

 3   Q.      Were there any other tenants at 45 North Main

 4           Street that had required a guarantor as a

 5           contingent of a lease contract?

 6   A.      No.

 7   Q.      So this was a tenant then that required

 8           specific due diligence to determine their

 9           continued creditworthiness in light of their

10           initial lack of creditworthiness?

11   A.      I don't know.  I could speculate, but you don't

12           want me to do that.

13   Q.      I don't want you to speculate, sir, but you

14           were the person who was doing the due diligence

15           on this commercial building, and I'm trying to

16           determine what, in fact, you did do when you

17           purchased it.

18   A.      Well, I believe that one of my conversations

19           with the Karams were why the rent for this

20           particular space was as low as it was to Wilson

21           Credit.  They had a provision in the lease that

22           basically allowed me to increase the rent for a

23           bump up in real estate taxes, a bump up in

24           operating expenses and general maintenance of
```

 1         the property.

 2    Q.    Didn't all your leases have that?

 3    A.    No.  Actually a couple of the leases were gross

 4         leases, gross rent lease situations.

 5    Q.    I'm sorry for interrupting you, sir.

 6    A.    And that I believe that one of the other

 7         reasons that he asked for a guaranty on that

 8         particular tenant was that he did renovate that

 9         space for them at a cost of close to $200,000.

10    Q.    Have you now told me all conversations you had

11         with Mr. Karam regarding the manner -- strike

12         that -- the reasons why he had a guaranty from

13         Consolidated USA for the Wilson Credit lease?

14    A.    I believe so.

15    Q.    Produced as part of your response to our

16         request for production of documents was a fair

17         number of documents, one of which is the

18         indenture of lease between 45 North Main

19         Street, LLC, and Wilson Credit Services, LLC.

20              I'm giving it to you in the manner in

21         which I received it which also includes what

22         appear to be a number of damages documents in

23         this case.  I'm just directing your attention

24         to the lease itself.

```
 1   Q.    Did you have any conversations with anyone
 2         regarding the financial stability of Wilson
 3         Credit, LLC, based on the fact that the
 4         guaranty was now terminating?
 5   A.    I spoke to Suzanne Schreiber and on several
 6         occasions as well to Keith Newell who was the
 7         chief financial officer of Schreiber &
 8         Associates.
 9   Q.    What was the substance of those conversations,
10         sir?
11   A.    That they would honor the terms of the lease.
12         They felt that the location was vital to their
13         collection activities in the region.
14   Q.    Did you ever reduce that to writing?
15   A.    No, but I asked.
16   Q.    You asked what?
17   A.    I asked for it to be reduced to writing.  I
18         said, Send me a letter.
19   Q.    Did they send you a letter?
20   A.    No.
21   Q.    Did the fact that they failed to send you a
22         letter raise your concerns regarding the
23         creditworthiness of Wilson, LLC?
24   A.    Yes.
```

| | | |
|---|---|---|
| 1 | | conversation with Ms. Schreiber. |
| 2 | A. | I felt -- okay.  Go ahead.  Ask away. |
| 3 | Q. | You may answer. |
| 4 | A. | I felt comfortable with the fact that I spoke |
| 5 | | to her, and she was very charming and put me at |
| 6 | | ease and said, Don't worry about it. |
| 7 | | Everything is going to be fine.  The rent there |
| 8 | | is a dream.  It's not that much money, and we |
| 9 | | would like to stay on. |
| 10 | Q. | Did she give you any indication as to why |
| 11 | | Wilson Credit failed and why some reconstituted |
| 12 | | organization would be successful? |
| 13 | A. | No. |
| 14 | Q. | Was she at all critical at all in your |
| 15 | | conversations with her regarding the management |
| 16 | | ability of the Wilsons? |
| 17 | A. | I think she made some disparaging remarks. |
| 18 | Q. | When first did she make disparaging remarks |
| 19 | | about the Wilsons? |
| 20 | A. | I can't remember. |
| 21 | Q. | Was it prior to this January conversation? |
| 22 | A. | It may have been. |
| 23 | Q. | Do you recall the nature of the disparaging |
| 24 | | remarks? |

```
 1            believe, yeah, he worked for all of them.
 2    Q.    So as far as you knew, he was CFO for the
 3          umbrella group of companies?
 4    A.    Yeah, Schreiber & Associates.
 5    Q.    And Consolidation I and II?
 6    A.    And Consolidation I and II.  I believe there
 7          are more companies there as well.
 8    Q.    Can you identify any of them?
 9    A.    No.
10    Q.    What was the substance of conversations that
11          you had with Mr. Newell?
12    A.    Pre-loss, the rent, the condition of the
13          premises, the electricity being on, heat being
14          on, what temperature the heats were set at, and
15          is it possible for me to get a key to the
16          premises.
17    Q.    When did you first have conversation with
18          Mr. Newell?
19    A.    As far as speaking to him, in October.
20    Q.    Why did you have a conversation with him
21          regarding rent in October?
22    A.    Because the rent was late.  He said the rent is
23          going to be paid by another entity for the time
24          being, which it was.
```

| | | |
|---|---|---|
| 1 | Q. | What was the other entity? |
| 2 | A. | I believe it was Consolidated USA I and II. |
| 3 | Q. | Did the fact that it was late in October and |
| 4 | | the fact that another entity had to pay for it |
| 5 | | trigger any alarm bells in your mind? |
| 6 | A. | We had a conversation about it, and I talked to |
| 7 | | him about the guaranty as well, sending the |
| 8 | | guaranty, as well as getting a key to the |
| 9 | | premises.  And he said that they were going to |
| 10 | | work on it.  They were going through some |
| 11 | | consolidation pains and would be getting back |
| 12 | | to me shortly. |
| 13 | | I then spoke to him or called him a couple |
| 14 | | weeks after that and said, I'm going to need a |
| 15 | | key, and he said that that would be difficult |
| 16 | | because of the financial information and the |
| 17 | | security, secure nature of the documentation |
| 18 | | that was in the premises. |
| 19 | Q. | We'll get to that in a second.  Do you recall |
| 20 | | when in October this conversation took place |
| 21 | | with Mr. Newell? |
| 22 | A. | Several times. |
| 23 | Q. | During those conversations, it started off |
| 24 | | because the rent was late? |

```
 1              solvency of Wilson Credit?
 2   A.   No.
 3   Q.   He had just told you that they wouldn't be
 4        paying their rent, that somebody else had to
 5        pay it and that they were having difficulty
 6        with that corporation making ends meet?
 7   A.   I believe the rent periodically came from a
 8        different entity anyway.
 9   Q.   But those are all red lights indicating to you
10        that there are financial problems here?
11   A.   Not necessarily.  The rent was coming on a
12        regular basis, and up until that point it was
13        late and then I made a phone call and continued
14        to get it on a regular basis.
15   Q.   Through the summer all of the rent payments
16        were late?
17   A.   No, I don't think so.
18   Q.   As part of Exhibit No. 17 in the documents that
19        were produced to us, the July rent wasn't
20        written until July 10th.  Presumably it was
21        received sometime after that, is that correct?
22   A.   I believe so.
23   Q.   That would be considered late?
24   A.   I believe the lease allows for a 10-day grace
```

```
 1              terms.

 2     Q.       Do you know one way or another what he said

 3              with regard to Wilson's ability to pay at that

 4              time?

 5     A.       He didn't say anything with regards to Wilson's

 6              ability to pay.  He said they were going to go

 7              through a reorganization or a restructure of

 8              their entity and someone else was going to come

 9              in and manage the company, and in the interim

10              someone else would be paying the rent.

11     Q.       As a reasonably prudent real estate management

12              person, that required on your behalf action to

13              make sure that the new person coming in to run

14              this business was independently financially

15              able to make ends meet?

16     A.       Yeah, but I didn't know who that person was.

17     Q.       That's one of the reasons why you have a

18              non-assignment of lease without the permission

19              of the landlord in your lease?

20     A.       Right.

21     Q.       Because you wanted to be sure that whoever came

22              in and became responsible for running this

23              business could make ends meet?

24     A.       Right.
```

1        eviction.

2  Q.   Had you ever had an eviction of a tenant who

3        was unable to make ends meet in a commercial

4        setting prior to Wilson Credit?

5  A.   No.

6  Q.   Did you consult with an attorney regarding what

7        steps you could take to protect your interest

8        in this regard?

9  A.   Yes.

10  Q.   When first did you consult with an attorney?

11  A.   I'm not really sure what the time frame was,

12        but I believe it was November.

13  Q.   Was that Attorney Frank?

14  A.   I believe so.

15  Q.   As a result of your conversations with Attorney

16        Frank, did he do anything on your behalf?

17  A.   I'm really not sure.  I think he may have sent

18        them a notice to quit.

19  Q.   Do you have a copy of that letter?

20  A.   If it was not produced previously --

21  Q.   It was not.

22  A.   Then I'll see if I can get one.

23  Q.   I think the only letter that I have is a letter

24        Attorney Frank sent on January 28, '04,

```
 1              regarding the damage to the property.
 2   A.    I think that may be it.
 3   Q.    That's just putting them on notice of the loss
 4         and to notify their insurance company.  It's
 5         not a notice to quit.  Is your memory that at
 6         some point Attorney Frank sent a notice to quit
 7         to Wilson Credit in November of '03?
 8   A.    I don't know.
 9   Q.    You just testified that he did.
10   A.    I talked to him about it.  I don't know whether
11         he had sent it.
12   Q.    Was anything else done on your behalf before
13         January 9th, 2004, regarding Wilson Credit and
14         their ability to pay?
15   A.    I believe I had some conversations with the
16         Karams with regards to that.
17   Q.    What was the substance of your conversation
18         with the Karams?
19   A.    That they were behind in the rent and they were
20         -- we had some concerns.
21   Q.    You voiced your concerns to -- was it Jaimie or
22         James Karam?
23   A.    I believe Jaimie.
24   Q.    What did Jaimie tell you when you voiced your
```

```
 1              concerns about Wilson's solvency?
 2    A.    He said to me, Are they paying the rent?  I
 3          said, Yes, they're behind a little bit.  He
 4          said, Well, as long as the rent is forthcoming,
 5          even if it's late.  He said, At this point in
 6          time you may find it difficult in the
 7          wintertime to switch over and get a new tenant.
 8          He said to try to work with them.
 9    Q.    When you had conversations regarding the
10          ability of Wilson to pay, did you ever have any
11          conversations with anybody at Wilson?
12    A.    I believe I did.  I think it was Brandon
13          Wilson, and I believe it was in November of
14          2003, and he told me at that point in time that
15          all the check writing was going to be done out
16          of the Danvers office, out of Schreiber &
17          Associates.
18    Q.    Did he say why?
19    A.    No.
20    Q.    Did you understand at that point that there was
21          an inability of Wilson to pay the bills
22          themselves as they became due?
23    A.    No.
24    Q.    Did that seem unusual to you, that a law firm
```

```
 1            would be paying money for the benefit of a

 2            non-related corporation?

 3   A.      Well, some of my other tenants, other

 4            commercial tenants, are subsidiaries of larger

 5            corporations, and the rent would be paid out of

 6            Michigan for a tenancy that was here.

 7            Sometimes on our residential end of it we would

 8            have financial institutions pay the rent for

 9            tenants from California, out of California, out

10            of New York City, out of Florida.

11   Q.      I understand how that happens, but based on

12            numerous conversations you knew that Schreiber

13            & Associates was a law firm?

14   A.      Yes.

15   Q.      You knew that there was an indirect

16            relationship with Jeffery and Suzanne Schreiber

17            and the Consolidation entities?

18   A.      I believe so, but I had seen the tax returns

19            for Consolidated, and they looked pretty

20            healthy, so I figured --

21   Q.      But they had no obligation to make any payments

22            at this point in time?

23   A.      They were making payments.  They had no

24            obligation to, but they were.
```

1    due?

2  A.  Right.

3  Q.  So attached to the December rent roll is a

4      single check -- strike that -- two checks dated

5      December 18th from Consolidation USA, Inc., and

6      from Consolidation USA II, Inc., is that

7      correct?

8  A.  Hm-hm.

9  Q.  Each of those entities paid one month's rent --

10     strike that -- one-half of one month's rent?

11 A.  One-half of one month's rent.

12 Q.  So these payments are actually for the November

13     rent?

14 A.  Correct.

15     MR. MURPHY:  May we mark this as Exhibit 5

16     consisting of the December 2003 rent roll for

17     45 North Main Street and the attached two rent

18     checks.

19     (Exhibit No. 5, December 2003 Rent Roll

20     and Checks, marked for Identification.)

21 Q.  As I understand from the records that were

22     produced, sir, these two checks attached to

23     Exhibit 5 are the last checks you ever received

24     from or on behalf of Wilson Credit?

```
 1              that was paying attention to you, what do you
 2              mean by that?
 3   A.         Well, I would call him and I would go through,
 4              Is Jeffery Schreiber there?  No, he's away
 5              skiing.  Obviously he's with his wife, so I
 6              didn't even ask for her.  Then I would say,
 7              Well, is Keith Newell there?  And they would
 8              say yes, and I would speak to him or he'd call
 9              me back or would not speak to him and had to
10              call again.
11   Q.         Is it fair to say that by the time you received
12              these checks in late December 2003 that you
13              were aware that Wilson had an inability to make
14              ends meet?
15   A.         I don't know.  It seemed like you're phrasing
16              it -- I didn't care who paid the rent as long
17              as the rent came in.  I was being told the rent
18              is going to be paid.
19   Q.         I understand that, but I want to suggest to you
20              for a second there are two different ways to
21              look at it.  Obviously you're concerned that
22              money is being paid.  But I'm just focussing on
23              Wilson Credit as an entity.  Is it fair to say
24              that certainly by late December 2003 you were
```

1          aware that it no longer had the financial

2          ability on its own to make ends meet?

3    A.    Yes.  But I was aware of another problem as

4          well, that the fact that the rent was late and

5          that I still had not received a key to the

6          premises prompted me to call quite a bit, and

7          they were calling me back, and I was assured

8          that I would be getting a key shortly.

9    Q.    Why did you want a key?

10   A.    So I could go in there and I could see what was

11         doing.

12   Q.    See what was going --

13   A.    What was doing, what was going on.

14   Q.    What were the sort of things that you learned

15         in property management to look for?

16   A.    One of the things that I had talked to Keith

17         Newell about almost every time that I had

18         spoken to him was is the heat on, and he

19         assured me that they have a maintenance person

20         that they send over there every now and then to

21         just make sure that everything was fine and

22         that the heat was on.

23   Q.    I take it that you were concerned and one of

24         the reasons you wanted the key was to make sure

```
 1                independently that the heat was on?

 2    A.          Independently I wanted to verify the fact that

 3                somebody had gone into the premises and the

 4                temperatures were set above freezing.

 5    Q.          Did you have any information as to whether

 6                Wilson employees were still working out of the

 7                premises?

 8    A.          We would see lights on there occasionally.

 9                They basically -- they would come in late in

10                the afternoon at around four-thirty,

11                five o'clock.  That was the time that they

12                started.  There were people there usually

13                during the daytime, but not an awful lot.  In

14                the evenings, sometime after five o'clock, a

15                lot more activity picked up.

16                    There were occasions that I stayed late at

17                work and I would see people hanging around the

18                side entrance and cigarette butts all over the

19                place.

20    Q.          At any time prior to January of '04, did you

21                become aware that Wilson had vacated the

22                premises, was no longer conducting business out

23                of that location?

24    A.          No.  I did not have any reason to believe that.
```

```
 1   Q.   When first were you aware they had vacated the
 2        premises?
 3   A.   I would say it was around the time that -- it
 4        was at the time the pipe broke that we got the
 5        key and we went into the space.
 6   Q.   Are you aware when they first vacated the
 7        premises?
 8   A.   As far as I'm concerned, they're still a
 9        tenant.  I believe that -- legally when they
10        vacated the premises?
11   Q.   Just so we're clear, I'm not trying to play
12        little word games here, sir, but at some point
13        the premises stopped being an active work site.
14        And I'm not getting into whether under the
15        terms of the lease it was vacated --
16   A.   I believe it was in January of 2004 that we
17        started to -- their parking lot spaces were not
18        being used.  We did not see any lights on.  And
19        I had called to get the key, and my calls were
20        of a very, very urgent nature saying, I need
21        the key, I need the key.
22   Q.   Just a couple things.  When did you first
23        observe that their parking spaces were not
24        being used?
```

```
 1   A.    I did not observe it firsthand, but my parking
 2         lot attendant, Teddy, told me that their
 3         parking spaces were not being used.
 4   Q.    When did Teddy tell you that he first
 5         observed --
 6   A.    I believe it was the end of January.  No, the
 7         end of December, but he said, Hey, maybe
 8         they're away for Christmas, maybe they're just
 9         taking some time off, then more so in the
10         beginning of January.
11   Q.    So at that point the fact that they weren't
12         using their parking spaces put you on a
13         heightened sense of alert that they had stopped
14         using it as a working environment?
15   A.    I guess.
16   Q.    Without guessing --
17   A.    Yeah.
18   Q.    That coupled with the fact that you didn't see
19         the lights on reinforced that they weren't
20         working there any longer?
21   A.    I started getting a lot more concerned around
22         then.
23   Q.    Fair to say that the lights were not observed
24         to be on as of the end of December as well?
```

```
 1              were unauthorized to go in there.  So we have

 2              requested this to be a secured premises.

 3   Q.         Did you ever make a formal demand upon the

 4              tenant for access to the premises to inspect it

 5              as you had a right under the lease?

 6   A.         Yeah.  I did inspect it on several occasions.

 7              I believe it was in the months of September and

 8              October.  I inspected it.  I inspected it on

 9              several occasions with regards to air

10              conditioning problems, electrical problems.

11   Q.         Those were problems the tenant called your

12              attention to and you came in to inspect them

13              and have them repaired?

14   A.         Yeah.  There was a question as to the

15              temperature setting for the air conditioning

16              units and stuff like that.  They wanted to know

17              how to turn on the thermostats or the

18              regulators.  They were actually turning the

19              wrong ones on.  I guess they had access to the

20              thermostats.  They weren't locked.

21                   So we showed them how to switch over from

22              the off position to the on position and

23              regulate it manually which they weren't doing.

24              In that space there was probably about 20
```

```
 1          thermostats.

 2   Q.    Prior to the loss and after these two

 3          inspections in September and October, did you

 4          ever have any other occasion to conduct an

 5          inspection of the premises?

 6   A.    No.

 7   Q.    Fair to say that as the financial ability of

 8          the Wilsons to pay became more well-known to

 9          you, and you've indicated you had very specific

10          issues with regard to their ability to pay for

11          the heat, whether they were keeping it above

12          freezing, what did you do in December and early

13          January to ensure that the premises were being

14          properly heated?

15   A.    I was watching -- we were watching the

16          temperature in the area, what the weather

17          forecasts were.  As it got colder, we stepped

18          up our inquiries as to when we were going to

19          get a key.

20   Q.    Anything else beyond that that you did to

21          ensure that the premises were heated properly?

22   A.    No.

23              MR. MURPHY:  I am going to make a formal

24          demand for the identity of the lawyer and the
```

```
 1              to find out is if you went to Attorney Frank
 2              because you were concerned and the reason you
 3              wanted to have this inspection was that you
 4              were concerned that Wilson wasn't paying the
 5              heating bills and that the property could fall
 6              into disrepair if you couldn't inspect it?
 7                   MR. REILLY:  Objection, instruct the
 8              witness not to answer.
 9                   MR. MURPHY:  On what basis?
10                   MR. REILLY:  I think that's a covert way
11              of getting into the subject of the
12              conversation.  I gave you the right to ask
13              whether he had a discussion on the subject of
14              access, and he's answered that.  When you start
15              to get into his state of mind as to why he's
16              seeking legal counsel, I think you're going
17              over the line, and I'm going to instruct him
18              not to answer.
19                   You have a right to know whether he
20              consulted with counsel on the subject.  You
21              have inquired there.  I don't think you have a
22              right to go further.
23    Q.        But you did have conversations with Mr. Newell
24              on this point when you asked Mr. Newell if the
```

```
 1            heat was on because you were concerned about
 2            the heat remaining above the freezing point?
 3   A.       Yes.
 4   Q.       Those conversations took place in November and
 5            December of 2003?
 6   A.       Hm-hm.  Yes.
 7   Q.       Did those conversations continue into
 8            January 2004?
 9   A.       I believe so.
10   Q.       Last question on your meeting with Attorney
11            Frank.  Do you recall when that meeting took
12            place?
13   A.       I believe it was at a Christmas party just
14            making social conversation.
15   Q.       So there was no formal attorney/client --
16   A.       I think it was a Christmas party in our
17            building, but I said to him --
18                 MR. REILLY:  No.
19   Q.       It would be fair to say you didn't have the
20            lease when you went to see him at the Christmas
21            party?
22   A.       I don't think so.
23                 (Luncheon recess taken.)
24
```

```
 1   A.    The father.

 2   Q.    So is it your understanding that there was an

 3         oral modification of the written lease?

 4   A.    I don't know whether it was an oral

 5         modification or a written modification.  I know

 6         that the gas bill was not in my name.  When I

 7         say in my name, Wood, in Wood Development.

 8   Q.    Are you aware of there being a writing which

 9         memorializes this modification of the lease?

10   A.    Yes.  I did see a letter that was addressed to

11         the Wilson Credit people by either the Karams

12         or First Bristol or one of the entities that

13         they control saying they were responsible for

14         the heat.

15   Q.    Do you know what the -- sorry.  Continue your

16         response.

17   A.    And that at the same time that letter asked for

18         them to transfer or to switch over the meter

19         into their name and to pay the back gas bill, I

20         guess, or heating bill.

21   Q.    Do you know when that document was prepared?

22   A.    No, I don't.

23   Q.    Do you know if that was before or after you

24         took over?
```

```
 1   A.   I believe it was before.

 2   Q.   Do you know if that document has been produced?

 3   A.   Yes, I believe so.

 4   Q.   It's your contention that that letter written

 5        by either First Bristol or Karam to Wilson

 6        Credit modified the terms of the lease?

 7   A.   I believe so because I think that if it didn't

 8        the gas bill would have stayed in the name of

 9        First Bristol.  They then went ahead and

10        switched it over to their name.

11   Q.   Do you know if that took place when you

12        purchased the building?

13   A.   I think it took place beforehand.  I'm not -- I

14        don't know when it took place.  I do know this,

15        it took place before I purchased the building

16        because I did not get a gas bill for that

17        location up until the time that there was a

18        problem.

19   Q.   This document was not signed by Wilson or

20        anyone on its behalf?

21   A.   I don't know.  The document was produced in the

22        form that I had it.  I don't recall whether it

23        was signed by them or not.

24   Q.   Fair enough.  I don't recall it off the top of
```

```
 1   A.     To the best of my knowledge, they were doing
 2          business right up until the date of loss.  They
 3          had activities going on.  They were receiving
 4          mail there.
 5   Q.     Let me redefine doing business.  We had chatted
 6          earlier about the fact that their parking
 7          spaces were not being used and that the lights
 8          weren't being used which led you and
 9          Mr. Freitas to conclude that they were not
10          working in the space.
11               For what period of time did you conclude
12          that they were not working in the space prior
13          to the date of loss?
14   A.     The end of December.
15   Q.     Can you be any more specific than that?
16   A.     I'd probably say it was somewhere around
17          Christmas, just before Christmas.
18   Q.     Are you sure they were working in the month of
19          December in that building?
20   A.     We saw activity.
21   Q.     What sort of activity did you see in December
22          prior to --
23   A.     People coming and going.
24   Q.     Sir, you had indicated that you saw a letter
```

```
 1   Q.    R-E-G-O?

 2   A.    R-E-G-O, yeah.

 3   Q.    They wouldn't let you even go look to make sure

 4         the heating system was still working?

 5   A.    We asked for a key, but they didn't give us

 6         one.

 7   Q.    Did you ask them to let you go in with them or

 8         somebody on their behalf beside you so you

 9         could check to see if the heating system was

10         working?

11   A.    I think the closest we came was going to the

12         head of the stairs, and there were bottles that

13         were piled yea high and we heard motors running

14         and we felt heat, so we assumed that the heat

15         was running.

16   Q.    When you say the top of the stairs, you're on

17         the second floor?

18   A.    No.  We're on the first floor.

19   Q.    I thought you told me the stairs between the

20         first floor and second floor were filled with

21         beer and wine?

22   A.    We actually went to where the beer and wine

23         were all stored.  I actually can show you like

24         a little diagram.
```

```
 1              permission and key of the restaurant owner, is

 2              that fair?

 3    A.        Correct.

 4    Q.        But going back --

 5    A.        The restaurant owners were not there all the

 6              time.

 7    Q.        The area where you were standing was on this,

 8              essentially where the X is on this diagram when

 9              you said you heard the motors running?

10    A.        Correct.

11    Q.        That would have been through this locked door

12              at the top of the stairs, the locked door into

13              the anteroom, and the locked door into the

14              utility room away?

15    A.        Right.

16    Q.        Is that the only time that you checked to see

17              if the utilities were working?

18    A.        Yeah.

19    Q.        On what date did that occur to the best of your

20              knowledge?

21    A.        I would say once in October, once in November,

22              and once in December.

23    Q.        I'm sorry.  I thought you told me you had only

24              done it once?
```

```
 1    A.    No.  I had done it more than once.

 2    Q.    When in December did you do that?

 3    A.    I would probably say middle of December.

 4    Q.    It was by the end of December that you were

 5          getting really concerned about the nonpayment

 6          of rent and the heat being turned off?

 7    A.    It was starting to get colder.

 8    Q.    How come you didn't do anything at the end of

 9          December to go down and make sure that the

10          utilities were working?

11    A.    I was just under the assumption that they were.

12    Q.    Did you ever call the utilities to make sure

13          that monies were being paid in a timely fashion

14          to ensure that heat was still being provided to

15          the facility?

16    A.    Yes, but after the fact.  After the fact I

17          called them and asked them for certain

18          information, and they said that was not -- they

19          couldn't divulge that information.  They told

20          me if it was the subject matter of a lawsuit

21          that they would be able to divulge it if they

22          were subpoenaed.

23    Q.    No. 1, you never called them to make sure the

24          gas was still on prior to the date of loss?
```

1          lease?

2    A.    As far as I know, yeah.

3    Q.    So that wouldn't be a change in the conditions

4          of the lease?

5    A.    I asked for clarification with regards to that

6          particular paragraph of the lease, and I said

7          -- because I went over every single lease.  I

8          said I'm being told on a spreadsheet that the

9          tenant is responsible for the electricity and

10         for the gas, and on the lease when I reviewed

11         the lease in depth and started doing my due

12         diligence that was one of the issues that came

13         up, and any concerns that I had were basically

14         put at ease by my communications with them and

15         them telling me that I don't have to worry

16         about that because the gas is in the name of

17         the tenant.

18   Q.    I'm still not understanding what you were

19         worried about.

20   A.    What I was worried about was when I did my due

21         diligence, when I actually started getting into

22         the numbers making a determination as to

23         whether this property purchase made sense

24         financially and reviewed each lease and each

```
 1              aspect of the lease that concerned me, I put

 2              yellow tags on them like you're doing and I had

 3              some questions, and we sat down and we reviewed

 4              all the questions, and they said the lease --

 5              the gas is in the name of the tenant.

 6     Q.       So you knew from the beginning that the tenant

 7              was responsible for the payment of the gas and

 8              electric?

 9     A.       Absolutely.

10     Q.       The only thing this does is switch whose name

11              it's in?

12     A.       Correct.

13     Q.       Was that an important thing for you, as to

14              whose name it was in?

15     A.       No.

16     Q.       You produced a number of telephone bills, and I

17              noted that some of the telephone bills have

18              highlights in them either to Lawrence or

19              Burlington.  Do you know what those are

20              intended to reflect?

21     A.       Yeah.  Those would have been phone calls that

22              were made to the Schreiber & Associates

23              organization.

24     Q.       Do you know which telephone number is theirs?
```

```
 1              It's basically Lowell, Danvers, Lawrence, and
 2         Burlington.
 3    A.   They had various numbers.  If you -- let me
 4         think about that.  I may be able to shed some
 5         light on that.
 6              (There was a discussion off the record.)
 7    A.   These phone numbers are -- the 722-2800, that's
 8         the main switchboard at Schreiber & Associates.
 9         There are some other sub-numbers here which are
10         either cell phone numbers that belong to the
11         Schreiber people or their direct phone numbers,
12         and over the course of a period of time I have
13         obtained a various log of phone numbers, and we
14         would just dial through them one after another.
15    Q.   All of these phone records that are marked from
16         Verizon that have highlighted numbers are all
17         telephone calls that were made to one or more
18         of the Schreibers or their affiliated agents,
19         for instance, Mr. Keith -- whatever his name
20         was?
21    A.   Keith Newell.
22    Q.   Is that correct?
23    A.   Yeah.  There are also some cell phone numbers
24         that may be in there as well.
```

```
 1  Q.    When you went through these, you attempted to
 2        highlight all the numbers that were made to
 3        those folks?
 4  A.    Yes.  And we also had in some instances some
 5        home phone numbers.
 6  Q.    So, for instance, this shows that you made
 7        phone calls on December 4th, December 11th,
 8        December 15th, three calls on the 18th, and one
 9        on the 22nd, two on the 15th, one on the 5th,
10        is that correct?
11  A.    More or less.
12  Q.    So December was a very active month for making
13        calls?
14  A.    Yeah.  I may have also made phone calls from my
15        cell phone.  We've had a difficult time in
16        obtaining those records.
17  Q.    So there were more numbers than what are
18        reflected here?
19  A.    At that period of time I think my cell phone
20        bill was in my wife's name.
21  Q.    Looks like you had two phone calls on January
22        8th as well which is the day before this loss
23        occurred?
24  A.    Yes.
```

```
 1   Q.   Why did you have two phone calls on the 8th?

 2   A.   To say you promised me the key and I have not

 3        gotten it yet.  He told me, if I spoke to him,

 4        it was in the mail and I should be getting it

 5        shortly.

 6   Q.   When did you get it?

 7   A.   I believe I got it on the 9th.

 8   Q.   Did you really?

 9   A.   Yeah.

10   Q.   Did you have any information as to when the

11        loss actually occurred if you discovered it on

12        the 9th?

13   A.   When we discovered it, it was on the 9th.

14   Q.   Is it your belief based on the damage you saw

15        that it happened on or about the 9th?

16   A.   No.

17   Q.   What's your belief?

18   A.   I believe that it happened before that.

19   Q.   Do you have any information as to how much

20        before the 9th?

21   A.   It would be purely speculative, I think, on my

22        part, but I will tell you that based upon the

23        first water bill that came in after this water

24        damage the water bill had jumped from on an
```

```
 1            e-mail from you apparently to Keith Newell when
 2            the loss occurred.  The second one is a fax
 3            cover sheet from Jaimie to you.
 4   A.       The question?
 5   Q.       Was Jaimie involved in the resolution of this
 6            loss?  I see it's a January 9, '04, e-mail
 7            faxed to you which says, I tried to get Wilson
 8            Credit heat checked, but no gas or electric to
 9            supply something in heaters.  Need these turned
10            on ASAP, and call Miller at Air Master or
11            Sardinha.  What was his involvement?  Why did
12            he get involved?
13   A.       When the mail came on that Friday morning and I
14            opened up the key, I called Jaimie and said, I
15            have a key, and I said, I'm going to have a
16            couple of copies made and I'll give you a copy.
17            He said, Great.
18                 So I left the key and -- I went and had
19            keys made, and I left the key for him in the
20            office.  He said he was going to go over there
21            and check it.  I don't recall exactly what time
22            of day, but I was on my way to another
23            property, and I got a call from either my
24            secretary or from my maintenance man saying
```

```
 1          that I better get back.
 2  Q.      Do you remember what time of day that was?
 3  A.      It was in the early afternoon.
 4  Q.      Jaimie was the one who went over and discovered
 5          it?
 6  A.      Jaimie was the one who went over and discovered
 7          it and immediately called my maintenance -- or
 8          called the office and my maintenance man went
 9          over there, and they went through the space
10          together.
11  Q.      Why would Jaimie be the person to come over
12          your place, pick up the key and go over and
13          inspect the place?
14  A.      That was part of his -- I don't know.  I don't
15          know.  I think he went over there with -- the
16          way I think it worked out is he went over with
17          my guy Gary, and they went over there together.
18          I don't know what the logistics were.
19  Q.      Why did you call Jaimie as soon as you got the
20          key?  Was this a pre-existing plan?
21  A.      Oh, yeah, no, because we had been talking to --
22          I had been talking to him about the fact that I
23          kept on requesting the key and that I was
24          waiting to get it, and he said, Well, call me
```

1          landlord to --

2    A.    Gain access to the premises.

3    Q.    -- upon reasonable advanced notice to gain

4          access to inspect it to ensure that the

5          property is safe?

6    A.    Right.  And the conversations that I've had

7          with the Schreiber organization and Keith

8          Newell and everyone else there is, Have your

9          guy come down there; I'll have him walk me

10          through the premises; I just want to make sure

11          everything is fine.

12              They kept on assuring me that everything

13          was fine and that they were there on a regular

14          basis and there were no problems.

15    Q.    We'll put that to one side.  All I'm talking

16          about is the terms of the lease.  It's a fair

17          statement that you understood that pursuant to

18          Paragraph 17.2 of the lease you could gain

19          access to the premises on your own to ensure

20          that it was being maintained in a reasonably

21          safe condition?

22    A.    Correct.

23    Q.    You didn't do it because you didn't have the

24          key?

```
 1   A.   Correct.

 2   Q.   It would have cost you the cost of a locksmith

 3        to gain access to the property, is that

 4        correct?

 5   A.   Correct.

 6   Q.   That's the only thing that kept you from

 7        gaining access to it?

 8   A.   No.

 9   Q.   What else kept you from gaining access to it?

10   A.   The tenant basically telling me or

11        representative of the tenant telling me that we

12        couldn't have access because of the security

13        issues to the stuff that was in the premises.

14   Q.   That was not in the lease?

15   A.   Not that I know of, no.

16   Q.   As far as at least the lease is concerned, you

17        understood that you had the right to gain

18        access to the premises for reasonable

19        inspection of the premises?

20   A.   Yes.

21   Q.   Did Jaimie have any further involvement other

22        than going over on January 9th to inspect the

23        premises beyond what you've told me?

24   A.   Afterwards?
```

1          they assign the lease from one party to another

2          they're still responsible or they're going to

3          be responsible for the rent, and they said that

4          they would be responsible for the rent and that

5          I shouldn't worry about it and the rent will be

6          paid.

7     Q.   Have you ever seen a document of this form that

8          contained a signature by or on behalf of one of

9          the Schreibers or their affiliated entities

10         where it says Consolidation USA, Inc.?

11    A.   I don't understand that question.  You mean

12         where they signed it?

13    Q.   Correct.

14    A.   That's not signed by them?

15    Q.   It is not.

16    A.   I do not know whether I have seen one.  There

17         may be one.  No.

18    Q.   I show you the second page at Exhibit A which

19         is your lease, three pages of text, and a

20         signature page signed by it looks to be Patrick

21         Wilson, member of Wilson Credit.  This appears

22         to be stapled to the copy of the lease.  Do you

23         know if this was transmitted with some

24         transmittal letter by somebody to either

# EXHIBIT B

1          UNITED STATES OF AMERICA

2          DISTRICT OF MASSACHUSETTS

3              C. A. No. 04-12590DPW

4

5     **WOOD DEVELOPMENT, LLP,**

6          Plaintiff

7     VS.

8     **PHILADELPHIA INDEMNITY**

9     **INSURANCE CO.,**

10         Defendant

11

12         DEPOSITION OF: **JAMES M. KARAM**

13         Murphy & Riley, P.C.

14         141 Tremont Street

15         Boston, MA 02111

16         Tuesday, November 29, 2005

17         10:00 A.M.

18

19

20

21

22

23     **FEDERAL COURT REPORTERS (978)535-8333**

24         **THOMAS J. HOUTON, COURT REPORTER**

18

1          Q.    Were you ever involved in any

2    lawsuits or collection proceedings against

3    Wilson Credit?

4          A.    No.

5          Q.    Did Wilson Credit or any of their

6    related entities rent any other properties

7    from you?

8          A.    No.

9          Q.    Or did they?

10         A.    No.

11         Q.    Do you know why Wilson Credit was

12   required to have a guarantor for the lease?

13         A.    The reason we did that was because we

14   invested a considerable sum of money into the

15   space and we wanted some type of guarantee

16   that they you know, would get up and running

17   and usually tenants coming in with the first

18   year is usually I would think was usually

19   their hardest for a lot of expenses and

20   overhead.

21         Q.    Did you do any background check as

22   far as their financial stability?

23         A.    Consolidated, the guarantor sent us

24   the financial statement.  I think they sent us

39

1      time before you sold the property to Wood

2      Development?

3           A.   No.

4           Q.   Did you ever tell Mr. Wood anything

5      to the effect Wilson Credit was in financial

6      trouble or had financial problems?

7           A.   No.

8           Q.   Were you aware of any information

9      that lead you to believe prior to selling the

10     property to Wood Development that Wilson

11     Credit was in financial trouble?

12          A.   No.

13          Q.   Insofar as you remember understanding

14     that this Exhibit 2 says that you have got a

15     CC, did you in fact get a CC?

16          A.   I did not, no.

17               MR. REILLY: Can we mark the next

18     two Exhibits?

19

20               (Exhibits 6 and 7 marked)

21

22          Q.   I show you what has been marked as

23     Exhibit 7, the letter of January 30, 2003 to

24     Jeffrey Schreiber to you.  Have you seen that

40

1     letter prior to today?

2        A.   Yes.

3        Q.   Do you remember sending that letter

4     to Mr. Schreiber?

5        A.   Yes.

6        Q.   Would it be fair to say in that

7     letter you're requesting Mr. Schreiber to

8     transfer the gas service into the name of

9     Wilson Credit?

10       A.   Yes, he transferred one, and this is

11    the transfer to the second.

12       Q.   The practice was pursuant to the

13    lease that the gas meters would be in the name

14    of the tenant, correct?

15       A.   Yes, and we provided the physical

16    components, and they would provide the, pay

17    for it.

18       Q.   Was it the practice that the bills

19    would go directly to the tenant, is that fair?

20       A.   Yes.

21       Q.   Did you, when you owned the property,

22    did you ever check to make sure that the bills

23    were being paid?

24       A.   No.

41

1          Q.    I'm showing you what has been marked

2     as Exhibit #6 which is the letter of February

3     4, 2003 from you to Brandon Wilson, is that a

4     letter that you sent to Brandon Wilson?

5          A.    Yes.

6          Q.    In that letter did you inform him

7     that you had switched the gas out of your name

8     Bristol, First Bristol Corporation and into

9     the name of Wilson Credit?

10         A.    Yes.

11         Q.    When Bristol sold the property to

12    Wood Development, did you inform Wood

13    Development that the gas bills went to Wilson

14    Credit?

15         A.    Yes.

16         Q.    And did you tell Wood Development

17    that there had been any concern or problem

18    with Wilson Credit paying the gas bills?

19         A.    No.

20         Q.    Were you aware of any reason that

21    made you concerned or had any doubts that

22    Wilson Credit was paying the gas bills in a

23    timely manner?

24         A.    We thought they were being paid.





# FIRST BRISTOL CORPORATION

February 4, 2003

Mr. Brandon Wilson
Wilson Credit Services
25 North Main Street
Fall River, MA 02720

EXHIBIT
#6 +)
1-29-03 14

RE:   Wilson Credit Services
      New England Gas Bills

Dear Brandon:

Last week I sent Jeff Schreiber a letter expressing my concern that the gas has not yet been switched over to your company's name. I have not heard from him, so I am assuming he is out of town. We have switched the gas out of our name and you need to call before Friday, February 7, in order to avoid any interruption in service. Please note that you owe us for past due bills, totaling $3,009.65 due to First Bristol Corporation.

The phone number for New England Gas is 508-675-7811 and they are expecting your call to switch over meter# 15348 for your boiler and meter# 96394 for your hot water.

If you have any questions or would like me to show you the meters and their location, please do not hesitate to call.

Sincerely,

James M. Karam
Development Director

JMK/kmb

Enclosure

- An Affiliate of J. Karam Mgt., Inc. -
~~~ M~~~~~ Pl~~~ P.O. Box 2516, Fall River, MA 02722 • (508) 679-1180 • Fax (508) 677-4940



# FIRST BRISTOL CORPORATION

January 30, 2003

Mr. Jeffrey A. Schreiber
Schreiber & Associates, P.C.
99 Rosewood Drive
PO BOX 210
Danvers, MA 01923

**RE:     Gas Billing**
**North Main Street**
**Fall River, MA**

Dear Jeff:

It has come to my attention that Wilson Credit Services has not switched over the gas meter to be billed directly for heat at the Fall River office.

As per your lease, you are responsible for cost of heat for your 12,000 sq. ft. space. Enclosed are bills from New England Gas totaling $3,009.65 from June 2002 through January 22, 2003. I also need you to switch this meter over to your name, as soon as possible. The New England Gas Company can be reached at 508-675-7811 and the meter# is 15348. Please note this is a separate meter than meter# 96304, which should already be in your name and is used for the hot water only.

Please call me when you receive this letter if you have any questions or would like me to show you the meter and boiler for your subject space. Thank you very much for your assistance in this matter.

Sincerely,

James M. Karam
Development Director

Enclosure

- An Affiliate of J. Karam Mgt., Inc. -
222 Milliken Place, P.O. Box 2516, Fall River, MA 02722 • (508) 679-1180 • Fax (508) 677-4940

# EXHIBIT C

UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

C.A. No. 04-12590DPW

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

WOOD DEVELOPMENT, LLP,
        Plaintiff

vs.

PHILADELPHIA INDEMNITY
INSURANCE CO.,
        Defendant

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF SUZANNE SCHREIBER, a

witness called by counsel for the Defendant,

taken pursuant to the applicable provisions of

the Federal Rules of Civil Procedure, before

Joann Denning, a Shorthand Reporter and Notary

Public in and for the Commonwealth of

Massachusetts, at the offices of Murphy &

Riley, P.C., 141 Tremont Street, Boston,

Massachusetts, on Tuesday, January 17, 2006,

commencing at 10:04 a.m.



```
 1            during the conversation.
 2    Q.    What was your response to their inquiries about
 3            payment?
 4    A.    If we had to loan Wilson Consolidated Services
 5            money for the lease, we paid it.
 6    Q.    Could you say that again?
 7    A.    If we had to loan money to Wilson Consolidated,
 8            then we would loan them the money to pay the
 9            lease.
10    Q.    What was their response to that?
11    A.    Wood Development?
12    Q.    Yes.
13    A.    They were happy that somebody was paying the
14            lease.
15    Q.    Was that, in fact, done?  Was a loan made to
16            pay the lease?
17    A.    I loaned money to Wilson Consolidated Services
18            in order to pay the lease.
19    Q.    That was after this discussion with Wood
20            Development?
21    A.    I can't recall if it was after or before.  I
22            don't know.
23    Q.    Did Wood Development discuss with you extension
24            of the guaranty of the lease?
```